IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| E.T. by and through her parents and and next friends, et al. | § § § | |
| *Plaintiffs,* | § § § | |
| v. | § § § | Civil Action No. 1:21-cv-00717-LY |
| Governor Greg Abbott, in his official Capacity as Governor of Texas; Mike Morath, in his official capacity as the Commissioner of the Texas Education Agency; the Texas Education Agency; and Attorney General Ken Paxton, in is official capacity as Attorney General of Texas, | § § § § § § § § § | |
| *Defendants.* | § § | |

---

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER**

---

### INTRODUCTION

Plaintiffs, 14 Texas-based children with disabilities, are suing to enjoin two COVID-19-related orders: Governor Abbott's Executive Order GA-38 ("GA-38") and the Texas Education Agency ("TEA")'s August 5, 2021 Guidance ("August 5th Guidance," collectively, the "Challenged Orders"). They complain that the Challenged Orders—which require nothing of Plaintiffs themselves—stop local officials from mandating the wearing of facemasks.

Plaintiffs' claims suffer from numerous jurisdictional defects, with standing being the most glaring. Plaintiffs cite the risk of a COVID-19 infection as their jurisdictional hook. However, this injury is speculative as it turns on: (1) how their school districts will react if the Challenged Orders are enjoined; (2) how students in those districts will react to a mask mandate; (3) who would contract COVID-19 in a district that mandated masks, as opposed to one that just encouraged masks; (4)

1

whether Plaintiffs would contract COVID-19 themselves and from whom; (5) the severity of Plaintiffs' infection (asymptomatic, mild, severe, etc.) and the reasons for those reactions; and (6) various other contingencies. Plaintiffs will need to show that each contingency underlying their injuries is certainly impending to obtain standing, which they did not and realistically cannot do. What's more, due to traceability and generalized grievance issues, Plaintiffs must connect their future COVID-19 infections to both the Challenged Orders *and* their disabilities.

If Plaintiffs could somehow overcome the "certainly impending" jurisdictional hurdle, they would then need to convince this Court to ignore 120 years of caselaw requiring an enforcement connection between the defendants sued and the statutes challenged. Yet numerous Fifth Circuit and Supreme Court decisions confirm that Plaintiffs sued the wrong defendants here and that they lack standing for various other reasons.

Plaintiffs': (1) claims should be dismissed for lack of standing and on sovereign immunity grounds under Fed. R. Civ. P. 12(b)(1); (2) claims should be dismissed as inadequately pled under Fed. R. Civ. P. 12(b)(6); and (3) request for a temporary restraining order and preliminary injunction should be denied, most notably because Plaintiffs are not likely to succeed on their meritless claims.[1]

## BACKGROUND

### I.      The Texas Disaster Act, GA-38, and the August 5th Guidance.

This case centers on Governor Abbott's GA-38 and the TEA's August 5th Guidance.

**GA-38:** GA-38 is one of many executive orders Governor Abbott issued in response to the COVID-19 pandemic. This order is authorized by the Texas Disaster Act ("TDA"), the State's

---

[1] As the issues overlap, Defendants will file their response to Plaintiffs' motion for a temporary restraining order separately from their motion to dismiss. These two filings are substantively identical. The purpose of filing two separate pleadings is to avoid having the filings rejected by PACER if we combined them in one brief.

comprehensive set of statutes allocating powers and responsibilities during a disaster.[2] The TDA makes the Governor "responsible for meeting . . . the dangers to the state and people presented by disasters."[3] The TDA gives the Governor a broad array of powers allowing him to fulfill this responsibility.[4] Among other relevant provisions, Tex. Gov't Code § 418.012 gives the Governor the power to issue executive orders carrying "the force and effect of law."[5] The Texas Supreme Court has interpreted the TDA to allow the Governor to issue orders aimed at a variety of concerns, such as "encouraging economic recovery, preserving constitutional rights, or promoting ballot integrity."[6] The scope of the Governor's emergency powers is not at issue here.

Governor Abbott issued GA-38 on July 29, 2021.[7] This order seeks to create a uniform response to the COVID-19 pandemic, one that gives individuals the autonomy to make personal health decisions free from government control.[8] GA-38 bans most state and local officials from mandating the wearing of face masks and preempts any conflicting local orders on this issue.[9] GA-38 "strongly encourages" people to wear masks[10] but ultimately gives individuals the freedom to choose whether or not to wear a mask.[11]

A local official or entity who imposes a mask mandate in violation of GA-38 is subject to a fine of up to $1,000.[12] Other than local officials, individuals cannot be punished under this section.[13]

---

[2] *See* Tex. Gov't Code §§ 418.001 *et seq.*
[3] *Id.* at § 418.011.
[4] *Id.* at §§ 418.011–.026.
[5] *Id.* at § 418.012.
[6] *Abbott v. Anti-Defamation League Austin, Sw., & Texoma Regions*, 610 S.W.3d 911, 918 (Tex. 2020).
[7] Ex. D. A copy of GA-38 is publicly available at the following website: https://gov.texas.gov/uploads/files/press/EO-GA-38_continued_response_to_the_COVID-19_disaster_IMAGE_07-29-2021.pdf (last visited September 12, 2021)
[8] *Id.* at 1.
[9] *Id.* at 3–5.
[10] *Id.* at 1.
[11] *Id.* at 3.
[12] *Id.* at 4–5.
[13] *See id.*

The ban on local mask mandates first appeared in GA-34, which was issued on March 2, 2021 and then again was expressly carried forward in GA-36, which was issued on May 18, 2021.[14]

    **The August 5th Guidance:** It is important to note at the outset that the August 5th Guidance related to various issues affecting schools due to COVID-19 has been superseded twice and is no longer in effect or enforceable. The portion of the August 5th Guidance Plaintiffs assert as relevant, although no longer in effect, merely reiterates the requirements of GA-38:

> Per GA-38, school systems cannot require students or staff to wear a mask. GA-38 addressed government-mandated face coverings in response to the COVID-19 pandemic. Other authority to require protective equipment, including masks, in an employment setting is not necessarily affected by GA-38.
>
> School systems must allow individuals to wear a mask if they choose to do so.[15]

The August 5th Guidance does not specify how it will be enforced or who will enforce it.[16] The TEA and Commissioner Morath (the "TEA Defendants") never enforced or threatened to enforce the August 5th Guidance's mask provisions against anyone.[17] TEA Guidances like this are aimed at school districts, not individual students.[18] TEA Defendants have never enforced a Guidance against an individual student.[19]

    The August 5th Guidance was superseded two weeks later when TEA issued a revised guidance (the "August 19th Guidance") that "replac[ed] all prior guidances."[20] Relevant here, the August 19th Guidance's mask provision stated as follows: "Please note, mask provisions of GA-38 are not being enforced as the result of ongoing litigation. Further guidance will be made available after

---

[14] Ex. E at 2. A copy of GA-36 is publicly available at the following website: https://lrl.texas.gov/scanned/govdocs/Greg%20Abbott/2021/GA-36.pdf (last visited September 12, 2021).
[15] *Id.* at 1.
[16] *See id.*
[17] Declaration of Megan Aghazadian ("Aghazadian Decl.") at ¶ 8.
[18] Aghazadian Decl. at ¶ 9.
[19] *Id.*
[20] Ex. B at 1.

the court issues are resolved."[21] The August 19th Guidance did not specify who would be enforcing GA-38's mask provisions absent ongoing litigation.[22]

The August 19th Guidance was superseded on September 2, 2021 (the "September 2nd Guidance").[23] Like its predecessor, the September 2nd Guidance also states that "[the] mask provisions of GA-38 are not being enforced as the result of ongoing litigation" due to "court issues" regarding GA-38.[24] It notes that TEA will issue a further guidance regarding face masks after pending court issues are resolved.[25] It is unclear when these pending court issues will be resolved, when the TEA will release a revised guidance, or what that future guidance will say on the matter of masks in schools.[26] TEA Defendants cannot enforce the August 5th Guidance as this guidance is no longer in effect.[27]

## II.    An Overview of Plaintiffs' Claims.

Plaintiffs are 14 young Texas-based students who all claim to be disabled,[28] and at "an increased risk of serious complications or death" from COVID-19 due to their disabilities.[29] Plaintiffs challenge GA-38's ban on mask mandates and the related portion of the superseded August 5th Guidance referencing GA-38's position on mask mandates.[30] Plaintiffs do not allege that these Challenged Orders were ever enforced against them or explain how they could ever be in the future.[31]

Plaintiffs claim the Challenged Orders: (1) violate the Americans with Disabilities Act ("ADA"); (2) violate Section 505 of the Rehabilitation Act ("Section 504"); and (3) are preempted by

---

[21] *Id.*
[22] *See id.*
[23] Ex. C at 1.
[24] *Id.*
[25] *Id.*
[26] Aghazadian Decl. at ¶ 10.
[27] *Id.* at ¶ 11.
[28] ECF 21 ("Am. Compl.") at ¶¶ 2, 14–27.
[29] *Id.* at ¶ 2.
[30] *Id.* at ¶ 2; ECF 21-2.
[31] *See generally* Am. Compl.

the American Rescue Plan Act of 2021 ("ARPA Act").[32] Plaintiffs seek to enjoin Defendants from enforcing the Challenged Orders as well as declaratory relief against them as a group.[33] These claims rest on Plaintiffs' conclusory assertions that the Challenged Orders will increase the spread of COVID-19 in schools, resulting in Plaintiffs either (1) becoming infected with COVID-19 if they attend school in-person or (2) being forced to stay home to avoid contracting COVID-19.[34] However, absent from Plaintiffs' pleading is any allegation that they have been or are currently unable to attend school in person due to the Challenged Orders.[35] This is a curious omission given that Plaintiffs' entire case turns on their alleged inability to attend in-person classes.[36] Plaintiffs do not allege they, or anyone else for that matter, has contracted COVID-19 due to the Challenged Orders.[37]

Plaintiffs do not identify which, if any, of the particular schools they attend currently have mask mandates in place.[38] Digging a bit deeper reveals that six of their districts have mask mandates in place despite the Challenged Orders.[39] As Plaintiffs ignore this issue, they do not explain why these six districts imposed mask mandates or why the eight other districts did not impose mask mandates.[40]

Plaintiffs spend numerous pages detailing Attorney General Paxton's "Enforcement Campaign" regarding GA-38,[41] which refers to his efforts to stop local officials from violating a state law.[42] Plaintiffs do not allege that Attorney General Paxton ever threatened to sue them, or anyone

---

[32] *Id.* at ¶¶ 1–3, 7, 32, 77–99.

[33] *Id.* at pgs. 44–45 (Prayer for Relief).

[34] *See* Am. Compl. at ¶¶ 52–55, 63–76.

[35] *See id.* at ¶¶ 63–76.

[36] *See id.* at ¶¶ 32–38; *see also* ECF 7 at 7 (noting that Plaintiffs' schools will resume in-person classes by August 23, 2021, at the latest).

[37] *See id.*

[38] *See id.*

[39] *Compare id.* at ¶¶ 63–76, *with COVID-19: List of Government Entities Unlawfully Imposing Mask Mandates*, ATTORNEY GENERAL OF TEXAS, https://www.texasattorneygeneral.gov/covid-governmental-entity-compliance (Sept. 8, 2021, 9:24 a.m.). The six schools that have imposed mask mandates are: (1) Round Rock Independent School District; (2) Edgewood Independent School District; (3) San Antonio Independent School District; (4) IDEA Public Schools School District; (5) Leander Independent School District; and (6) Richardson Independent School District.

[40] *See* Am. Compl. at ¶¶ 63–76.

[41] *See, e.g., id.* at ¶¶ 56–61 (bold omitted).

[42] *See* Tex. Gov't Code § 418.012 (giving the Governor's emergency orders the force and effect of law).

closely associated with them, for violating GA-38.[43] Indeed, such a suit would be impossible as GA-38 regulates the conduct of public officials and entities, not individuals.[44] Plaintiffs do not allege that Governor Abbott or TEA Defendants ever enforced or threatened to enforce GA-38.[45]

### LEGAL STANDARDS APPLICABLE TO DEFENDANTS' MOTION TO DISMISS

A motion to dismiss under FED. R. CIV. P. 12(b)(6) turns on whether the plaintiff pled a "plausible" (as opposed to just a "possible") claim for relief—*i.e.*, whether the plaintiff pled "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[46] If "a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"[47] On such a motion, the court can rely on: (1) the complaint; (2) the complaint's attachments; (3) a defendant's attachments that were referenced in the complaint and central to the plaintiff's claim; and (4) matters on which a court may take judicial notice.[48]

Justiciability issues such as standing and sovereign immunity go to the court's jurisdiction over the dispute and thus are subject to a FED. R. CIV. P. 12(b)(1) motion to dismiss.[49] In addition to relying on the items addressed above, on a Rule 12(b)(1) motion to dismiss the court can also weigh the evidence and resolve disputed facts to ensure that it has power over the case.[50] Plaintiffs, "as the parties asserting federal subject-matter jurisdiction, bear the burden of proving that its requirements are met."[51]

---

[43] *See id.*

[44] *See* Ex. D.

[45] *See generally* Am. Compl.

[46] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[47] *Id.* (quotations omitted) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).

[48] *See, e.g., Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008); *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000).

[49] *See, e.g., Block v. Texas Bd. of Law Examiners*, 952 F.3d 613, 616–17 (5th Cir. 2020); *Moore v. Bryant*, 853 F.3d 245, 248–49 (5th Cir. 2017).

[50] *Barrera-Montenegro v. U.S. & Drug Enf't Admin.*, 74 F.3d 657, 659 (5th Cir. 1996); *MDPhysicians & Assoc., Inc. v. State Bd. of Ins.*, 957 F.2d 178, 181 (5th Cir. 1992).

[51] *Willoughby v. U.S. ex rel. U.S. Dep't of the Army*, 730 F.3d 476, 479 (5th Cir. 2013).

<u>RULE 12(b)(1) ARGUMENTS</u>

## I.     Plaintiffs Lack Standing to Bring this Suit.

Plaintiffs' claim to standing is foreclosed by multiple Supreme Court and Fifth Circuit decisions. Plaintiffs' alleged injuries—being unable to safely return to school due to the Challenged Orders—are too remote and speculative to confer standing. And their injuries are not redressable by a favorable decision in this suit, largely because Plaintiffs did not sue the officials with proper enforcement authority.

Plaintiffs' prior brief tries to confuse the standing issue.[52] Thus, we will first clarify the nature of Plaintiffs' injury, explaining that Plaintiffs must meet the test applicable to "imminent" injuries. We will then explain that Plaintiffs need to sue an official or entity with enforcement authority over the Challenged Orders. Finally, we will analyze standing issues particular to each Defendant and note the various binding cases that foreclose Plaintiffs' claim to standing.

### A.     Plaintiffs' Must Satisfy the Test for "Imminent" Injuries.

An injury can either be "actual" or "imminent" for standing purposes.[53] An imminent injury is subject to a more stringent standing test.[54] To be legally cognizable, the threatened injury must be "certainly impending"; "allegations of *possible* future injury are not sufficient."[55]

Plaintiffs seek only equitable relief in this suit.[56] Under Fifth Circuit and Supreme Court precedent, requests for equitable relief implicate the standing test for "imminent" injuries.[57] This

---

[52] *See generally* ECF 26.

[53] *See, e.g., Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 409 (2013) (hereinafter "*Amnesty International*").

[54] *See id.*

[55] *Id.* (brackets and quotations omitted).

[56] *See* Am. Compl. at pgs. 44–45 (Prayer for Relief).

[57] *See, e.g., Stringer v. Whitley*, 942 F.3d 715, 721 (5th Cir. 2019); ("[P]laintiffs seeking injunctive relief must show a continuing or threatened future injury to themselves."); *Deutsch v. Annis Enterprises, Inc.*, 882 F.3d 169, 173 (5th Cir. 2018) (noting that the "standing requirements for equitable relief" require the plaintiff to "show that 'there is a real and immediate threat of repeated injury'") (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)); *Machete Productions, L.L.C. v. Page*, 809 F.3d 281, 288 (5th Cir. 2015) ("In the context of prospective injunctive and declaratory relief, past exposure to illegal conduct,

means Plaintiffs must show a "substantial risk that they will suffer the potential future injury absent the requested relief."[58]

This conclusion is also justified by the nature of Plaintiffs' alleged injuries. Plaintiffs claim the Challenged Orders will increase the spread of COVID-19 in schools, which will result in Plaintiffs either (1) becoming infected with COVID-19 if they attend school in-person or (2) being forced to stay home to avoid getting COVID-19.[59] Fearing a future COVID-19 infection is a forward-looking injury for obvious reasons.[60] And staying home from school (whether now or in the future) due to fear of a future COVID-19 infection also qualifies as forward-looking injury since: "[Plaintiffs] cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending."[61]

In sum, Plaintiffs' alleged injuries are subject to the stricter standing test applicable to "imminent" injuries. As shown below, Plaintiffs lack standing as they have not, and realistically cannot, meet this test.

### B.     Plaintiffs did Not Plausibly Alleged a "Certainly Impending" Injury Fairly Traceable to the Challenged Orders.

In *Glass v. Paxton*, the Fifth Circuit set forth a two-step test for analyzing whether an injury is too speculative to confer standing. First, identify the core injury at issue.[62] If the injury is self-inflicted (like self-censorship or, here, staying home from school), the focus is on "the catalyst" for that self-

---

by itself, does not evince a present case or controversy and thus cannot establish standing.") (citing *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974)).

[58] *Stringer*, 942 F.3d at 721. The "substantial risk" standard is likely synonymous with—or at least not meaningfully distinguishable from—the "certainly impending" standard. *See Amnesty International*, 568 U.S. at 414 n.5).

[59] *See* Am. Compl. at ¶¶ 52–55, 63–76.

[60] *See Amnesty International*, 568 U.S. at 409 ("[W]e have repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient.") (quotations and brackets omitted).

[61] *Id.* at 416; *Glass v. Paxton*, 900 F.3d 233, 238–42 (5th Cir. 2018) (applying *Amnesty International's* "certainly impending" test to professors' decision to self-censor their speech due to the alleged increased risk of harm stemming from a statute allowing handguns in college classrooms).

[62] *Glass*, 900 F.3d at 239.

inflicted injury—i.e. the harm the plaintiffs sought to avoid.[63] Second, "identify each contingency prompting" the injury (or the catalyst for that injury).[64] "Each link in the chain of contingencies must be 'certainly impending' to confer standing."[65]

**Step 1: Identify the Harm:** We analyzed this issue above. Plaintiffs' core injury is the threat of a COVID-19 infection. For obvious traceability reasons, Plaintiffs cannot rely on the threat we all face from COVID-19. Rather, Plaintiffs must show a certainly impending threat of a COVID-19 infection stemming from the Challenged Orders.[66]

**Step 2: Identify Each Link in the Chain of Contingencies:** There are at least eight contingencies underlying Plaintiffs' claim to standing.

*Contingency #1: Will the Plaintiffs' Schools Impose a Mask Mandate?* Plaintiffs must show a substantial likelihood that their schools would impose mask mandates were it not for the Challenged Orders' ban on mask mandates. The 14 Plaintiffs attend 14 different school districts.[67] Of these 14 school districts, six have mask mandates despite the Challenged Orders.[68] The six Plaintiffs at the "mask mandate" school districts are not being injured by the Challenged Orders, and it is unlikely that this Court's injunction against the Challenged Orders will materially change the behavior of school districts already defying GA-38, which is a state law.[69]

---

[63] *Id.*

[64] *Id.*

[65] *Id.*

[66] *See, e.g., California v. Texas,* 141 S. Ct. 2104, 2108 (2021) (finding that the plaintiff must assert an injury fairly traceable "to the allegedly unlawful conduct" challenged in the suit) (quotations omitted); *Amnesty International,* 568 U.S. at 401–02 ("[E]ven if respondents could demonstrate that the threatened injury is certainly impending, they still would not be able to establish that this injury is fairly traceable to [the challenged statute].").

[67] Am. Compl. at ¶¶ 63–76.

[68] *Compare id.* at ¶¶ 63–76, *with COVID-19: List of Government Entities Unlawfully Imposing Mask Mandates,* ATTORNEY GENERAL OF TEXAS, https://www.texasattorneygeneral.gov/covid-governmental-entity-compliance (Sept. 8, 2021, 9:24 a.m.). The six schools that have imposed mask mandates are: (1) Round Rock Independent School District; (2) Edgewood Independent School District; (3) San Antonio Independent School District; (4) IDEA Public Schools School District; (5) Leander Independent School District; and (6) Richardson Independent School District.

[69] Tex. Gov't Code § 418.012.

For the eight remaining districts, their decision not to impose a mask mandate must be attributable to the Challenged Orders for purposes of Plaintiffs' standing. For example, a district that does not think mask mandates are good policy—or that used the Challenged Orders as political cover for such a belief—would not be impacted by an injunction against the Challenged Orders. In that scenario, Plaintiffs would need to sue the school district's board of trustees and convince this Court to order those trustees to enact a mask mandate; this Court could not redress Plaintiffs' injuries as this suit stands now. Realistically, when a plaintiff's injury turns on how a group of officials will respond to a hot-button political issue at some undetermined point in the future, that plaintiff is going to have serious standing problems.

*Contingency #2: A Mask Mandate Will Substantially Increase the Number of School Children Wearing Masks:* The Challenged Orders do not prohibit anyone from wearing a mask and, in fact, these orders encourage the wearing of masks.[70] In this context, Plaintiffs will need to show that an order mandating masks will significantly increase the number of people wearing masks when compared to an order that merely encourages mask wearing. Even for a "mask mandate" order, the compliance rate would turn on numerous factors: the specifics of the order; the rate of enforcement; the penalty for enforcement; loopholes or exceptions to the order, etc. Plaintiffs make no meaningful showing on this point.

*Contingency #3: The Hypothetical Maskless Child with COVID-19:* Plaintiffs must show a certainly impending risk that some maskless child in the future (the hypothetical "Maskless Child") in their school will become infected with COVID-19. If the Maskless Child was masked, then his contracting COVID-19 is not traceable to the Challenged Orders. This is an easy contingency to meet, but it leads to other problems for Plaintiffs.

*Contingency #4: The Maskless Child Spreads COVID-19 Due to Being Maskless:* In this context, the Maskless Child with COVID-19 would need to spread the disease to others in the Plaintiff's school

---

[70] *See* Exs. A, D.

when he otherwise would not have if he was wearing a mask. If the Maskless Child would have infected others regardless of his masked status, then those subsequent infections are not traceable to the Challenged Orders. This contingency is harder to meet than the one above.

*Contingency #5: The Maskless Child with COVID-19 Interacts with the Plaintiff:* To catch a disease from the Maskless Child, the Plaintiff must interact with him (or at least interact with others who interacted with him). This issue turns on a number of factors: the Maskless Child's hygiene practices; when he discovered he was sick; how he responded to this discovery; how social he is, etc.

*Contingency #6: The Plaintiff Catches COVID-19 from the Maskless Child:* This contingency is obvious. To have an injury traceable to the Maskless Child (and thus the Challenged Orders), the Plaintiff must contract COVID-19 from the Maskless Child. Less obvious is the fact that the Plaintiff must catch COVID-19 from the Maskless Child *even though the Plaintiff is wearing a mask.* If even the Plaintiffs refuse to wear masks in school, then we have to stop and ask ourselves: What are we even doing here?

*Contingency #7: The Plaintiff will have a Severe Reaction to COVID-19:* Plaintiffs cannot rely on a generalized fear that they will contract COVID-19. The entire world is under that threat. To overcome the generalized grievance hurdle, Plaintiffs must assert a sufficiently particularized injury.[71]

Here, Plaintiffs claim their disabilities put them at "an increased risk of serious complications or death in the event that they contract COVID-19."[72] It is the increased risk of "serious complications or death" due to their disabilities that helps create a more particularized injury.[73] It is not the risk of

---

[71] *See, e.g., Warth v. Seldin,* 422 U.S. 490, 499 (1975) (defining a generalized grievance as one "shared in substantially equal measure by all or a large class of citizens"); *Kulikowski v. Polis,* 20-CV-03152-RM-NYW, 2021 WL 2517149, at *4 (D. Colo. May 28, 2021) (noting, in the context of a plaintiff's challenge to a governor's COVID-19-related orders, the plaintiff must articulate a particularized injury to overcome generalized grievance issues), report and recommendation adopted, 20-CV-03152-RM-NYW, 2021 WL 2514575 (D. Colo. June 18, 2021); *Delaney v. Baker,* 511 F. Supp. 3d 55, 69 (D. Mass. 2021) (same); *Parker v. Wolf,* 506 F. Supp. 3d 271, 288 (M.D. Pa. 2020) (same).

[72] Am. Compl. at ¶ 2.

[73] Although it is certainly debatable whether, even with this limit, Plaintiffs' alleged injuries are sufficiently particularized to confer standing.

an asymptomatic or light case, which is what most children experience if they contract COVID-19.[74] This leads to the final contingency.

*Contingency #8: The Plaintiff will Have a Severe Reaction to COVID-19 Because of His Disability:* This follows from the point above. Plaintiffs' claims turn on their increased risk due to COVID-19 *because of* their disabilities.[75] Were it not for this "disability" connection, their alleged injuries would be nonjusticiable generalized grievances. Thus, even if Plaintiffs could meet all the contingencies above, they would still lack standing if they would have become seriously ill regardless of their disabilities.

*Putting it Together:* Plaintiffs did not plausibly allege a certainly impending risk of COVID-19 infection fairly traceable to the Challenged Orders. Under binding precedent, Plaintiffs must allege plausible facts showing that "[e]ach link in the chain of contingencies" noted above is "certainly impending."[76] Plaintiffs did not make this showing.

Plaintiffs may contest the fairness of the analysis above—that our analysis effectively insulates the Challenged Orders from review. The Supreme Court rejected this argument in *Amnesty International*, finding "the assumption that if respondents have no standing to sue, no one would have standing, is not a reason to find standing."[77]

And our analysis—which is the analysis required by binding precedent—merely reveals that *these* Plaintiffs will not have standing to bring *these* claims. Plaintiffs are not the object of the Challenged Orders, and the Challenged Orders did not require them to do (or not do) anything. It will always be difficult for a plaintiff to establish standing in this context.[78] That difficulty is magnified when, as here,

---

[74] *Frequently Asked Questions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/faq.html ("Children can be infected with the virus that causes COVID-19 and get sick with COVID-19. Most children with COVID-19 have mild symptoms or they may have no symptoms at all ('asymptomatic').") (last visited Sept. 11, 2021).
[75] *See, e.g.*, Am. Compl. at ¶¶ 2, 39, ¶¶ 63–76.
[76] *Glass v. Paxton*, 900 F.3d 233, 239 (5th Cir. 2018).
[77] *Amnesty International*, 568 U.S. at 420 (quotations and brackets omitted).
[78] *See, e.g.*, *Bennett v. Spear*, 520 U.S. 154, 167 (1997) ("[To have standing] the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court."); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992) ("[W]hen the plaintiff is not himself the object of the government action or

the plaintiff's claim to standing turns on how third parties not before the court will respond (school

board trustees, the hypothetical Maskless Child, etc.).

**C.    Plaintiffs Lack Standing, Largely Because They Did Not Sue an Official or Entity with Enforcement Authority Over the Challenged Orders.**

**1.    Over 120 Years of Precedent Require Plaintiffs to Sue an Official or Entity with Enforcement Authority Over the Challenged Orders.**

To have standing, a plaintiff *must* sue an official or entity with enforcement authority over the

law in question. As we will show in the next section, Plaintiffs' suit violates this core jurisprudential

rule.

Over 120 years of caselaw support the need to sue an official or entity with enforcement

authority. In 1899, the U.S. Supreme Court found that the Eleventh Amendment requires there to be

a "special relation" between "the state officers named" and the "particular statute alleged to be

unconstitutional."[79] About a decade later the Court, in *Ex parte Young*, reframed this analysis as

requiring state officers to "have some connection with the enforcement of the act" due to Eleventh

Amendment concerns.[80] For over 100 years, courts have applied *Ex parte Young*  to find "that the

defendant state official must have some enforcement connection with the challenged statute."[81]

The need for an enforcement connection applies equally in the standing context, an analysis

that "significant[ly] overlaps" with *Ex parte Young*.[82] As the Court explained a few months ago in

*California v. Texas*: "[O]ur cases have consistently spoken of the need to assert an injury that is the

---

inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish.") (quotations omitted).

[79] *Fitts v. McGhee*, 172 U.S. 516, 530 (1899) ("If, because they were law officers of the state, a case could be made for the purpose of testing the constitutionality of the statute, by an injunction suit brought against them, then the constitutionality of every act passed by the legislature could be tested by a suit against the governor and the attorney general, based upon the theory that the former, as the executive of the state, was, in a general sense, charged with the execution of all its laws, and the latter, as attorney general, might represent the state in litigation involving the enforcement of its statutes.").

[80] 209 U.S. 123, 157 (1908).

[81] *Okpalobi v. Foster*, 244 F.3d 405, 415 (5th Cir. 2001).

[82] *Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 514 (5th Cir. 2017).

result of a statute's actual or threatened *enforcement*, whether today or in the future."[83] There, the Court found the plaintiffs' claims failed on redressability grounds, among other things.[84] The Supreme Court reasoned that the plaintiffs could not enjoin the Secretary of Health and Human Services from enforcing a statute that "he ha[d] no power to enforce."[85] Nor could the plaintiffs rely on the federal Declaratory Judgment Act, which "cannot alone supply jurisdiction otherwise absent."[86]

More recently, in *Whole Woman's Health v. Jackson*, the Supreme Court vacated an injunction to Texas's Senate Bill (S.B.) 8 on jurisdictional grounds.[87] In doing so, the Court also framed the issue in terms of "enforcement," noting the State's "represent[ation] that neither it nor its executive employees possess the authority to enforce the Texas law either directly or indirectly" and the private defendant's sworn statement "that he has no present intention to enforce the law."[88] As the Court explained: "[F]ederal courts enjoy the power to enjoin individuals tasked with enforcing laws, not the laws themselves."[89]

*California v. Texas* and *Whole Woman's Health* are not novel rulings. These decisions reflect well-settled precedent requiring an enforcement connection between the official sued and the statute at issue.[90] As shown below, Plaintiffs lack standing as they have not sued the requisite enforcing official/entity.

---

[83] 141 S. Ct. 2104, 2114 (2021) (citing cases).
[84] *Id.* at 2115–16.
[85] *Id.* at 2116.
[86] *Id.*
[87] 21A24, 2021 WL 3910722, at *1 (U.S. Sept. 1, 2021).
[88] *Id.*
[89] *Id.* (citing *California v. Texas*, 141 S. Ct. at 2123).
[90] *See, e.g., Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("One recurring issue in our cases is determining when the threatened enforcement of a law creates an Article III injury."); *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979) ("A plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement."); *Commonwealth of Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923) ("The party who invokes the power must be able to show, not only that the statute is invalid, but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally."); *Support Working Animals, Inc. v. Governor of Florida*, 20-12665, 2021 WL 3556779, at *5 (11th Cir. Aug. 12, 2021) ("[A] plaintiff's injury isn't redressable by prospective relief where other state actors, who aren't parties to the litigation, would remain free and clear of any judgment and thus free to engage in the [enforcement] conduct that the plaintiffs say injures them . . . ."); *Jacobson v. Florida Sec'y of State*, 974 F.3d 1236, 1257 (11th Cir. 2020) ("If

2.     **Plaintiffs Lack Standing as Defendants Do Not Have Enforcement Authority Over the Challenged Orders and for Various Other Reasons.**

Below, we will go through Plaintiffs' claims against each Defendant and explain why Plaintiffs lack standing to sue them. These arguments are in addition to the "certainly impending" issue analyzed above, which is an independent reason why Plaintiffs lack standing.

**Attorney General Paxton:** Plaintiffs lack standing to sue Attorney General Paxton for six reasons.

First, Plaintiffs do not allege that Attorney General Paxton has an enforcement connection to the August 5th Guidance.[91] Thus, they lack standing to sue him over this order.

Second, the Fifth Circuit has recognized that Attorney General Paxton does not "enforce" Governor Abbott's emergency orders: "[W]e hold the Attorney General . … lacks the required enforcement connection to GA-09 and may not be sued for injunctive relief under the Eleventh Amendment."[92] The Court's holding was in the context of an *Ex parte Young* analysis and was later vacated when the parties' dispute became moot,[93] but its reasoning and conclusion apply equally here.[94] Put simply, an order enjoining Attorney General Paxton from enforcing GA-38 will not redress

---

rulemaking authority were sufficient to establish traceability, plaintiffs could presumably also challenge a law by suing the legislators who enacted it instead of the officials who execute it. Although in many cases the same official will both make and execute a challenged regulation, that arrangement is not present here."); *Digital Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 958 (8th Cir. 2015) ("The redressability prong is not met when a plaintiff seeks relief against a defendant with no power to enforce a challenged statute.") (quotations omitted); *Bronson v. Swensen*, 500 F.3d 1099, 1112 (10th Cir. 2007) ("The absence of a nexus between Swensen's enforcement powers and the challenged criminal provisions renders ineffectual plaintiffs' requested prospective relief."); *Okpalobi v. Foster*, 244 F.3d 405, 426 (5th Cir. 2001) ("The requirements of *Lujan* are entirely consistent with the long-standing rule that a plaintiff may not sue a state official who is without any power to enforce the complained-of statute."); *Hope Clinic v. Ryan*, 249 F.3d 603, 605 (7th Cir. 2001) ("[P]laintiffs lack standing to contest the statutes authorizing private rights of action, not only because the defendants cannot cause the plaintiffs injury by enforcing the private-action statutes, but also because any potential dispute plaintiffs may have with future private plaintiffs could not be redressed by an injunction running only against public prosecutors.").

[91] *See* Am. Compl. at ¶¶ 31, 56–61; ECF 26, 7–8.

[92] *In re Abbott*, 956 F.3d 696, 709 (5th Cir. 2020), *cert. granted, judgment vacated sub nom. Planned Parenthood Ctr. for Choice v. Abbott*, 141 S. Ct. 1261 (2021).

[93] *Id.*

[94] *See, e.g., City of Austin v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019) (noting the similarities between the *Ex parte Young* and standing analyses), cert. denied sub nom. City of Austin, Tex. v. Paxton, 141 S. Ct. 1047 (2021); *Air Evac EMS, Inc.*, 851 F.3d at 520 (same); *NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 395 (5th Cir. 2015) (same).

Plaintiffs' injuries as he does not enforce GA-38 in the first place.[95] Rather, Governor Abbott's TDA-based emergency orders are akin to criminal statutes.[96] As a result, these orders are enforced by other officials, most naturally the appropriate local district attorney.[97]

Third, Plaintiffs' claim to standing—that they were injured when Attorney General Paxton sued, or threatened to sue school, school districts[98]—is hard to square with how such issues are normally analyzed. Take *Susan B. Anthony List v. Driehaus* for instance.[99] There, the Supreme Court analyzed when "the threatened enforcement of a law creates an Article III injury."[100] The Court set out a three-part test for analyzing such claims: (1) did the plaintiffs show an intent to engage in a course of conduct arguably affected with a constitutional interest; (2) was the plaintiff's intended conduct proscribed by the statute they wish to challenge; and (3) was the threat of future enforcement "substantial"?[101] Plaintiffs cannot meet the second part of this test as the Challenged Orders do not prohibit their conduct in any way. And Plaintiffs cannot meet the third part of this test as the Challenged Orders will never be "enforced" against them.

Fourth, it is debatable whether the threat of a civil lawsuit—not a criminal proceeding, not a suit to impose a statutory penalty, but a garden-variety civil lawsuit—is a legally cognizable injury even for the person being threatened. In *Driehaus* for example, the Court did not decide whether a "burdensome" administrative proceeding would "alone give[] rise to an Article III injury."[102] The

---

[95] *See, e.g.*, *California v. Texas*, 141 S. Ct. at 2116 ("Plaintiffs cannot enjoin the Secretary of Health and Human Services, because he has no power to enforce [the challenged statute] against them.").

[96] *See* Tex. Gov't Code § 418.173 (noting that the Governor's emergency orders can carry penalties of (1) a fine up to $1,000 and (2) confinement in jail for up to 180 days).

[97] *See In re Abbott*, 956 F.3d at 709; *In re Abbott*, 601 S.W.3d 802, 812–13 (Tex. 2020) (acknowledging the State's concession on this issue and finding that the plaintiffs lacked standing as they did not allege from an official with actual enforcement authority, meaning the appropriate local district attorney).

[98] *See* Am. Compl. at ¶¶ 56–61.

[99] 573 U.S. 149 (2014).

[100] *Id.* at 158.

[101] *Id.* at 158–67.

[102] *Id.* at 166.

Court found that it was the combination of the proceeding "backed by the additional threat of criminal prosecution" that gave rise to standing in that case.[103]

Plaintiffs are asking for a seemingly unprecedented extension of the federal judiciary's reach. Under their theory, the person threatened with a civil lawsuit will be able to, somewhat illogically, redress that injury by filing their own federal civil lawsuit. Not only that, but any persons tangentially impacted by the threat of civil litigation can also jump into federal court. Plaintiffs, "as the parties asserting federal subject-matter jurisdiction, bear the burden of proving that its requirements are met."[104] Plaintiffs cannot do so here.

Fifth, Plaintiffs cite the Fifth Circuit's decision in *NiGen Biotech L.L.C. v. Paxton* as the "controlling precedent" here.[105] Not so. There, the Attorney General sent letters to NiGen and its retailers identifying NiGen's products as "'false, misleading, or deceptive' in violation of the Texas Deceptive Trade Practices Act ('DTPA')."[106] These letters "intimat[ed] that formal enforcement was on the horizon for both NiGen and the retailers," and caused the retailers to pull NiGen's products from their shelves, costing "NiGen millions of dollars in lost revenue."[107]

The issue was the Attorney General's letters were acting as a "preliminary injunction against the lawful sale of NiGen's products."[108] This situation was further complicated by the Attorney General's longstanding refusal (four years by the time of the Fifth Circuit's decision) "to justify its threatening letters."[109] The Court understandably found that NiGen's injury was redressable.[110] In that context, a favorable judicial decision would allow NiGen to "sell its products freely in Texas" and

---

[103] *Id.*
[104] *Willoughby*, 730 F.3d at 479.
[105] ECF 26 at 5.
[106] *NiGen Biotech, L.L.C.*, 804 F.3d at 392.
[107] *Id.*
[108] *Id.* at 397.
[109] *Id.* at 395.
[110] *Id.* at 397.

"repair its damaged relationship with its retailers that has resulted from the Attorney General's conduct."[111]

There are key differences between this case and *NiGen*. In *NiGen*, the Attorney General had specific authority to enforce the DTPA.[112] This matters, as the enforcement issue requires that the official has both a "demonstrated willingness to enforce [the statute]" *and* "the particular duty to enforce the statute in question."[113] Plaintiffs cannot use *NiGen* as a lever to enjoin an official with no power to enforce the Challenged Orders. That argument is foreclosed by the Supreme Court's recent decision in *California v. Texas* and over a century's worth of other caselaw.[114]

Plaintiffs use the veil of *NiGen* to cover up their true argument: They are asking this Court to enjoin Attorney General Paxton from exercising his *general duty* to uphold Texas state laws. Binding precedent dictates that this "general duty" is insufficient to create the required enforcement connection.[115]

Another problem for Plaintiffs is that in *NiGen*, the Attorney General did not contest the traceability of the plaintiff's injury.[116] Thus, *NiGen* has no bearing on the traceability issues here—issues that prove fatal to Plaintiffs' claims.

Finally, Plaintiffs argue their request for a declaratory judgment itself can confer standing.[117] This argument is foreclosed by *California v. Texas*. There, the Court explained: "The Declaratory Judgment Act alone does not provide a court with jurisdiction."[118] The Court continued: "[J]ust like

---

[111] *Id.*

[112] *See* Tex. Bus. & Com. Code § 17.47(a) noting that "the consumer protection division" cam "bring an action in the name of the state against the person [violating the DTPA]"); *id.* at § 17.45(8) (defining the "Consumer protection division" as "the consumer protection division of the attorney general's office").

[113] *See Tex. Democratic Party v. Abbott*, 978 F.3d 168, 181 (5th Cir. 2020), cert. denied, 141 S. Ct. 1124 (2021) (quoting *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014)).

[114] *Supra* at pgs. 14-15; *see also Tex. Democratic Party v. Abbott*, 978 F.3d 168, 181 (5th Cir. 2020) ("'[O]ur cases do not support the proposition that an official's public statement alone establishes authority to enforce a law, or the likelihood of his doing so, for *Young* purposes.'") (quoting *In re Abbott*, 956 F.3d at 709), cert. denied, 141 S. Ct. 1124 (2021).

[115] *See, e.g., Tex. Democratic Party*, 978 F.3d at 181; *City of Austin*, 943 F.3d at 999–1000.

[116] *NiGen Biotech, L.L.C.*, 804 F.3d at 396.

[117] ECF 26 at 8.

[118] 141 S. Ct. at 2115.

suits for every other type of remedy, declaratory-judgment actions must satisfy Article III's case-or-controversy requirement."[119]

The idea is that remedies "operate with respect to specific parties," as opposed to "legal rules in the abstract."[120] "[I]t must be the effect of the court's judgment on the defendant that redresses the plaintiff's injury, whether directly or indirectly."[121] Thus, when "defendant officials do not enforce the [challenged statute], a declaratory judgment would not meet the requirement of redressability."[122] If the plaintiff's desire to obtain favorable judicial precedent on a legal question was alone enough to confer standing, "then the federal courts would be busy indeed issuing advisory opinions that could be invoked as precedent in subsequent litigation."[123]

In sum, Plaintiffs have no meaningful claim to standing against Attorney General Paxton. Plaintiffs face similar problems in their claim to standing against Governor Abbott, the TEA, and Commissioner Morath, so these other Defendants will be given less attention.

**Governor Abbott:** The arguments identified above apply with greater force to Governor Abbott. Plaintiffs do not allege that Governor Abbott has an enforcement connection to the August 5th Guidance.[124] Thus, they lack standing to sue him over this order. Like Attorney General Paxton, Governor Abbott also does not enforce emergency executive orders.[125] Plaintiffs confuse the "power to enact" with the "power to enforce," a key difference in the justiciability context because, again, remedies "operate with respect to specific parties," as opposed to "legal rules in the abstract."[126] If the

---

[119] *Id.*

[120] *Id.*

[121] *Digital Recognition Network, Inc.*, 803 F.3d at 958 (quoting *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1159 (10th Cir. 2005)) (emphasis omitted).

[122] *Id.* at 959; *see also Bronson*, 500 F.3d at 1112.

[123] *Digital Recognition Network, Inc.*, 803 F.3d at 958–59.

[124] *See* Am. Compl. at ¶ 28; ECF 26 at 8–9.

[125] *See* In re Abbott, 956 F.3d at 709; *6th St. Bus. Partners LLC v. Abbott*, 1:20-CV-706-RP, 2020 WL 4274589, at *5 (W.D. Tex. July 24, 2020).

[126] *California v. Texas*, 141 S. Ct. at 2115; *see also In re Abbott*, 956 F.3d at 709 ("The power to promulgate law is not the power to enforce it."); *cf. Tex. Democratic Party v. Hughs*, 20-50667, 2021 WL 2310010, at *2 n.5 (5th Cir. June 4, 2021) ("A reasonable person could argue that it makes little sense to be unable to sue the official who caused the problem in question, but we are bound to follow the relevant precedents and, therefore, do not address this point further.").

law was otherwise, a plaintiff could haul members of Congress into federal court every time they enacted a statute the plaintiff did not like.[127] GA-38 "does not specifically task Governor [Abbott] with its enforcement, or suggest that he will play any role at all in its enforcement," and thus "Governor [Abbott] is not a proper defendant."[128]

Plaintiffs claim that Governor Abbott is "enforcing" GA-38 through threats of civil lawsuits.[129] As explained above, this is insufficient to create an enforcement connection. Also, Plaintiffs do not appear to claim that Governor Abbott is making these threats himself, or that he ever has (or ever will) file such a suit in his official capacity.[130] Instead, Plaintiffs claim, with no real support, that "[Governor Abbott] is collaborating with and supporting the Attorney General's enforcement campaign."[131] If statements of support were sufficient to create standing, then every public official with a Twitter account will inevitably be hauled into federal court at some point.

**TEA Defendants:** Plaintiffs try to connect TEA Defendants to the enforcement of both Challenged Orders. For clarity, the standing issues for these orders are analyzed separately.

*GA-38:* In their Amended Complaint, Plaintiffs do not allege any facts connecting either of the TEA Defendants to GA-38's enforcement.[132] Plaintiffs allege no facts suggesting TEA Defendants ever have or ever will enforce GA-38.[133] In their brief, Plaintiffs sneak in an "enforcement" connection between the TEA Defendants and GA-38's mask provisions.[134] But their argument amounts to a mere legal conclusion and, regardless, "a lawyer's statement in a . . . brief is no substitute for adequately pleaded facts in a complaint, and a memorandum cannot provide allegations that are wholly absent

---

[127] *See Jacobson*, 974 F.3d at 1257 ("If rulemaking authority were sufficient to establish traceability, plaintiffs could presumably also challenge a law by suing the legislators who enacted it instead of the officials who execute it. Although in many cases the same official will both make and execute a challenged regulation, that arrangement is not present here.").
[128] *See Morris*, 739 F.3d at 746.
[129] ECF 26 at 8–9.
[130] *See* ECF 26 at 8–9; Am. Compl. at ¶¶ 56–61.
[131] ECF 26 at 8.
[132] *See, e.g.*, Am. Compl. ¶¶ 7, 9, 29–30, 51, 56–61.
[133] *See id.*
[134] ECF 26 at 10.

from the Amended Complaint."[135] Given that the Plaintiffs' have failed to demonstrate an enforcement connection, any injunction against TEA Defendants will amount to an advisory opinion.[136]

Also, to have standing, Plaintiffs must show the threat of future enforcement from TEA Defendants is "substantial."[137] Plaintiffs alleged no facts on this point. In sum, Plaintiffs do not have standing to challenge GA-38 against TEA Defendants.

*August 5th Guidance:* Plaintiffs' claim to standing against the August 5th Guidance is fatally flawed. As with GA-38, TEA Defendants have never enforced, or threatened to enforce, the August 5th Guidance against any person or entity,[138] and Plaintiffs do not allege otherwise. Thus, they cannot show the required "substantial" threat of future enforcement.[139] And enjoining TEA Defendants from enforcing the August 5th Guidance would be meaningless. The August 5th Guidance merely states what GA-38 requires.[140] And truthfully describing the law to school districts certainly does not create a justiciable controversy, at least not on the facts before this Court.

Finally, Plaintiffs face a ripeness problem. "'A claim is not ripe for review if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.'"[141] At the time Plaintiffs filed their Complaint,[142] it was unclear if or how TEA Defendants would enforce

---

[135] *In re PHP Healthcare Corp.*, 128 Fed. Appx. 839, 847 (3d Cir. 2005); *see also* 2 Moore's Federal Practice, § 12.34[2] (Matthew Bender 3d ed.) ("The court may not . . . take into account additional facts asserted in a memorandum ... because such memoranda do not constitute pleadings under Rule 7(a)."); *Schneider v. Cal. Dep't of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998) ("In determining the propriety of a Rule 12(b)(6) dismissal, a court *may not* look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss.").

[136] *California v. Texas*,141 S. Ct. at 2116 (finding a lack of standing because the Court could not enjoin who lacks power to enforce the challenged statute against the plaintiffs).

[137] *Driehaus*, 573 U.S. at 158.

[138] Aghazadian Decl. at ¶ 8.

[139] *Driehaus*, 573 U.S. at 158.

[140] *Compare* Ex. A at 1, *with* Ex. D.

[141] *United States v. Magana*, 837 F.3d 457, 459 (5th Cir. 2016) (quoting *United States v. Carmichael*, 343 F.3d 756, 761 (5th Cir. 2003) (quotations omitted).

[142] *Carr v. Alta Verde Indus., Inc.*, 931 F.2d 1055, 1061 (5th Cir. 1991) ("As with all questions of subject matter jurisdiction except mootness, standing is determined as of the date of the filing of the complaint, and subsequent events do not deprive the court of jurisdiction.").

the August 5th Guidance, which does not identify a specific enforcement mechanism or penalty.[143] Post-filing events have further clouded the issue, as the August 5th Guidance has been rescinded, and its offending provision—the one restating what GA-38 says about masks—is no longer in effect.[144] Thus, in addition to lacking standing, Plaintiffs' claim is unripe. They also face a mootness problem as the August 5th Guidance is no longer in effect.[145]

Ultimately, Plaintiffs lack standing against all named Defendants. This Court should dismiss this suit for lack of jurisdiction.

## II.     Plaintiffs' American Rescue Plan Act and Americans with Disabilities Act Claims are Barred by Sovereign Immunity.

A state's sovereign immunity can be overcome in three ways: (1) a clearly stated waiver or consent to suit by the state; (2) a valid abrogation by Congress; or (3) the *Ex parte Young* exception.[146]

In their brief, Plaintiffs argue that Defendants' sovereign immunity has been waived for the Section 504 claim, an issue Defendants do not dispute at this stage.[147] Plaintiffs' brief clarifies that they rely on the *Ex parte Young* exception for their ARPA and ADA claims.[148] To be entitled to this exception, "the plaintiff at least must show the defendant has 'the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty.'"[149] As detailed above, Plaintiffs have not shown that Defendants had the requisite enforcement connection with the Challenged Orders.[150] The same analysis applies here.

### RULE 12(b)(6) ARGUMENTS

---

[143] *See* Ex. A.

[144] Aghazadian Decl. at ¶¶ 6–11; Exs. B–C.

[145] *See, e.g.*, *United States v. Harris*, 960 F.3d 689, 695 (5th Cir. 2020) ("Ripeness separates those matters that are premature because the injury is speculative and may never occur from those that are appropriate for judicial review."); *Rocky v. King*, 900 F.2d 864, 866 (5th Cir. 1990) ("The mootness doctrine requires that the controversy posed by the plaintiff's complaint be 'live' not only at the time the plaintiff files the complaint but also throughout the litigation process.").

[146] *See Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 304 (1990); *Ex parte Young*, 209 U.S. 123 (1908).

[147] ECF 26 at 3.

[148] *Id.* at 4–11.

[149] *Tex. Democratic Party*, 978 F.3d at 179 (quoting *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014)).

[150] *Supra* at pgs. 14-23.

I.       **Plaintiffs Failed to Plead a Plausible Section 504 Claim.**

Plaintiffs assert disability discrimination and failure-to-accommodate claims under Section 504.[151] Both are insufficiently pled.

To establish a *prima facia* case for disability discrimination under Section 504, a plaintiff must show: (1) a qualifying disability; (2) that the plaintiff is being excluded from participation in, denied the benefits of, or otherwise discriminated against by a covered entity; and (3) such discrimination is solely by reason of the plaintiff's disability.[152] "Discrimination includes a failure to make accommodations."[153] To establish a *prima facie* reasonable accommodation claim under Section 504, the plaintiff must have either (1) identified his disability and resulting limitation and requested an accommodation in direct and specific terms, or (2) his disability, the resulting limitation, and the necessary reasonable accommodation must have been "open, obvious, and apparent" to the entity's relevant agents.[154]

To the extent Plaintiffs contend they were discriminated against due to their disabilities in a manner other than through a failure to accommodate, their claim fails for three reasons.

First, Plaintiffs do not plausibly allege that Defendants excluded them from participation in school, denied them the benefits of education, or otherwise discriminated against them. Defendants are not excluding Plaintiffs from attending school. Plaintiffs are free to attend school. It is their fear of COVID-19 that is posing the barrier. And Plaintiffs are free to engage in the interactive process with their respective schools to identify accommodations that would mitigate the risk of COVID-19 to assuage their fears. But there is a fundamental disconnect between Defendants' alleged actions and

---

[151] Am. Compl. at ¶¶ 90-91.
[152] *Francois v. Our Lady of the Lake Hospital, Inc.*, 8 F.4th 370, 378 (5th Cir. 2021) (citing *Miraglia v. Bd. of Supervisors of La. State Museum*, 901 F.3d 565, 574 (5th Cir. 2018)); *Smith v. Harris Cnty., Tex.*, 956 F.3d 311, 316 (5th Cir. 2020) (discussing the difference between the Rehabilitation Act "solely by reason of" causation standard and the ADA "by reason of" causation standard).
[153] *Campbell v. Lamar Institute of Tech.*, 842 F.3d 375, 380 (5th Cir. 2016).
[154] *Id.* (citing *Smith v. Harris Cnty.*, 956 F.3d 311, 317 (5th Cir. 2020) and *Windham v. Harris Cnty.* 875 F.3d 229, 236 (5th Cir. 2017)).

the purported exclusion from programming by the school districts providing that programing.

Second, Plaintiffs did not plausibly allege that the purported exclusion is solely due to their disabilities. In fact, Plaintiffs do not allege that they missed a single day of school due to the Challenged Orders.[155] Even if they did amend their Complaint again to fix this error, they would still run into the problem of showing exclusion solely due to their disabilities, as opposed to COVID-19 generally. To the extent Plaintiffs contest Defendants' enactment of the Challenged Orders, they did not plausibly allege that Defendants issued these orders solely because of Plaintiffs' disabilities or that Defendants were motivated by Plaintiffs' disabilities.

Third, Plaintiffs have not been denied "meaningful access" to an education, as is required to support their claims.[156] The Challenged Orders left Plaintiffs free to attend school in person while wearing masks and engaging in any other COVID-19 precautions they deem appropriate. If Plaintiffs did not want to attend school in person, the Challenged Orders left Plaintiffs free to make that choice, as the orders contain no restrictions on Plaintiffs' ability to attend school virtually or on local schools' ability to offer this service. This point is highlighted by the fact that Plaintiffs could not identify a single instance where they missed school due to the Challenged Orders.

To the extent Plaintiffs rely on failure-to-accommodate as discrimination, their claim fares no better. "A critical component of a Title II claim for failure to accommodate . . . is proof that the disability and its consequential limitations were known by the entity providing public services."[157] "Mere knowledge of the disability is not enough; the service provider must also have understood the limitations the plaintiff experienced . . . as a *result* of that disability."[158] "The burden falls on the plaintiff to specifically identify the disability and resulting limitations, and to request an accommodation in

---

[155] *See* Am. Compl. at ¶¶ 63–76.
[156] *See, e.g.*, *Ruskai v. Pistole*, 775 F.3d 61, 78–79 (1st Cir. 2014) (citing *Alexander v. Choate*, 469 U.S. 287, 299 (1985)).
[157] *Windham*, 875 F.3d at 236 (internal quotations omitted).
[158] *Id.* (internal quotations omitted, emphasis in original).

direct and specific terms."[159]

"Once a qualified individual with a disability requests reasonable accommodations, the public entity has an obligation to engage in an interactive process to determine the best means of accommodating the plaintiff's disability."[160] In reviewing such requests, "[a]n institution is not duty bound to acquiesce in and implement every accommodation a disabled student demands."[161] Put simply, the student "is not entitled to his preferred accommodation" so long as the offered accommodation is reasonable.[162]

Here, Plaintiffs did not allege that they submitted a request for an accommodation for a known disability in direct and specific terms for Defendants to review, consider, and respond with alternative accommodations. This omission, while fatal to Plaintiffs' claim, is also understandable because such requests would be virtually nonsensical when directed to the Governor, the Attorney General, or even the TEA. It is the various schools and school districts who can engage in the interactive process with Plaintiffs, as only they can review direct and specific requests for particularized limitations and offer reasonable accommodations to address those limitations—all of which will be based on the needs of the requestor and the resources of the recipient. At its core, there is a fundamental disconnect between the essence of a failure-to-accommodate claim—the interactive process and reasonableness of the offers extended by participants thereto—and Plaintiffs' choice of defendants—state policymakers sued for enacting state policy.

Also, to present a viable accommodation claim, Plaintiffs' requested accommodation must be "reasonable." But Plaintiffs' proposed accommodation is not. GA-38 seeks to establish a uniform policy leaving the decision to wear or not wear a mask up to each student (and their parents). Plaintiffs'

---

[159] *Id.* (internal quotations omitted).
[160] *See Shrub v. Univ. of Tex. Health Sci. Ctr. at Houston-Sch. of Med.*, 63 F. Supp.3d 700, 708–09 (S.D. Tex. 2014) (citing *Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 315 (5th Cir. 2007); *see also Campbell*, 842 F.3d at 379–82.
[161] *Campbell*, 842 F.3d at 381.
[162] *Id.* at 382.

requested accommodation, however, is that every school must *mandate* the wearing of masks, overriding the students (and their parents') choice. Changing GA-38's "no mask mandate" to a "mask mandate" would "fundamentally alter" the policy choice set forth in GA-38, and thus it is not a reasonable accommodation.[163]

Finally, Plaintiffs do not qualify for the limited exception that can, in narrow circumstances, waive their need to request an accommodation. "When a plaintiff fails to request an accommodation [in direct and specific terms], he can prevail only by showing that the disability, resulting limitation, and necessary reasonable accommodation were open, obvious, and apparent to the entity's relevant agents."[164] "Knowledge of a disability is different from knowledge of the resulting limitation."[165] "And it is certainly different from knowledge of the necessary accommodation."[166] "To prevail, [Plaintiff] must adduce evidence that all three were or should have been obvious."[167] Here, Plaintiffs did not plausibly allege that Defendants knew of their "disabilit[ies] and [their] consequential limitations," a prerequisite to their failure-to-accommodate claim.[168]

## II.     Plaintiffs Failed to Plead a Viable ADA Claim.

As Plaintiffs acknowledged, Section 504 and ADA claims are generally analyzed under the same standard.[169] Plaintiffs' ADA claim fails for the same reasons as its Section 504 claim.

## III.    Plaintiffs Failed to State a Claim under the American Rescue Plan Act.

Plaintiffs' ARPA claim fails as they do not have a private right of action to bring this claim.[170]

---

[163] *Id.*
[164] *Windham*, 875 F.3d at 236 (internal quotations omitted).
[165] *Id.* at 238.
[166] *Id.*
[167] *Id.* at 238.
[168] *See Cadena v. El Paso Cty.*, 946 F.3d 717, 723–24 (5th Cir. 2020).
[169] ECF 7 at 16.
[170] *Webb v. Texas Higher Education Coordinating Bd.*, Co. EP-14-CV-00345-FM, 2014 WL 12594193, at *12 (W.D. Tex., Dec. 12, 2014) (dismissing claim under Rule 12(b)(6) where statutory provision provided no private right of action).

Private rights of action to enforce federal law must be created by Congress.[171] Courts must determine whether Congress intended the statute to create both a private right, and a private remedy.[172] Absent statutory intent, courts may not create such private rights and remedies, "no matter how desirable that might be as a policy matter, or how compatible with the statute."[173]

The ARPA does not create a private cause of action.[174] Likewise, the Supremacy Clause does not create any federal rights, or a private cause of action.[175] Plaintiffs have no right of action to bring an ARPA claim. Without a private right of action, Plaintiffs cannot state a plausible ARPA claim.

### RESPONSE TO PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER

Plaintiffs' claims are meritless, most notably due to their glaring standing problems. This Court should deny their request for a temporary restraining order against the Challenged Orders.

A party moving for temporary restraining order must establish: (1) a substantial likelihood of success on the merits; (2) a substantial threat that the movant will suffer irreparable harm absent the requested order; (3) that the threatened injury outweighs any damage that the temporary restraining order might cause the defendant; and (4) that the temporary restraining order will not disserve the public interest.[176] These requirements mirror those of a preliminary injunction.[177] A temporary restraining order is an extraordinary remedy that should not be granted unless the requesting party has clearly carried the burden of persuasion on all four requirements.[178]

---

[171] *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) (citing *Touche Ross & Co. v. Redington*, 442 U.S. 560, 578 (1979)).

[172] *Id.* (citing *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 15 (1979)).

[173] *Id.* (citing *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 145 (1985); *Transamerica*, 444 U.S. at 23; *Touche Ross*, 442 U.S. at 575-56).

[174] *Anthony Lamar ADC #120479 v. ASA Hutchison, et al.*, No. 4:21-CV-00529, 2021 WL 4047158 at * 6, n. 47 (E.D. Ark. Sep. 3, 2021).

[175] *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015) ("[T]he Supremacy Clause is not the source of any federal rights, and certainly does not create a cause of action") (internal quotations and citations omitted); *see also Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 613 (1979); *Jefferson Cmty. Health Care Ctrs., Inc. v. Jefferson Par. Gov't*, 849 F.3d 615, 626 (5th Cir. 2017).

[176] *Whole Woman's Health v. Paxton*, 264 F.Supp.3d 813, 818 (W.D. Tex. 2017) (internal citations omitted).

[177] *Id.*

[178] *PCI Transp., Inv. v. Fort Worth & W.R.R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005).

*Likelihood of Success:* The likelihood of success on the merits was analyzed above. Plaintiffs will not succeed on the merits of their claims.

*Irreparable Harm & Balance of the Equities:* "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."[179] Exercising caution is especially important where the defendant is itself a state actor because of the federalism concerns attendant to a federal court intervening in a state's conduct of its own laws.[180] The State's interest in ensuring compliance with its laws weighs heavily in a court's balancing of the equities in the injunction context.[181] "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."[182]

Defendants, and most notably Attorney General Paxton, are trying to stop the widespread defiance of GA-38 by local officials. Ensuring that state law is not undermined by local officials is an important state interest, one that would be undermined by Plaintiffs' requested temporary restraining order.

*Public Interest:* Plaintiffs' request, which is to force everyone to wear masks, must be weighed against other individuals' desire to be able to make that choice for themselves. This issue is particularly glaring for individuals who may not be able to wear masks due to their own disabilities or medical concerns, an issue not addressed by Plaintiffs.

Also, Plaintiffs' proposed restraining order would upset, rather than maintain, the status quo. As set forth in the Texas Supreme Court's recent Order, the status quo regarding mask mandates in

---

[179] *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

[180] *See Gibson*, No. 16-354-SDD-RLB, 2016 WL 5796897, at *2 (M.D. Lou. 2016); *Parrott v. Livingston*, No. 6:15cv866, 2016 WL 4487918, at *1 (E.D. Tex. 2016); *see also Machete Prods., L.L.C.*, 809 F.3d 281, 288 (5th Cir. 2015) (quoting *Eccles v. Peoples Bank of Lakewood Village, Cal.*, 333 U.S. 426, 431 (1948)).

[181] *See Texas v. Ysleta Sur del Pueblo*, 955 F.3d 408, 415 (5th Cir. 2020) ("Although the Tribe has an interest in self-governance, the Tribe cannot satisfy that interest by engaging in illegal activity," and allowing ongoing operations of an illegal casino "would countenance ongoing violations" of Texas law.).

[182] *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345 (1977) (citations omitted)).

Texas has been that such mandates have been at the discretion of Governor Abbott.[183] Plaintiffs' proposed restraining order would upset the status quo of who ultimately controls COVID-19-related decisions for the State of Texas. Also, any such order would place this Court fundamentally at odds with the Texas Supreme Court which, again, said the status quo favors the State in this context.

## CONCLUSION

For the reasons set forth above, Defendants respectfully request that this Court: (1) deny Plaintiffs' request for a temporary restraining order; (2) grant Defendants' motion to dismiss; and (3) award Defendants such further relief as the Court deems just and proper.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

SHAWN COWLES
Deputy Attorney General for Civil Litigation

THOMAS A. ALBRIGHT
Chief - General Litigation Division

/s/  *Todd Dickerson*
TODD DICKERSON
Texas Bar No. 24118368
RYAN G. KERCHER
Texas Bar No. 24060998
TAYLOR GIFFORD
Texas Bar No. 24027262
CHRISTOPHER HILTON
Texas Bar No. 24087727
Assistant Attorneys General
Office of the Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548

---

[183] https://search.txcourts.gov/SearchMedia.aspx?MediaVersionID=f69537ef-cd47-46d7-a457-42f201955c6a&coa=cossup&DT=STAY%20ORDER%20ISSUED&MediaID=46ddfec0-7bd9-455e-8521-9dcb86fb4b0e (last visited 09/12/2021).

Phone: 512-463-2120
Fax: 512-320-0667
Todd.Dickerson@oag.texas.gov
Ryan.Kercher@oag.texas.gov
Taylor.Gifford@oag.texas.gov
Christopher.Hilton@oag.texas.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I certify that on September 13, 2021, a true and correct copy of the foregoing document was served via the Court's CM/ECF system to all counsel of record.

*/s/ Todd Dickerson*
Todd Dickerson
Assistant Attorney General