IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| E.T. by and through her parents and and next friends, et al. | § § § | |
| *Plaintiffs,* | § § § | |
| v. | § § § | Civil Action No. 1:21-cv-00717-LY |
| Mike Morath, in his official capacity as the Commissioner of the Texas Education Agency; the Texas Education Agency; and Attorney General Ken Paxton, in is official capacity as Attorney General of Texas, | § § § § § § § | |
| *Defendants.* | § § | |

## DEFENDANTS' TRIAL BRIEF

### INTRODUCTION

Plaintiffs are seven Texas-based children with disabilitie suing to enjoin two COVID-19-related orders: Governor Abbott's Executive Order GA-38 ("GA-38") and the Texas Education Agency ("TEA")'s August 5, 2021 Guidance ("August 5th Guidance," collectively, the "Challenged Orders"). They complain that the Challenged Orders—which require nothing of Plaintiffs themselves—stops local officials from mandating the wearing of facemasks.

Plaintiffs' claims suffer from numerous jurisdictional defects, with standing being the most glaring. Plaintiffs cite the risk of a COVID-19 infection as their jurisdictional hook. However, this injury is speculative as it turns on: (1) how their school districts will react if the Challenged Orders are enjoined; (2) how students in those districts will react to a mask mandate; (3) who would contract COVID-19 in a district that mandated masks, as opposed to one that just encouraged masks; (4) whether Plaintiffs would contract COVID-19 themselves and from whom; (5) the severity of

Plaintiffs' infection (asymptomatic, mild, severe, etc.) and the reasons for those reactions; and (6) various other contingencies. Plaintiffs will need to show that each contingency underlying their injuries is certainly impending to obtain standing, which they did not and realistically cannot do. What's more, due to traceability and generalized grievance issues, Plaintiffs must connect their future COVID-19 infections to both the Challenged Orders *and* their disabilities.

If Plaintiffs could somehow overcome the "certainly impending" jurisdictional hurdle, they would then need to convince this Court to ignore 120 years of caselaw requiring an enforcement connection between the defendants sued and the statutes challenged. Yet numerous Fifth Circuit and Supreme Court decisions confirm that Plaintiffs sued the wrong defendants here and that they lack standing for various other reasons.

Plaintiffs' claims: (1) fail for lack of standing and on sovereign immunity grounds (2) claims fail because they cannot meet their burden of proof on any claim.

<u>FACTS</u>

I.    **The Texas Disaster Act, GA-38, and the August 5th Guidance.**

This case centers on Governor Abbott's GA-38 and the TEA's August 5th Guidance.

**GA-38:** GA-38 is one of many executive orders Governor Abbott issued in response to the COVID-19 pandemic. This order is authorized by the Texas Disaster Act ("TDA"), the State's comprehensive set of statutes allocating powers and responsibilities during a disaster.[1] The TDA makes the Governor "responsible for meeting . . . the dangers to the state and people presented by disasters."[2] The TDA gives the Governor a broad array of powers allowing him to fulfill this responsibility.[3] Among other relevant provisions, Tex. Gov't Code § 418.012 gives the Governor the

---

[1] *See* Tex. Gov't Code §§ 418.001 *et seq.*
[2] *Id.* at § 418.011.
[3] *Id.* at §§ 418.011–.026.

power to issue executive orders carrying "the force and effect of law."[4] The Texas Supreme Court has interpreted the TDA to allow the Governor to issue orders aimed at a variety of concerns, such as "encouraging economic recovery, preserving constitutional rights, or promoting ballot integrity."[5] The scope of the Governor's emergency powers is not at issue here.

Governor Abbott issued GA-38 on July 29, 2021.[6] This order seeks to create a uniform response to the COVID-19 pandemic, one that gives individuals the autonomy to make personal health decisions free from government control.[7] GA-38 bans most state and local officials from mandating the wearing of face masks and preempts any conflicting local orders on this issue.[8] GA-38 "strongly encourages" people to wear masks[9] but ultimately gives individuals the freedom to choose whether or not to wear a mask.[10]

A local official or entity who imposes a mask mandate in violation of GA-38 is subject to a fine of up to $1,000.[11] Other than local officials, individuals cannot be punished under this section.[12] The ban on local mask mandates first appeared in GA-34, which was issued on March 2, 2021 and then again was expressly carried forward in GA-36, which was issued on May 18, 2021.[13]

**The August 5th Guidance:** The August 5th Guidance related to various issues affecting schools due to COVID-19 has been superseded several times. The portion of the August 5th Guidance Plaintiffs assert as relevant merely reiterates the requirements of GA-38:

> Per GA-38, school systems cannot require students or staff to wear a mask. GA-38 addressed government-mandated face coverings in response to the COVID-19

---

[4] *Id.* at § 418.012.
[5] *Abbott v. Anti-Defamation League Austin, Sw., & Texoma Regions*, 610 S.W.3d 911, 918 (Tex. 2020).
[6] Ex. 1. A copy of GA-38 is publicly available at the following website: https://gov.texas.gov/uploads/files/press/EO-GA-38_continued_response_to_the_COVID-19_disaster_IMAGE_07-29-2021.pdf (last visited September 29, 2021).
[7] *Id.* at 1.
[8] *Id.* at 3–5.
[9] *Id.* at 1.
[10] *Id.* at 3.
[11] *Id.* at 4–5.
[12] *See id.*
[13] Exh. 2 at 2. A copy of GA-36 is publicly available at the following website:
https://lrl.texas.gov/scanned/govdocs/Greg%20Abbott/2021/GA-36.pdf (last visited September 29, 2021).

pandemic. Other authority to require protective equipment, including masks, in an employment setting is not necessarily affected by GA-38.

School systems must allow individuals to wear a mask if they choose to do so.[14]

The August 5th Guidance does not specify how it will be enforced or who will enforce it.[15]

The August 5th Guidance was superseded two weeks later when TEA issued a revised guidance (the "August 19th Guidance") that "replac[ed] all prior guidances."[16] Relevant here, the August 19th Guidance's mask provision stated as follows: "Please note, mask provisions of GA-38 are not being enforced as the result of ongoing litigation. Further guidance will be made available after the court issues are resolved."[17] The August 19th Guidance did not specify who would be enforcing GA-38's mask provisions absent ongoing litigation.[18]

The August 19th Guidance was superseded on September 2, 2021 (the "September 2nd Guidance").[19] Like its predecessor, the September 2nd Guidance also states that "[the] mask provisions of GA-38 are not being enforced as the result of ongoing litigation" due to "court issues" regarding GA-38.[20] It notes that TEA will issue a further guidance regarding face masks after pending court issues are resolved.[21]

On September 17, 2021, TEA again updated its guidance regarding mask policies ("September 17th Guidance"), readopting the language used in its August 5 Guidance (quoted *supra*).[22]

---

[14] Exh. 3 at 1.

[15] *See id.*

[16] Exh. 4 at 1.

[17] *Id.*

[18] *See id.*

[19] Exh. 5. A copy of the September 2nd Guidance is publicly available at https://tea.texas.gov/sites/default/files/covid/SY-20-21-Public-Health-Guidance.pdf (last visited September 29, 201).

[20] *Id.*

[21] *Id.*

[22] Exh. 6. A copy of the September 17th Guidance is publicly available at https://tea.texas.gov/sites/default/files/covid/210917_21-22%20Public%20Health%20Guidance_final.pdf (last visited September 29, 2021).

## II.    TEA and the Office of the Attorney General's Actions Regarding GA-38 and the Public Health Guidance.

TEA's public health guidance lists GA-38's requirements regarding mask mandates, but does not itself impose such requirements.[23] TEA does not prohibit schools from instituting mask mandates, GA-38 does.[24] TEA's public health guidance references GA-38's mask requirements for informational purposes.[25] The intended effect of TEA's public health guidance is to provide information to the education community.[26] TEA does not have the authority to enforce GA-38, and cannot use its enforcement mechanisms against school districts requiring masks in contravention of GA-38.[27] TEA's policy is for schools to provide in-person instruction to as many students as can take advantage of it.[28] TEA does not offer guidance regarding required mitigation strategies.[29]

TEA does not expect that school districts will follow its Public Health Guidance or not, but only that the districts will seriously consider the guidance.[30] TEA does not take action if school districts do not follow its guidance.[31] School districts have not sought TEA input on whether a given policy violates GA-38.[32] TEA has not enforced GA-38.[33] TEA knows that districts will have different reactions to its public health guidance.[34] TEA is unaware of any school districts withdrawing mask mandates as a result of its public health guidance.[35] The intent of TEA's public health guidance is to clearly restate existing law.[36]

---

[23] Exh. 7, 41:22-42:2.
[24] *Id.* at 42:3-7.
[25] *Id.* at 42:8-18.
[26] *Id.* at 43:22-44:2.
[27] *Id.* at 44:18-45:14.
[28] Exh. 8, 18:3-9.
[29] *Id.* at 18:10-23.
[30] *Id.* at 28:3-14.
[31] *Id.* at 28:15-22.
[32] *Id.* at 30:2-11.
[33] *Id.* at 34:2-7.
[34] *Id.* at 39:2-22.
[35] *Id.* at 50:24-51:5.
[36] *Id.* at 52:18-25.

TEA provides information to the OAG regarding local education agencies about which TEA has received complaints regarding compliance with GA-38.[37] TEA does so at the request of the OAG.[38] The information TEA provides is public information.[39] TEA does not know how the OAG uses the information.[40] When TEA receives complaints that school districts are not in compliance with GA-38, it responds that it does not have the authority to investigate such complaints, and refers the complainant to the local grievance process.[41]

TEA does have the authority to make rules, which are found in the Texas Administrative Code.[42] TEA adopts such rules pursuant to the procedures required by the Administrative Procedures Act.[43] TEA's Public Health Guidance is not a rule adopted by TEA pursuant to the Administrative Procedures Act, and TEA's mechanisms for enforcing its rules do not apply to enforcing its Public Health Guidance.[44] While the Public Health Guidance contains some requirements, its discussion of masks do not constitutes requirements.[45] TEA's discussion of mask requirements in the Public Health Guidance is not subject to investigation or enforcement by TEA, and TEA has instituted no such actions regarding alleged violations of GA-38.[46]

The Office of the Attorney General ("OAG") has issued letters to school districts regarding compliance with GA-38.[47] The intent of those letters is to give the school districts the opportunity to move into compliance with the current state of the law, with the understanding that the OAG might institute legal action to assert the supremacy of state law over local ordinances or policies.[48] That legal

---

[37] Exh. 7, 19:10-16.
[38] *Id.* at 19:17-23.
[39] *Id.* at 34:19-23.
[40] *Id.* at 19:24-20:9.
[41] *Id.* at 22:3-12.
[42] *Id.* at 70:14-20.
[43] *Id.* at 70:21-25.
[44] *Id.* at 71:10-18.
[45] *Id.* at 71:19-72:17.
[46] *Id.* at 72:18-25.
[47] Exh. 9, 10:14-19.
[48] *Id.* at 22:4-19

action includes civil lawsuits in State Court seeking injunctions against mask mandates adopted by local school districts.[49] The authority of the OAG includes seeking an injunction to get a declaration and enjoin *ultra vires* acts.[50] The OAG has instituted legal actions against school districts such as Round Rock and Richardson school districts.[51] Those lawsuits demonstrate the nature of relief contemplated by OAG letters to school districts.[52] The letters to school districts contemplated seeking the full range of available civil action remedies.[53] Private parties have also sued local officials for violating GA-38 based on an *ultra vires* theory.[54]

## III.     An Overview of Plaintiffs' Claims.

### A.     *Plaintiffs' Legal Theories*

Plaintiffs are seven young Texas-based students with disabilities,[55] and allege they are at "an increased risk of serious complications or death" from COVID-19 due to their disabilities.[56] Plaintiffs challenge GA-38's ban on mask mandates and the related portion of the August 5th Guidance referencing GA-38's position on mask mandates.[57] Plaintiffs cannot show the Challenged Orders were ever enforced against them or explain how they could ever be in the future.

Plaintiffs claim the Challenged Orders: (1) violate the Americans with Disabilities Act ("ADA"); (2) violate Section 505 of the Rehabilitation Act ("Section 504"); and (3) are preempted by those two statutes, as well as the American Rescue Plan Act of 2021 ("ARPA Act").[58] Plaintiffs seek to enjoin Defendants from enforcing the Challenged Orders as well as declaratory relief against them

---

[49] *Id.* at 23:11-19.

[50] *Id.* at 19:7-12.

[51] *Id.* at 39:24-40:5.

[52] *Id.*

[53] *Id.* at 40:11-15.

[54] *See, e.g.,* Order at 3, *Scribner, et al. v. Treger, et al.*, No. 02-21-00277-CV (Tex.App.—Fort Worth, Sept. 13, 2021) (publicly available at https://tinyurl.com/2ndCOAOrder02-21-00277.

[55] ECF 45 ("2d Am. Compl.") at ¶¶ 2, 17–23.

[56] *Id.* at ¶ 2.

[57] *Id.* at ¶ 2; ECF 21-2.

[58] *Id.* at ¶¶ 2-3, 27, 73–97.

as a group.[59] These claims rest on Plaintiffs' insistence that the Challenged Orders will increase the spread of COVID-19 in schools, resulting in Plaintiffs either (1) becoming infected with COVID-19 if they attend school in-person or (2) being forced to stay home to avoid contracting COVID-19.[60]

      B.     *Plaintiffs' Schools and School Districts, and Attendance*

Plaintiff M.P. attends Fort Settlement Middle School in Fort Bend ISD.[61] Fort Bend ISD has not had a mask mandate for most of the 2021-22 school year.[62] Despite having no mask mandate in place, Fort Bend ISD's COVID-19 positivity rate is not markedly different from the other school districts at issue in this lawsuit.[63] The current infection rate among students and staff combined in Fort Bend ISD is .23%, and there are only four positive COVID-19 cases in Plaintiff M.P.'s school, out of a combined 1,502 students and staff.[64] Plaintiff M.P. has elected to attend school remotely.[65] The impacts or injuries of which Plaintiff M.P. complains include a loss of speech services and reading support, poor class performance, and loss of reading fluency.[66]

Plaintiff E.T. attends Pearson Ranch Middle School in Round Rock ISD.[67] Round Rock ISD has a mask mandate in place.[68] Despite some activities remaining mask-optional at her school, Plaintiff E.T. has elected to attend school in-person.[69] If Round Rock ISD rescinds its mask mandate, Plaintiff E.T. will elect to attend school remotely. According to DSHS data and Round Rock ISD data, both Plaintiff E.T.'s school and Round Rock ISD have COVID-19 infection rates similar to Fort Bend

---

[59] *Id.* at pgs. 38-39 (Prayer for Relief).
[60] *Id.* at ¶¶ 35-42, 66–72.
[61] Stipulated Facts at Exhibit A.
[62] *Id.*
[63] Exh. 10. For complete Department of State Health Services ("DSHS") COVID-19 school district information for the relevant schools and school districts, *see* Exh. 13-19.
[64] Exhs. 11-12.
[65] Stipulated Facts at Exh. A.
[66] *Id.*
[67] *Id.*
[68] *Id.*
[69] *Id.*

ISD.[70] The impacts or injuries of which Plaintiff E.T. complains include the "loss of significant educational opportunities," educational supplies, and "extracurriculars."[71]

Plaintiff S.P. attends Canyon Creek Elementary in Richardson ISD.[72] Richardson ISD has a mask mandate in place.[73] Plaintiff S.P. has elected to attend school in person and will continue to do so whether his school rescinds its mask mandate or not.[74] According to DSHS data and Richardson ISD data, both Plaintiff S.P.'s school and Richardson ISD have COVID-19 infection rates similar to Fort Bend ISD.[75] The impacts or injuries of which Plaintiff S.P. complains include falling behind in class (including the areas of reading, math, and socialization) as the result of attending school remotely in the previous school year.[76]

Plaintiff J.R. attends Bonham Academy in San Antonio ISD.[77] San Antonio ISD has a mask mandate in place.[78] Despite some activities at her school remaining mask free, Plaintiff J.R. has elected to attend school in person.[79] Plaintiff J.R.'s parents have purchased HEPA filters for her classroom.[80] Plaintiff J.R.'s concern regarding masks is not based solely on her own disabilities, but also on the asthma and autoimmune disorder diagnoses of her family.[81] If San Antonio ISD rescinds its mask mandate, Plaintiff J.R. will elect to homeschool.[82] Both DSHS data and San Antonio ISD data reflect that Plaintiff J.R.'s school and San Antonio ISD have COVID-19 infection rates similar to Fort Bend

---

[70] Exh. 10;
[71] Stipulated Facts at Exh. A.
[72] *Id.*
[73] *Id.*
[74] *Id.*
[75] Exhs. 10, 21-22.
[76] *Id.*
[77] *Id.*
[78] *Id.*
[79] *Id.*
[80] *Id.*
[81] *Id.*
[82] *Id.*

ISD.[83] The impacts or injuries of which Plaintiff J.R. complains include the loss of access to services and support that in-person school provides, and that homeschooling does not.[84]

Plaintiff H.M. attends River Place Elementary School in Leander ISD.[85] Leander ISD has a mask mandate in place.[86] Plaintiff H.M. has elected to attend school in person.[87] If another classmate tests positive for COVID-19, Plaintiff H.M. will elect to attend school remotely.[88] According to DSHS data and Leander ISD data, both Plaintiff H.M.'s school and Leander ISD have COVID-19 infection rates similar to Fort Bend ISD.[89] The impacts or injuries of which Plaintiff H.M. complains include missing out on peer modeling experiences to aid his behavioral and speech development, as well as the loss of face-to-face instruction.[90]

Plaintiff A.M. attends Roosevelt Elementary in Edgewood ISD.[91] Edgewood ISD has a mask mandate in place.[92] Even though some activities remain mask-optional, Plaintiff A.M. has elected to attend school in-person.[93] If Edgewood ISD rescinds its mask mandate, Plaintiff A.M. will elect to attend remotely.[94] According to DSHS data, both Plaintiff A.M.'s school and Edgewood ISD have COVID-19 infection rates similar to Fort bend ISD.[95] The impacts or injuries of which Plaintiff A.M. complains include a loss in total hours of instruction, and the achievement of substantial progress in classes, including verbalizing words.[96]

---

[83] Exhs. 10, 23-24.
[84] Stipulated Facts at Exh. A.
[85] *Id.*
[86] *Id.*
[87] *Id.*
[88] *Id.*
[89] Exhs. 10, 25-26.
[90] Stipulated Facts at Exh. A.
[91] *Id.*
[92] *Id.*
[93] *Id.*
[94] *Id.*
[95] Exh. 10.
[96] Stipulated Facts at Exh. A.

Plaintiff E.S. attends Skipcha Elementary School in Killeen ISD. Plaintiff E.S.'s school does not have a mask mandate in place. Plaintiff E.S. attends school in person.[97] If remote options were available, Plaintiff E.S. would consider them, but would be concerned regarding the potential loss of social interaction.[98] According to both DSHS data and Killeen ISD data, Plaintiff E.S.'s school and Killeen ISD have COVID-19 infection rates similar to those districts with mask mandates in place;[99] in fact, Plaintiff E.S.'s school has only 3 positive student cases.[100] The impacts or injuries of which Plaintiff E.S. complains include lost social interaction, loss of sufficient progress in class, and loss of "1:1 assistance."[101]

Although Plaintiffs allege losses of free appropriate public education, none allege or can show that: (1) they have Section 504 plans in place; (2) that they have sought Section 504 plans or other accommodations due to masking; or that they have exhausted remedies set out by the Individuals with Disabilities Education Act. Instead, Plaintiffs complain of Attorney General Paxton's "Enforcement Campaign" regarding GA-38,[102] which refers to his efforts to stop local officials from violating a state law.[103] Plaintiffs cannot show that Attorney General Paxton ever threatened to sue them, or anyone closely associated with them, for violating GA-38.[104] Indeed, such a suit would be impossible as GA-38 regulates the conduct of public officials and entities, not individuals.[105] Plaintiffs likewise cannot show the TEA Defendants ever enforced or threatened to enforce GA-38.

---

[97] Stipulated Facts at Exh. A.
[98] *Id.*
[99] Exhs. 10, 27-28.
[100] Exh. 28.
[101] Stipulated Facts at Exh. A.
[102] *See, e.g.*, *id.* at ¶¶ 51–72 (bold omitted).
[103] *See* Tex. Gov't Code § 418.012 (giving the Governor's emergency orders the force and effect of law).
[104] *See id.*
[105] *See* Ex. D.

## LEGAL STANDARDS

Plaintiffs, "as the parties asserting federal subject-matter jurisdiction, bear the burden of proving that its requirements are met."[106] "A plaintiff is also required to submit facts through some evidentiary method and has the burden of proving by a preponderance of the evidence that the trial court does have subject matter jurisdiction."[107] Moreover, courts "have an independent obligation to determine whether subject-matter jurisdiction exists."[108] If Plaintiffs do not sustain their burden, or if the Court is not otherwise satisfied that it has subject-matter jurisdiction, then the court lacks "power to adjudicate the case," and it must be dismissed.[109]

With respect to the merits of plaintiff's claims, "the burden is on the plaintiff to prove every element."[110] At a bench trial, the Court should ignore any inadmissible evidence that it may hear when making its decisions.[111] Appellate courts will "review findings of fact for clear error and conclusions of law and mixed questions of law and fact de novo" in an appeal from a bench trial.[112]

## JURISDICTIONAL BARRIERS TO PLAINTIFFS' CLAIMS

### I.    Plaintiffs Lack Standing to Bring this Suit.

Plaintiffs' claim to standing is foreclosed by multiple Supreme Court and Fifth Circuit decisions. Plaintiffs' alleged injuries—being unable to safely return to school due to the Challenged Orders—are too remote and speculative to confer standing. And their injuries are not redressable by

---

[106] *Willoughby v. U.S. ex rel. U.S. Dep't of the Army*, 730 F.3d 476, 479 (5th Cir. 2013).

[107] *Cell Science Sys. Corp. v. La. Health Servs.*, 804 F. App'x 260, 264 (5th Cir. 2020) (quoting *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981)) (cleaned up).

[108] *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 501 (2006).

[109] *Hooks v. Landmark Indus., Inc.*, 797 F.3d 309, 312 (5th Cir. 2015) (quoting *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998)) (cleaned up).

[110] *Miraglia v. Bd. of Sup'rs of La. State Museum*, 901 F.3d 565, 573 (5th Cir. 2018) (quoting *Malvino v. Delluniversita*, 840 F.3d 223, 231 (5th Cir. 2016)) (cleaned up).

[111] *See Harris v. Rivera*, 454 U.S. 339, 346 (1981).

[112] *Dickerson v. Lexington Ins. Co.*, 556 F.3d 290, 294 (5th Cir. 2009).

a favorable decision in this suit, largely because Plaintiffs did not sue the officials with proper enforcement authority.

Plaintiffs' prior briefing tries to confuse the standing issue.[113] Thus, we will first clarify the nature of Plaintiffs' injury, explaining that Plaintiffs must meet the test applicable to "imminent" injuries. We will then explain that Plaintiffs need to sue an official or entity with enforcement authority over the Challenged Orders. Finally, we will analyze standing issues particular to each Defendant and note the various binding cases that foreclose Plaintiffs' claim to standing.

### A.     Plaintiffs' Must Satisfy the Test for "Imminent" Injuries.

An injury can either be "actual" or "imminent" for standing purposes.[114] An imminent injury is subject to a more stringent standing test.[115] To be legally cognizable, the threatened injury must be "certainly impending"; "allegations of *possible* future injury are not sufficient."[116]

Plaintiffs seek only equitable relief in this suit.[117] Under Fifth Circuit and Supreme Court precedent, requests for equitable relief implicate the standing test for "imminent" injuries.[118] This means Plaintiffs must show a "substantial risk that they will suffer the potential future injury absent the requested relief."[119]

This conclusion is also justified by the nature of Plaintiffs' alleged injuries. Plaintiffs claim the Challenged Orders will increase the spread of COVID-19 in schools, which will result in Plaintiffs

---

[113] *See generally* ECF 26.

[114] *See, e.g., Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 409 (2013) (hereinafter "*Amnesty International*").

[115] *See id.*

[116] *Id.* (brackets and quotations omitted).

[117] *See* 2d Am. Compl. at pgs. 38–39 (Prayer for Relief).

[118] *See, e.g., Stringer v. Whitley*, 942 F.3d 715, 721 (5th Cir. 2019); ("[P]laintiffs seeking injunctive relief must show a continuing or threatened future injury to themselves."); *Deutsch v. Annis Enterprises, Inc.*, 882 F.3d 169, 173 (5th Cir. 2018) (noting that the "standing requirements for equitable relief" require the plaintiff to "show that 'there is a real and immediate threat of repeated injury'") (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)); *Machete Productions, L.L.C. v. Page*, 809 F.3d 281, 288 (5th Cir. 2015) ("In the context of prospective injunctive and declaratory relief, past exposure to illegal conduct, by itself, does not evince a present case or controversy and thus cannot establish standing.") (citing *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974)).

[119] *Stringer*, 942 F.3d at 721. The "substantial risk" standard is likely synonymous with—or at least not meaningfully distinguishable from—the "certainly impending" standard. *See Amnesty International*, 568 U.S. at 414 n.5).

either (1) becoming infected with COVID-19 if they attend school in-person or (2) being forced to stay home to avoid getting COVID-19.[120] Fearing a future COVID-19 infection is a forward-looking injury for obvious reasons.[121] And staying home from school (whether now or in the future) due to fear of a future COVID-19 infection also qualifies as forward-looking injury since: "[Plaintiffs] cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending."[122]

In sum, Plaintiffs' alleged injuries are subject to the stricter standing test applicable to "imminent" injuries. As shown below, Plaintiffs lack standing as they have not, and realistically cannot, meet this test.

## B.    Plaintiffs Cannot Prove a "Certainly Impending" Injury Fairly Traceable to the Challenged Orders.

In *Glass v. Paxton*, the Fifth Circuit set forth a two-step test for analyzing whether an injury is too speculative to confer standing. First, identify the core injury at issue.[123] If the injury is self-inflicted (like self-censorship or, here, staying home from school), the focus is on "the catalyst" for that self-inflicted injury—i.e. the harm the plaintiffs sought to avoid.[124] Second, "identify each contingency prompting" the injury (or the catalyst for that injury).[125] "Each link in the chain of contingencies must be 'certainly impending' to confer standing."[126]

**Step 1: Identify the Harm:** We analyzed this issue above. Plaintiffs' core injury is the threat of a COVID-19 infection. For obvious traceability reasons, Plaintiffs cannot rely on the threat we all

---

[120] *See* 2d Am. Compl. at ¶¶ 35–50, 66–72.

[121] *See Amnesty International*, 568 U.S. at 409 ("[W]e have repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient.") (quotations and brackets omitted).

[122] *Id.* at 416; *Glass v. Paxton*, 900 F.3d 233, 238–42 (5th Cir. 2018) (applying *Amnesty International's* "certainly impending" test to professors' decision to self-censor their speech due to the alleged increased risk of harm stemming from a statute allowing handguns in college classrooms).

[123] *Glass*, 900 F.3d at 239.

[124] *Id.*

[125] *Id.*

[126] *Id.*

face from COVID-19. Rather, Plaintiffs must show a certainly impending threat of a COVID-19 infection stemming from the Challenged Orders.[127]

**Step 2: Identify Each Link in the Chain of Contingencies:** There are at least eight contingencies underlying Plaintiffs' claim to standing.

*Contingency #1: Will the Plaintiffs' Schools Impose a Mask Mandate?* Plaintiffs must show a substantial likelihood that their schools would impose mask mandates were it not for the Challenged Orders' ban on mask mandates. The seven Plaintiffs attend seven different school districts.[128] Of these seven school districts, five have mask mandates despite the Challenged Orders.[129] The five Plaintiffs at the "mask mandate" school districts are not being injured by the Challenged Orders, and it is unlikely that this Court's injunction against the Challenged Orders will materially change the behavior of school districts already defying GA-38, which is a state law.[130]

For the two remaining districts, their decision not to impose a mask mandate must be attributable to the Challenged Orders for purposes of Plaintiffs' standing. For example, a district that does not think mask mandates are good policy—or that used the Challenged Orders as political cover for such a belief—would not be impacted by an injunction against the Challenged Orders. In that scenario, Plaintiffs would need to sue the school district's board of trustees and convince this Court to order those trustees to enact a mask mandate; this Court could not redress Plaintiffs' injuries as this suit stands now. Realistically, when a plaintiff's injury turns on how a group of officials will respond

---

[127] *See, e.g., California v. Texas*, 141 S. Ct. 2104, 2108 (2021) (finding that the plaintiff must assert an injury fairly traceable "to the allegedly unlawful conduct" challenged in the suit) (quotations omitted); *Amnesty International*, 568 U.S. at 401–02 ("[E]ven if respondents could demonstrate that the threatened injury is certainly impending, they still would not be able to establish that this injury is fairly traceable to [the challenged statute].").

[128] 2d Am. Compl. at ¶¶ 66–72.

[129] *Compare id.* at ¶¶ 66–72, *with COVID-19: List of Government Entities Unlawfully Imposing Mask Mandates*, ATTORNEY GENERAL OF TEXAS, https://www.texasattorneygeneral.gov/covid-governmental-entity-compliance (Sept. 29, 2021). The six schools that have imposed mask mandates are: (1) Round Rock Independent School District; (2) Edgewood Independent School District; (3) San Antonio Independent School District; (4) Killeen Independent School District; (5) Leander Independent School District; and (6) Richardson Independent School District.

[130] Tex. Gov't Code § 418.012.

to a hot-button political issue at some undetermined point in the future, that plaintiff is going to have serious standing problems.

*Contingency #2: A Mask Mandate Will Substantially Increase the Number of School Children Wearing Masks:* The Challenged Orders do not prohibit anyone from wearing a mask and, in fact, these orders encourage the wearing of masks.[131] In this context, Plaintiffs will need to show that an order mandating masks will significantly increase the number of people wearing masks when compared to an order that merely encourages mask wearing. Even for a "mask mandate" order, the compliance rate would turn on numerous factors: the specifics of the order; the rate of enforcement; the penalty for enforcement; loopholes or exceptions to the order, etc. Plaintiffs make no meaningful showing on this point.

*Contingency #3: The Hypothetical Maskless Child with COVID-19:* Plaintiffs must show a certainly impending risk that some maskless child in the future (the hypothetical "Maskless Child") in their school will become infected with COVID-19. If the Maskless Child was masked, then his contracting COVID-19 is not traceable to the Challenged Orders. This is an easy contingency to meet, but it leads to other problems for Plaintiffs.

*Contingency #4: The Maskless Child Spreads COVID-19 Due to Being Maskless:* In this context, the Maskless Child with COVID-19 would need to spread the disease to others in the Plaintiff's school when he otherwise would not have if he was wearing a mask. If the Maskless Child would have infected others regardless of his masked status, then those subsequent infections are not traceable to the Challenged Orders. This contingency is harder to meet than the one above.

*Contingency #5: The Maskless Child with COVID-19 Interacts with the Plaintiff:* To catch a disease from the Maskless Child, the Plaintiff must interact with him (or at least interact with others who interacted with him). This issue turns on a number of factors: the Maskless Child's hygiene practices; when he discovered he was sick; how he responded to this discovery; how social he is, etc.

---

[131] *See* Exs. A, D.

*Contingency #6: The Plaintiff Catches COVID-19 from the Maskless Child:* This contingency is obvious. To have an injury traceable to the Maskless Child (and thus the Challenged Orders), the Plaintiff must contract COVID-19 from the Maskless Child. Less obvious is the fact that the Plaintiff must catch COVID-19 from the Maskless Child *even though the Plaintiff is wearing a mask.* If even the Plaintiffs refuse to wear masks in school, then we have to stop and ask ourselves: What are we even doing here?

*Contingency #7: The Plaintiff will have a Severe Reaction to COVID-19:* Plaintiffs cannot rely on a generalized fear that they will contract COVID-19. The entire world is under that threat. To overcome the generalized grievance hurdle, Plaintiffs must assert a sufficiently particularized injury.[132]

Here, Plaintiffs claim their disabilities put them at "an increased risk of serious complications or death in the event that they contract COVID-19."[133] It is the increased risk of "serious complications or death" due to their disabilities that helps create a more particularized injury.[134] It is not the risk of an asymptomatic or light case, which is what most children experience if they contract COVID-19.[135] This leads to the final contingency.

*Contingency #8: The Plaintiff will Have a Severe Reaction to COVID-19 Because of His Disability:* This follows from the point above. Plaintiffs' claims turn on their increased risk due to COVID-19 *because of* their disabilities.[136] Were it not for this "disability" connection, their alleged injuries would be

---

[132] *See, e.g., Warth v. Seldin*, 422 U.S. 490, 499 (1975) (defining a generalized grievance as one "shared in substantially equal measure by all or a large class of citizens"); *Kulikowski v. Polis*, 20-CV-03152-RM-NYW, 2021 WL 2517149, at *4 (D. Colo. May 28, 2021) (noting, in the context of a plaintiff's challenge to a governor's COVID-19-related orders, the plaintiff must articulate a particularized injury to overcome generalized grievance issues), report and recommendation adopted, 20-CV-03152-RM-NYW, 2021 WL 2514575 (D. Colo. June 18, 2021); *Delaney v. Baker*, 511 F. Supp. 3d 55, 69 (D. Mass. 2021) (same); *Parker v. Wolf*, 506 F. Supp. 3d 271, 288 (M.D. Pa. 2020) (same).

[133] 2d Am. Compl. at ¶ 3.

[134] Although it is certainly debatable whether, even with this limit, Plaintiffs' alleged injuries are sufficiently particularized to confer standing.

[135] *Frequently Asked Questions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/faq.html ("Children can be infected with the virus that causes COVID-19 and get sick with COVID-19. Most children with COVID-19 have mild symptoms or they may have no symptoms at all ('asymptomatic').") (last visited Sept. 11, 2021).

[136] *See, e.g.*, 2d Am. Compl. at ¶¶ 2, ¶¶ 66–72.

nonjusticiable generalized grievances. Thus, even if Plaintiffs could meet all the contingencies above, they would still lack standing if they would have become seriously ill regardless of their disabilities.

*Putting it Together:* Plaintiffs cannot prove a certainly impending risk of COVID-19 infection fairly traceable to the Challenged Orders. Under binding precedent, Plaintiffs must allege plausible facts showing that "[e]ach link in the chain of contingencies" noted above is "certainly impending."[137] Plaintiffs cannot meet their burden of proof.

Plaintiffs may contest the fairness of the analysis above—that our analysis effectively insulates the Challenged Orders from review. The Supreme Court rejected this argument in *Amnesty International*, finding "the assumption that if respondents have no standing to sue, no one would have standing, is not a reason to find standing."[138]

And our analysis—which is the analysis required by binding precedent—merely reveals that *these* Plaintiffs will not have standing to bring *these* claims. Plaintiffs are not the object of the Challenged Orders, and the Challenged Orders did not require them to do (or not do) anything. It will always be difficult for a plaintiff to establish standing in this context.[139] That difficulty is magnified when, as here, the plaintiff's claim to standing turns on how third parties not before the court will respond (school board trustees, the hypothetical Maskless Child, etc.).

---

[137] *Glass v. Paxton*, 900 F.3d 233, 239 (5th Cir. 2018).

[138] *Amnesty International*, 568 U.S. at 420 (quotations and brackets omitted).

[139] *See, e.g.*, *Bennett v. Spear*, 520 U.S. 154, 167 (1997) ("[To have standing] the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court."); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992) ("[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish.") (quotations omitted).

### C.    Plaintiffs Lack Standing, Largely Because They Did Not Sue an Official or Entity with Enforcement Authority Over the Challenged Orders.

#### 1.    Over 120 Years of Precedent Require Plaintiffs to Sue an Official or Entity with Enforcement Authority Over the Challenged Orders.

To have standing, a plaintiff *must* sue an official or entity with enforcement authority over the law in question. As we will show in the next section, Plaintiffs' suit violates this core jurisprudential rule.

Over 120 years of caselaw support the need to sue an official or entity with enforcement authority. In 1899, the U.S. Supreme Court found that the Eleventh Amendment requires there to be a "special relation" between "the state officers named" and the "particular statute alleged to be unconstitutional."[140] About a decade later the Court, in *Ex parte Young*, reframed this analysis as requiring state officers to "have some connection with the enforcement of the act" due to Eleventh Amendment concerns.[141] For over 100 years, courts have applied *Ex parte Young* to find "that the defendant state official must have some enforcement connection with the challenged statute."[142]

The need for an enforcement connection applies equally in the standing context, an analysis that "significant[ly] overlaps" with *Ex parte Young*.[143] As the Court explained a few months ago in *California v. Texas*: "[O]ur cases have consistently spoken of the need to assert an injury that is the result of a statute's actual or threatened *enforcement*, whether today or in the future."[144] There, the Court found the plaintiffs' claims failed on redressability grounds, among other things.[145] The Supreme Court reasoned that the plaintiffs could not enjoin the Secretary of Health and Human Services from

---

[140] *Fitts v. McGhee*, 172 U.S. 516, 530 (1899) ("If, because they were law officers of the state, a case could be made for the purpose of testing the constitutionality of the statute, by an injunction suit brought against them, then the constitutionality of every act passed by the legislature could be tested by a suit against the governor and the attorney general, based upon the theory that the former, as the executive of the state, was, in a general sense, charged with the execution of all its laws, and the latter, as attorney general, might represent the state in litigation involving the enforcement of its statutes.").

[141] 209 U.S. 123, 157 (1908).

[142] *Okpalobi v. Foster*, 244 F.3d 405, 415 (5th Cir. 2001).

[143] *Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 514 (5th Cir. 2017).

[144] 141 S. Ct. 2104, 2114 (2021) (citing cases).

[145] *Id.* at 2115–16.

enforcing a statute that "he ha[d] no power to enforce."[146] Nor could the plaintiffs rely on the federal Declaratory Judgment Act, which "cannot alone supply jurisdiction otherwise absent."[147]

More recently, in *Whole Woman's Health v. Jackson*, the Supreme Court vacated an injunction to Texas's Senate Bill (S.B.) 8 on jurisdictional grounds.[148] In doing so, the Court also framed the issue in terms of "enforcement," noting the State's "represent[ation] that neither it nor its executive employees possess the authority to enforce the Texas law either directly or indirectly" and the private defendant's sworn statement "that he has no present intention to enforce the law."[149] As the Court explained: "[F]ederal courts enjoy the power to enjoin individuals tasked with enforcing laws, not the laws themselves."[150]

*California v. Texas* and *Whole Woman's Health* are not novel rulings. These decisions reflect well-settled precedent requiring an enforcement connection between the official sued and the statute at issue.[151] As shown below, Plaintiffs lack standing as they have not sued the requisite enforcing official/entity.

---

[146] *Id.* at 2116.

[147] *Id.*

[148] 21A24, 2021 WL 3910722, at *1 (U.S. Sept. 1, 2021).

[149] *Id.*

[150] *Id.* (citing *California v. Texas*, 141 S. Ct. at 2123).

[151] *See, e.g.*, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("One recurring issue in our cases is determining when the threatened enforcement of a law creates an Article III injury."); *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979) ("A plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement."); *Commonwealth of Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923) ("The party who invokes the power must be able to show, not only that the statute is invalid, but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally."); *Support Working Animals, Inc. v. Governor of Florida*, 20-12665, 2021 WL 3556779, at *5 (11th Cir. Aug. 12, 2021) ("[A] plaintiff's injury isn't redressable by prospective relief where other state actors, who aren't parties to the litigation, would remain free and clear of any judgment and thus free to engage in the [enforcement] conduct that the plaintiffs say injures them . . . ."); *Jacobson v. Florida Sec'y of State*, 974 F.3d 1236, 1257 (11th Cir. 2020) ("If rulemaking authority were sufficient to establish traceability, plaintiffs could presumably also challenge a law by suing the legislators who enacted it instead of the officials who execute it. Although in many cases the same official will both make and execute a challenged regulation, that arrangement is not present here."); *Digital Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 958 (8th Cir. 2015) ("The redressability prong is not met when a plaintiff seeks relief against a defendant with no power to enforce a challenged statute.") (quotations omitted); *Bronson v. Swensen*, 500 F.3d 1099, 1112 (10th Cir. 2007) ("The absence of a nexus between Swensen's enforcement powers and the challenged criminal provisions renders ineffectual plaintiffs' requested prospective relief."); *Okpalobi v. Foster*, 244 F.3d 405, 426 (5th Cir. 2001) ("The requirements of *Lujan* are entirely consistent with the long-standing rule that a plaintiff may not sue a state official who is without any power to enforce the complained-of statute."); *Hope Clinic v. Ryan*, 249 F.3d 603, 605 (7th Cir. 2001) ("[P]laintiffs lack standing to contest the statutes authorizing private rights of action, not only because the defendants

2.    **Plaintiffs Lack Standing as Defendants Do Not Have Enforcement Authority Over the Challenged Orders and for Various Other Reasons.**

Below, we will go through Plaintiffs' claims against each Defendant and explain why Plaintiffs lack standing to sue them. These arguments are in addition to the "certainly impending" issue analyzed above, which is an independent reason why Plaintiffs lack standing.

**Attorney General Paxton:** Plaintiffs lack standing to sue Attorney General Paxton for six reasons.

First, Plaintiffs cannot show that Attorney General Paxton has an enforcement connection to the August 5th Guidance. Thus, they lack standing to sue him over this order.

Second, the Fifth Circuit has recognized that Attorney General Paxton does not "enforce" Governor Abbott's emergency orders: "[W]e hold the Attorney General ... lacks the required enforcement connection to GA-09 and may not be sued for injunctive relief under the Eleventh Amendment."[152] The Court's holding was in the context of an *Ex parte Young* analysis and was later vacated when the parties' dispute became moot,[153] but its reasoning and conclusion apply equally here.[154] Put simply, an order enjoining Attorney General Paxton from enforcing GA-38 will not redress Plaintiffs' injuries as he does not enforce GA-38 in the first place.[155] Rather, Governor

---

cannot cause the plaintiffs injury by enforcing the private-action statutes, but also because any potential dispute plaintiffs may have with future private plaintiffs could not be redressed by an injunction running only against public prosecutors.").

[152] *In re Abbott*, 956 F.3d 696, 709 (5th Cir. 2020), *cert. granted, judgment vacated sub nom. Planned Parenthood Ctr. for Choice v. Abbott*, 141 S. Ct. 1261 (2021).

[153] *Id.*

[154] *See, e.g.*, *City of Austin v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019) (noting the similarities between the *Ex parte Young* and standing analyses), cert. denied sub nom. City of Austin, Tex. v. Paxton, 141 S. Ct. 1047 (2021); *Air Evac EMS, Inc.*, 851 F.3d at 520 (same); *NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 395 (5th Cir. 2015) (same).

[155] *See, e.g.*, *California v. Texas*, 141 S. Ct. at 2116 ("Plaintiffs cannot enjoin the Secretary of Health and Human Services, because he has no power to enforce [the challenged statute] against them.").

Abbott's TDA-based emergency orders are akin to criminal statutes.[156] As a result, these orders are enforced by other officials, most naturally the appropriate local district attorney.[157]

Third, Plaintiffs' claim to standing—that they were injured when Attorney General Paxton sued, or threatened to sue school, school districts[158]—is hard to square with how such issues are normally analyzed. Take *Susan B. Anthony List v. Driehaus* for instance.[159] There, the Supreme Court analyzed when "the threatened enforcement of a law creates an Article III injury."[160] The Court set out a three-part test for analyzing such claims: (1) did the plaintiffs show an intent to engage in a course of conduct arguably affected with a constitutional interest; (2) was the plaintiff's intended conduct proscribed by the statute they wish to challenge; and (3) was the threat of future enforcement "substantial"?[161] Plaintiffs cannot meet the second part of this test as the Challenged Orders do not prohibit their conduct in any way. And Plaintiffs cannot meet the third part of this test as the Challenged Orders will never be "enforced" against them.

Fourth, it is debatable whether the threat of a civil lawsuit—not a criminal proceeding, not a suit to impose a statutory penalty, but a garden-variety civil lawsuit—is a legally cognizable injury even for the person being threatened. In *Driehaus* for example, the Court did not decide whether a "burdensome" administrative proceeding would "alone give[] rise to an Article III injury."[162] The Court found that it was the combination of the proceeding "backed by the additional threat of criminal prosecution" that gave rise to standing in that case.[163]

---

[156] *See* Tex. Gov't Code § 418.173 (noting that the Governor's emergency orders can carry penalties of (1) a fine up to $1,000 and (2) confinement in jail for up to 180 days).

[157] *See In re Abbott*, 956 F.3d at 709; *In re Abbott*, 601 S.W.3d 802, 812–13 (Tex. 2020) (acknowledging the State's concession on this issue and finding that the plaintiffs lacked standing as they did not allege from an official with actual enforcement authority, meaning the appropriate local district attorney).

[158] *See* 2d Am. Compl. at ¶¶ 51–64.

[159] 573 U.S. 149 (2014).

[160] *Id.* at 158.

[161] *Id.* at 158–67.

[162] *Id.* at 166.

[163] *Id.*

Plaintiffs are asking for a seemingly unprecedented extension of the federal judiciary's reach. Under their theory, the person threatened with a civil lawsuit will be able to, somewhat illogically, redress that injury by filing their own federal civil lawsuit. Not only that, but any persons tangentially impacted by the threat of civil litigation can also jump into federal court. Plaintiffs, "as the parties asserting federal subject-matter jurisdiction, bear the burden of proving that its requirements are met."[164] Plaintiffs cannot do so here.

Fifth, Plaintiffs cite the Fifth Circuit's decision in *NiGen Biotech L.L.C. v. Paxton* as the "controlling precedent" here.[165] Not so. There, the Attorney General sent letters to NiGen and its retailers identifying NiGen's products as "'false, misleading, or deceptive' in violation of the Texas Deceptive Trade Practices Act ('DTPA')."[166] These letters "intimat[ed] that formal enforcement was on the horizon for both NiGen and the retailers," and caused the retailers to pull NiGen's products from their shelves, costing "NiGen millions of dollars in lost revenue."[167]

The issue was the Attorney General's letters were acting as a "preliminary injunction against the lawful sale of NiGen's products."[168] This situation was further complicated by the Attorney General's longstanding refusal (four years by the time of the Fifth Circuit's decision) "to justify its threatening letters."[169] The Court understandably found that NiGen's injury was redressable.[170] In that context, a favorable judicial decision would allow NiGen to "sell its products freely in Texas" and "repair its damaged relationship with its retailers that has resulted from the Attorney General's conduct."[171]

---

[164] *Willoughby*, 730 F.3d at 479.
[165] ECF 26 at 5.
[166] *NiGen Biotech, L.L.C.*, 804 F.3d at 392.
[167] *Id.*
[168] *Id.* at 397.
[169] *Id.* at 395.
[170] *Id.* at 397.
[171] *Id.*

There are key differences between this case and *NiGen*. In *NiGen*, the Attorney General had specific authority to enforce the DTPA.[172] This matters, as the enforcement issue requires that the official has both a "demonstrated willingness to enforce [the statute]" *and* "the particular duty to enforce the statute in question."[173] Plaintiffs cannot use *NiGen* as a lever to enjoin an official with no power to enforce the Challenged Orders. That argument is foreclosed by the Supreme Court's recent decision in *California v. Texas* and over a century's worth of other caselaw.[174]

Plaintiffs use the veil of *NiGen* to cover up their true argument: They are asking this Court to enjoin Attorney General Paxton from exercising his *general duty* to uphold Texas state laws. Binding precedent dictates that this "general duty" is insufficient to create the required enforcement connection.[175]

Another problem for Plaintiffs is that, in *NiGen*, the Attorney General did not contest the traceability of the plaintiff's injury.[176] Thus, *NiGen* has no bearing on the traceability issues here—issues that prove fatal to Plaintiffs' claims.

Finally, Plaintiffs argue their request for a declaratory judgment itself can confer standing.[177] This argument is foreclosed by *California v. Texas*. There, the Court explained: "The Declaratory Judgment Act alone does not provide a court with jurisdiction."[178] The Court continued: "[J]ust like suits for every other type of remedy, declaratory-judgment actions must satisfy Article III's case-or-controversy requirement."[179]

---

[172] *See* Tex. Bus. & Com. Code § 17.47(a) noting that "the consumer protection division" cam "bring an action in the name of the state against the person [violating the DTPA]"); *id.* at § 17.45(8) (defining the "Consumer protection division" as "the consumer protection division of the attorney general's office").

[173] *See* Tex. *Democratic Party v. Abbott*, 978 F.3d 168, 181 (5th Cir. 2020), cert. denied, 141 S. Ct. 1124 (2021) (quoting *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014)).

[174] *Supra* at pgs. 14-15; *see also* Tex. *Democratic Party v. Abbott*, 978 F.3d 168, 181 (5th Cir. 2020) ("'[O]ur cases do not support the proposition that an official's public statement alone establishes authority to enforce a law, or the likelihood of his doing so, for *Young* purposes.'") (quoting *In re Abbott*, 956 F.3d at 709), cert. denied, 141 S. Ct. 1124 (2021).

[175] *See, e.g.,* Tex. *Democratic Party*, 978 F.3d at 181; *City of Austin*, 943 F.3d at 999–1000.

[176] *NiGen Biotech, L.L.C.*, 804 F.3d at 396.

[177] ECF 26 at 8.

[178] 141 S. Ct. at 2115.

[179] *Id.*

The idea is that remedies "operate with respect to specific parties," as opposed to "legal rules in the abstract."[180] "[I]t must be the effect of the court's judgment on the defendant that redresses the plaintiff's injury, whether directly or indirectly."[181] Thus, when "defendant officials do not enforce the [challenged statute], a declaratory judgment would not meet the requirement of redressability."[182] If the plaintiff's desire to obtain favorable judicial precedent on a legal question was alone enough to confer standing, "then the federal courts would be busy indeed issuing advisory opinions that could be invoked as precedent in subsequent litigation."[183]

In sum, Plaintiffs have no meaningful claim to standing against Attorney General Paxton. Plaintiffs face similar problems in their claim to standing against Governor Abbott, the TEA, and Commissioner Morath, so these other Defendants will be given less attention.

**TEA Defendants:** Plaintiffs try to connect TEA Defendants to the enforcement of both Challenged Orders. For clarity, the standing issues for these orders are analyzed separately.

*GA-38:* Plaintiffs cannot connect either of the TEA Defendants to GA-38's enforcement. TEA Defendants simply never have enforced or will enforce GA-38. TEA has expressly disclaimed authority to enforce GA-38, and Plaintiffs' conclusory allegation of a conspiracy to aid the OAG in alleged enforcement efforts by sharing publicly available between the two agencies is an unserious attempt to argue otherwise.[184]

Also, to have standing, Plaintiffs must show the threat of future enforcement from TEA Defendants is "substantial."[185] TEA has disclaimed any ability to do so. In sum, Plaintiffs do not have standing to challenge GA-38 against TEA Defendants.

---

[180] *Id.*
[181] *Digital Recognition Network, Inc.*, 803 F.3d at 958 (quoting *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1159 (10th Cir. 2005)) (emphasis omitted).
[182] *Id.* at 959; *see also Bronson*, 500 F.3d at 1112.
[183] *Digital Recognition Network, Inc.*, 803 F.3d at 958–59.
[184] *See, supra, pp. 5-6.*
[185] *Driehaus*, 573 U.S. at 158.

*Public Health Guidance:* Plaintiffs' claim to standing against TEA's Public Health Guidance is fatally flawed. As with GA-38, TEA Defendants have never enforced, or threatened to enforce, its Public Health Guidance against any person or entity,[186] and Plaintiffs do not allege otherwise. Thus, they cannot show the required "substantial" threat of future enforcement.[187] And enjoining TEA Defendants from enforcing the Public Health Guidance would be meaningless. The current Public Health Guidance merely states what GA-38 requires.[188] And truthfully describing the law to school districts certainly does not create a justiciable controversy, at least not on the facts before this Court.

Finally, Plaintiffs face a ripeness problem. "'A claim is not ripe for review if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.'"[189] At the time Plaintiffs filed their Complaint,[190] it was unclear if or how TEA Defendants would enforce the August 5th Guidance, which does not identify a specific enforcement mechanism or penalty.[191]

Ultimately, Plaintiffs lack standing against all named Defendants, and their claims therefore fail.

## II.    Plaintiffs' American Rescue Plan Act and Americans with Disabilities Act Claims are Barred by Sovereign Immunity.

A state's sovereign immunity can be overcome in three ways: (1) a clearly stated waiver or consent to suit by the state; (2) a valid abrogation by Congress; or (3) the *Ex parte Young* exception.[192]

Plaintiffs argue that Defendants' sovereign immunity has been waived for the Section 504 claim, an issue Defendants do not dispute at this stage.[193] Plaintiffs' brief clarifies that they rely on the

---

[186] Aghazadian Decl. at ¶ 8.
[187] *Driehaus*, 573 U.S. at 158.
[188] *Compare* Ex. A at 1, *with* Ex. D.
[189] *United States v. Magana*, 837 F.3d 457, 459 (5th Cir. 2016) (quoting *United States v. Carmichael*, 343 F.3d 756, 761 (5th Cir. 2003) (quotations omitted).
[190] *Carr v. Alta Verde Indus., Inc.*, 931 F.2d 1055, 1061 (5th Cir. 1991) ("As with all questions of subject matter jurisdiction except mootness, standing is determined as of the date of the filing of the complaint, and subsequent events do not deprive the court of jurisdiction.").
[191] *See* Ex. A.
[192] *See Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 304 (1990); *Ex parte Young*, 209 U.S. 123 (1908).
[193] ECF 26 at 3.

*Ex parte Young* exception for their ARPA and ADA claims.[194] To be entitled to this exception, "the plaintiff at least must show the defendant has 'the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty.'"[195] As detailed above, Plaintiffs have not shown that Defendants had the requisite enforcement connection with the Challenged Orders.[196] The same analysis applies here.

## PLAINTIFFS CANNOT PREVAIL ON THE MERITS

## I.    Plaintiffs Cannot Prove Their Section 504 Claim.

Plaintiffs assert disability discrimination and failure-to-accommodate claims under Section 504.[197] Plaintiffs can prevail on neither.

To establish a *prima facia* case for disability discrimination under Section 504, a plaintiff must show: (1) a qualifying disability; (2) that the plaintiff is being excluded from participation in, denied the benefits of, or otherwise discriminated against by a covered entity; and (3) such discrimination is solely by reason of the plaintiff's disability.[198] "Discrimination includes a failure to make accommodations."[199] To establish a *prima facie* reasonable accommodation claim under Section 504, the plaintiff must have either (1) identified his disability and resulting limitation and requested an accommodation in direct and specific terms, or (2) his disability, the resulting limitation, and the necessary reasonable accommodation must have been "open, obvious, and apparent" to the entity's relevant agents.[200]

---

[194] *Id.* at 4–11.
[195] *Tex. Democratic Party*, 978 F.3d at 179 (quoting *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014)).
[196] *Supra* at pgs. 14-23.
[197] 2d Am. Compl. at ¶ 87.
[198] *Francois v. Our Lady of the Lake Hospital, Inc.*, 8 F.4th 370, 378 (5th Cir. 2021) (citing *Miraglia v. Bd. of Supervisors of La. State Museum*, 901 F.3d 565, 574 (5th Cir. 2018)); *Smith v. Harris Cnty., Tex.*, 956 F.3d 311, 316 (5th Cir. 2020) (discussing the difference between the Rehabilitation Act "solely by reason of" causation standard and the ADA "by reason of" causation standard).
[199] *Campbell v. Lamar Institute of Tech.*, 842 F.3d 375, 380 (5th Cir. 2016).
[200] *Id.* (citing *Smith v. Harris Cnty.*, 956 F.3d 311, 317 (5th Cir. 2020) and *Windham v. Harris Cnty.* 875 F.3d 229, 236 (5th Cir. 2017)).

To the extent Plaintiffs contend they were discriminated against due to their disabilities in a manner other than through a failure to accommodate, their claim fails for three reasons.

First, Plaintiffs do not plausibly allege that Defendants excluded them from participation in school, denied them the benefits of education, or otherwise discriminated against them. Defendants are not excluding Plaintiffs from attending school. Plaintiffs are free to attend school, and six of them do. The seventh has elected to stay home despite her school exhibiting COVID-19 positive rates that are less than or equal to the rates at schools attended by other plaintiffs and that have mask mandates in place. It is Plaintiffs' fear of COVID-19 that poses the barrier. And Plaintiffs are free to engage in the interactive process with their respective schools to identify accommodations that would mitigate the risk of COVID-19 to assuage their fears. But there is a fundamental disconnect between Defendants' alleged actions and the purported exclusion from programming by the school districts providing that programing.

Second, Plaintiffs cannot show that the purported exclusion is solely due to their disabilities. Plaintiffs simply cannot show—and do not attempt to show—that Defendants issued these orders solely because of Plaintiffs' disabilities or that Defendants were motivated by Plaintiffs' disabilities.

Third, Plaintiffs have not been denied "meaningful access" to an education, as is required to support their claims.[201] The Challenged Orders left Plaintiffs free to attend school in person while wearing masks and engaging in any other COVID-19 precautions they deem appropriate. If Plaintiffs did not want to attend school in person, the Challenged Orders left Plaintiffs free to make that choice, as the orders contain no restrictions on Plaintiffs' ability to attend school virtually or on local schools' ability to offer this service.

To the extent Plaintiffs rely on failure-to-accommodate as discrimination, their claim fares no better. "A critical component of a Title II claim for failure to accommodate . . . is proof that the

---

[201] *See, e.g.*, *Ruskai v. Pistole*, 775 F.3d 61, 78–79 (1st Cir. 2014) (citing *Alexander v. Choate*, 469 U.S. 287, 299 (1985)).

disability and its consequential limitations were known by the entity providing public services."[202] "Mere knowledge of the disability is not enough; the service provider must also have understood the limitations the plaintiff experienced . . . as a *result* of that disability."[203] "The burden falls on the plaintiff to specifically identify the disability and resulting limitations, and to request an accommodation in direct and specific terms."[204]

"Once a qualified individual with a disability requests reasonable accommodations, the public entity has an obligation to engage in an interactive process to determine the best means of accommodating the plaintiff's disability."[205] In reviewing such requests, "[a]n institution is not duty bound to acquiesce in and implement every accommodation a disabled student demands."[206] Put simply, the student "is not entitled to his preferred accommodation" so long as the offered accommodation is reasonable.[207]

Here, Plaintiffs cannot show they submitted a request for an accommodation for a known disability in direct and specific terms for Defendants to review, consider, and respond with alternative accommodations. This omission, while fatal to Plaintiffs' claim, is also understandable because such requests would be virtually nonsensical when directed to the Attorney General, the Commissioner of Education, or the TEA. It is the various schools and school districts who can engage in the interactive process with Plaintiffs, as only they can review direct and specific requests for particularized limitations and offer reasonable accommodations to address those limitations—all of which will be based on the needs of the requestor and the resources of the recipient. At its core, there is a fundamental disconnect between the essence of a failure-to-accommodate claim—the interactive process and reasonableness

---

[202] *Windham*, 875 F.3d at 236 (internal quotations omitted).
[203] *Id.* (internal quotations omitted, emphasis in original).
[204] *Id.* (internal quotations omitted).
[205] *See Shrub v. Univ. of Tex. Health Sci. Ctr. at Houston-Sch. of Med.*, 63 F. Supp.3d 700, 708–09 (S.D. Tex. 2014) (citing *Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 315 (5th Cir. 2007); *see also Campbell*, 842 F.3d at 379–82.
[206] *Campbell*, 842 F.3d at 381.
[207] *Id.* at 382.

of the offers extended by participants thereto—and Plaintiffs' choice of defendants—state policymakers sued for enacting state policy.

Also, to present a viable accommodation claim, Plaintiffs' requested accommodation must be "reasonable." But Plaintiffs' proposed accommodation is not. GA-38 seeks to establish a uniform policy leaving the decision to wear or not wear a mask up to each student (and their parents). Plaintiffs' requested accommodation, however, is that every school must *mandate* the wearing of masks, overriding the students (and their parents') choice. Changing GA-38's "no mask mandate" to a "mask mandate" would "fundamentally alter" the policy choice set forth in GA-38, and thus it is not a reasonable accommodation.[208]

Fourth, Plaintiffs do not qualify for the limited exception that can, in narrow circumstances, waive their need to request an accommodation. "When a plaintiff fails to request an accommodation [in direct and specific terms], he can prevail only by showing that the disability, resulting limitation, and necessary reasonable accommodation were open, obvious, and apparent to the entity's relevant agents."[209] "Knowledge of a disability is different from knowledge of the resulting limitation."[210] "And it is certainly different from knowledge of the necessary accommodation."[211] "To prevail, [Plaintiff] must adduce evidence that all three were or should have been obvious."[212] Here, Plaintiffs cannot prove that Defendants knew of their "disabilit[ies] and [their] consequential limitations," with any specificity—a prerequisite to their failure-to-accommodate claim.[213]

Finally, Plaintiffs cannot show they exhausted their administrative remedies. Plaintiffs must exhaust dispute-resolution procedures set out in the Individuals with Disabilities Education Act

---

[208] *Id.*
[209] *Windham*, 875 F.3d at 236 (internal quotations omitted).
[210] *Id.* at 238.
[211] *Id.*
[212] *Id.* at 238.
[213] *See Cadena v. El Paso Cty.*, 946 F.3d 717, 723–24 (5th Cir. 2020).

("IDEA") even if they do not bring suit under the IDEA.[214] Congress extended the IDEA's requirement to exhaust administrative remedies to any suit under federal law that "seek[s] relief also available" under the IDEA.[215] A suit seeks such relief when attempting to "remedy the deprivation of the free appropriate public education that the IDEA guarantees."[216] Free appropriate public education includes "'instruction' tailored to meet a child's 'unique needs' and sufficient supportive services' to permit the child to benefit from that instruction."[217] A lawsuit raising the inadequacy of instruction or lack of support services for students with disabilities, it likely seeks relief that is available under the IDEA.[218]

Here, Plaintiffs complain of inadequate instruction and insufficient support services as students with disabilities. But they cannot show they have exhausted the dispute-resolution procedure required under IDEA.[219] As a result, Plaintiffs' Section 504 claims fail.

Plaintiffs also bring a pre-emption claim under the ADA, but that claim is also relies on the premise that Defendants have violated the ADA. As described above, Defendants have not violated the ADA, and so Plaintiffs' pre-emption claim fails.

## II.    Plaintiffs Cannot Prevail on Their ADA Claim.

As Plaintiffs acknowledged, Section 504 and ADA claims are generally analyzed under the same standard.[220] Plaintiffs' ADA claim fails for the same reasons as their Section 504 claim.[221]

---

[214] *McMillen v. New Caney Indep. Sch. Dist.*, 939 F.3d 640, 645 (5th Cir. 2019).
[215] 20 U.S.C. § 1415(l).
[216] *McMillen*, 939 F.3d at 645.
[217] *Fry v. Napoleon Cmty. Sch.*, 137 S.Ct. 743, 748-49 (2017) (quoting 20 U.S.C. §§ 1401(9), (26), and (29)).
[218] *McMillen*, 939 F.3d at 645.
[219] *See* 20 U.S.C. §§ 1415(b), (f), (i)(2).
[220] ECF 7 at 16.
[221] This includes Plaintiffs' failure to exhaust administrative remedies under the IDEA (*see, e.g., Logan v. Morris Jeff Cmty. Sch.*, No. 21-30258 (5th Cir. Sep. 28, 2021)).

## III.    Plaintiffs Cannot Prevail on Their Claim under the American Rescue Plan Act.

Plaintiffs' ARPA claim fails as they do not have a private right of action to bring this claim.[222]

Private rights of action to enforce federal law must be created by Congress.[223] Courts must determine whether Congress intended the statute to create both a private right, and a private remedy.[224] Absent statutory intent, courts may not create such private rights and remedies, "no matter how desirable that might be as a policy matter, or how compatible with the statute."[225]

The ARPA does not create a private cause of action.[226] Likewise, the Supremacy Clause does not create any federal rights, or a private cause of action.[227] Plaintiffs have no right of action to bring an ARPA claim. Without a private right of action, Plaintiffs have no ARPA claim.[228]

**CONCLUSION**

For the reasons set forth above, Defendants respectfully request that this Court: (1) grant Defendants' motion to dismiss (ECF 34); or alternatively, upon trial of this cause enter an order denying Plaintiffs' requested relief in its entirety and dismiss Plaintiffs' claims; and (3) award Defendants such further relief as the Court deems just and proper.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN

---

[222] *Webb v. Texas Higher Education Coordinating Bd.*, Co. EP-14-CV-00345-FM, 2014 WL 12594193, at *12 (W.D. Tex., Dec. 12, 2014) (dismissing claim under Rule 12(b)(6) where statutory provision provided no private right of action).

[223] *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) (citing *Touche Ross & Co. v. Redington*, 442 U.S. 560, 578 (1979)).

[224] *Id.* (citing *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 15 (1979)).

[225] *Id.* (citing *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 145 (1985); *Transamerica*, 444 U.S. at 23; *Touche Ross*, 442 U.S. at 575-56).

[226] *Anthony Lamar ADC #120479 v. ASA Hutchison, et al.*, No. 4:21-CV-00529, 2021 WL 4047158 at * 6, n. 47 (E.D. Ark. Sep. 3, 2021).

[227] *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015) ("[T]he Supremacy Clause is not the source of any federal rights, and certainly does not create a cause of action") (internal quotations and citations omitted); *see also Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 613 (1979); *Jefferson Cmty. Health Care Ctrs., Inc. v. Jefferson Par. Gov't*, 849 F.3d 615, 626 (5th Cir. 2017).

[228] Even the federal government is unconcerned with the Challenged Orders' purported interference with ARPA. *See* ECF 47.

Deputy First Assistant Attorney General

SHAWN COWLES
Deputy Attorney General for Civil Litigation

THOMAS A. ALBRIGHT
Chief - General Litigation Division

/s/  Todd Dickerson
TODD DICKERSON
Texas Bar No. 24118368
RYAN G. KERCHER
Texas Bar No. 24060998
TAYLOR GIFFORD
Texas Bar No. 24027262
CHRISTOPHER HILTON
Texas Bar No. 24087727
Assistant Attorneys General
Office of the Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Phone: 512-463-2120
Fax: 512-320-0667
Todd.Dickerson@oag.texas.gov
Ryan.Kercher@oag.texas.gov
Taylor.Gifford@oag.texas.gov
Christopher.Hilton@oag.texas.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I certify that on September 29, 2021, a true and correct copy of the foregoing document was served via the Court's CM/ECF system to all counsel of record.

*/s/ Todd Dickerson*
Todd Dickerson
Assistant Attorney General