## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| E.T., by and through her parents and next friends; J.R., by and through her parents and next friends; H.M., by and through her parents and next friends; E.S., by and through her parents and next friends; M.P., by and through her parents and next friends; S.P., by and through her parents and next friends; and A.M., by and through her parents and next friends. | ) ) ) ) ) ) ) ) ) | Civil Action No. 1:21-CV-00717-LY |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| MIKE MORATH, in his official capacity as the COMMISSIONER of the TEXAS EDUCATION AGENCY; the TEXAS EDUCATION AGENCY; and ATTORNEY GENERAL KENNETH PAXTON, in his official capacity as ATTORNEY GENERAL OF TEXAS, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs submit these proposed findings of fact and conclusions of law.

### Proposed Findings of Fact

1. On July 29, 2021, Governor Abbott issued Executive Order GA-38 which purports to prevent school districts from implementing mask mandates.  Ex. 1.

2. On August 5, 2021, the Texas Education Agency ("TEA")—the state agency that oversees primary and secondary public education in the State of Texas—issued its updated "Public Health Guidance," which establishes requirements for school systems during the pandemic, to reflect that "[p]er GA-38, school systems cannot require students or staff to wear a mask."  Ex. 4 (August 5, 2021 TEA Public Health Guidance).

3.  TEA's current September 17 guidance reiterates GA-38's mandate that public schools not be permitted to require students, staff, or visitors to wear masks in their facilities.  Ex. 2 (September 17, 2021 TEA Public Health Guidance).

4.  Between September 17, 2021 and the beginning of the school year, in August 2021, , there have been 154,444 cumulative, reported COVID-19 positive student cases.  Ex. 7 (Texas Health and Human Services, Texas Public Schools COVID-19 Data as of September 19, 2021).

5.  During the entire 2020-21 school year, there were 148,197 cumulative COVID-19 positive student cases in comparison.  Ex. 10 (Texas Health and Human Services, Historical Data for the 2020-2021 School Year).

6.  There have been more positive student cases in the first seven weeks of school during the 2021-22 than there were during the whole 2020-2021 school year.  Ex. 7 (Texas Health and Human Services, Texas Public Schools COVID-19 Data as of September 19, 2021); Ex. 10 (Texas Health and Human Services, Historical Data for the 2020-2021 School Year).

7.  During the 2020-21 school year, school districts had the discretion to choose whether to implement mask mandates for in-person instruction.  Ex. 164 (March 25, 2021 TEA Public Health Planning Guidance).

8.  TEA's March 25, 2021 Public Health Planning Guidance recommended that "[e]very student, teacher, or staff member shall wear a mask over the nose and mouth when inside a school building, school facility, facility used for school activities, or when in an outdoor space on school property . . . wherever it is not feasible to maintain six feet of social distancing."  Ex. 164 (March 25, 2021 TEA Public Health Planning Guidance).

9.  On August 20, 2021 at 4:56 PM, Attorney General Paxton tweeted, "Recent SCOTX decision is NOT a mask-mandate loss. Not a loss for freedom-loving Texans or the Rule of Law."  Ex. 138 (Defendant Paxton's Tweet on August 20, 2021 at 4:56 PM).

10. On August 26, 2021 at 12:38 PM, Attorney General Paxton tweeted, "BIG WIN FOR LAW & LIBERTY! @GregAbbott_TX's ban on mask mandates is clear. Dem local govts didn't care. So I sued them. Dem judges sided with local D friends. SCOTX just ruled: The Gov's exec order stands. ALL public entities must comply—or be sued and lose over and over again."  Ex. 142 (Defendant Paxton's Tweet on August 26, 2021 at 12:38 PM).

11. After the conclusion of the 2020-2021 school year, TEA announced that spring 2021 State of Texas Assessments of Academic Readiness (STAAR) results had significantly decreased because of virtual instruction.  Ex. 163 (TEA Releases Spring 2021 STAAR Grades).

12. The State of Texas has prioritized offering in-person instruction for the 2021-22 school year. Ex. 159 at 11:21–12:12 (Megan Aghazadian Deposition).

13. Pediatric infections reached an all-time high since the beginning of the COVID-19 pandemic, in part due to the circulation of the novel Delta variant and the inability to vaccinate children under 12 years old.  Ex. 18 at ¶¶ 24–29 (Dr. Ben Greenberg Expert Report).

14. The Delta variant of COVID-19 infects children at a higher rate than previous variants and has caused higher infection rates among students than did the Alpha variant during the previous school year.  Ex. 17 at ¶ 21 (Dr. Edward Septimus Expert Report).

15. The Delta variant causes more serious illness and increased fatality rates than prior COVID variants.  Ex. 17 at ¶¶ 22–23 (Dr. Edward Septimus Expert Report).

16. Since the start of the 2021-22 school year, at least 45 districts in Texas have temporarily shut down due to COVID-19 outbreaks among students and staff.  Ex. 341 (Allyson Waller, et al.,

*At least 45 districts shut down in-person classes due to COVID-19 cases*, affecting more than 40,000 students, THE TEXAS TRIBUNE, September 3, 2021, available at https://www.texastribune.org/2021/09/03/texas-covid-school-districts-shut-down/ (last accessed on September 25, 2021)).

17. The United States Centers for Disease Control and Prevention's ("CDC") Guidance for COVID-19 Prevention in K-12 Schools, updated on August 5, 2021, recommends universal indoor masking for all teachers, staff, students, and visitors to K-12 schools, regardless of vaccination status.  Ex. 13 (CDC's Guidance for COVID-19 Prevention in K-12 Schools).

18. The State's position on masking requirements during the 2021-2022 school year runs contrary to the Centers for Disease Control and Prevention's Guidance for COVID-19 Prevention in K-12 Schools, updated on August 5, 2021.  Ex. 13 (CDC's Guidance for COVID-19 Prevention in K-12 Schools); Ex. 4 (August 5, 2021 TEA Public Health Guidance); Ex. 1 (GA-38).

19. According to the CDC, masking requirements are integral to promoting a safe return to in-person learning this school year, especially due to the circulating and highly contagious Delta variant.  Ex. 13 (CDC's Guidance for COVID-19 Prevention in K-12 Schools).

20. The CDC has stated that "with COVID-19 cases increasing nationally since mid-June 2021, driven by the B.1.617.2 (Delta) variant of SARS-CoV-2, protection against exposure remains essential in school settings. Because of the highly transmissible nature of this variant, along with the extent of missing of vaccinated and unvaccinated people in schools, the fact that children <12 years of age are not currently eligible for vaccination, and low levels of vaccination among youth ages 12-17, CDC recommends universal indoor masking for all students (age 2 years and older), teachers, staff, and visitors to K-12 schools regardless of vaccination status."  Ex. 13 (CDC's Guidance for COVID-19 Prevention in K-12 Schools).

21. The CDC has stated that schools should also work with local public health officials to determine additional prevention strategies "by monitoring levels of community transmission (i.e. low, moderate, substantial, or high) and local vaccine coverage, and use of screening testing to detect cases in K-12 schools."  Ex. 13 (CDC's Guidance for COVID-19 Prevention in K-12 Schools).

22. The CDC's guidance "is based on current scientific evidence and lessons learned from schools implementing COVID-19 prevention strategies."  Ex. 13 (CDC's Guidance for COVID-19 Prevention in K-12 Schools).

23. Plaintiffs are seven students enrolled in the Texas public school system who have disabilities. Ex. 14 (Stipulated Facts).

24. Plaintiffs' disabilities include: Down syndrome, a heart defect, asthma, immune deficiency, underlying reactive airway disease, spina bifida, chronic respiratory failure, and cerebral palsy. Ex. 14 (Stipulated Facts).

25. Plaintiffs' medical conditions place them at increased risk of either contracting COVID-19 and/or experiencing severe symptoms from the virus. Ex. 15 at Section III (Expert Report of Dr. Alexander Yudovich); Ex. 16 at Section III (Amendment to Report of Dr. Alexander Yudovich); Ex. 18 at Section II (Expert Report of Dr. Benjamin Greenberg).

26. Children under the age of 12 are not eligible to receive any of the currently authorized COVID-19 vaccines.  Ex. 17 at ¶ 18 (Dr. Edward Septimus Affidavit); Ex. 205 (Danielle Silva, *After FDA approves Pfizer vaccine, several steps remain before kids under 12 can be vaccinated*, August 23, 2021, NBC NEWS, available at https://www.nbcnews.com/news/us-news/after-fda-approves-pfizer-vaccine-several-steps-remain-kids-under-n1277476 (last accessed on September 29, 2021).

27. Requiring masing is an effective means of reducing the risk that Plaintiffs will contract COVID and suffer severe complications or death from COVID.  *See generally* Ex. 17 at (Dr. Edward Septimus Affidavit).

28. Schools must have the ability to implement mask mandates at the classroom, campus, or district level to protect vulnerable students like plaintiffs during periods of high community spread.  *See generally* Ex. 17 at (Dr. Edward Septimus Affidavit).

29. Six of the seven Plaintiffs are under the age of 12 and thus not eligible to receive any of the currently authorized COVID-19 vaccines.  Ex. 17 at ¶ 18 (Dr. Edward Septimus Affidavit).

30. Plaintiff E.T. recently turned 12 years old and has an immune deficiency among other disabilities.  Ex. 15 at ¶ 9 (Dr. Alexander Yudovich Report); Ex. 14 (Stipulated Facts).

31. Even though E.T. has had her first vaccination dose, she still faces a higher risk than the general population of contracting COVID-19 and experiencing severe or fatal symptoms if she contracts COVID-19 her because, as her immunologist has stated, she may never retain sufficient antibodies to avoid COVID-19 infection. Ex. 14 (Stipulated Facts); Ex. 18 at ¶ 15 (Dr. Ben Greenberg Affidavit).

32. Plaintiff M.P. is a student in Fort Bend ISD, which currently has no mask mandate.  Ex. 14 (Stipulated Facts).

33. M.P. has Down syndrome, hypotonia, mixed receptive-expressive language disorder, and developmental delay.  Ex. 14 (Stipulated Facts).

34. M.P. attended in-person instruction this school year for the first two weeks because Fort Bend ISD offered no alternative remote instruction.  Ex. 14 (Stipulated Facts).

35. Due to rising COVID-19 positive cases and the lack of a mask mandate, M.P. stayed home in early September and attended virtual instruction, which is now available in the district but only

for a limited number of M.P.'s classes.  Ex. 226 ¶¶ 7-9 (Declaration of K.P. Regarding Student M.P. – September 12); Ex. 14 (Stipulated Facts).

36. M.P. attended school virtually last school year and experienced significant regression in a number of areas, including social skills, ability to focus, and reading fluency.  Ex. 14 (Stipulated Facts).

37. Because M.P. is no longer attending classes in person, she is unable to participate in elective classes such as choir and taekwondo, which are her favorite school activities.  Ex. 227 ¶¶ 2-3 (Declaration of K.P. Regarding Student M.P. – September 28).

38. Because M.P. is receiving virtual instruction, she has received no speech services or reading support from the district this school year.  Ex. 14 (Stipulated Facts).

39. Plaintiff E.T. is a student in Round Rock ISD, which currently has a mask mandate in place in violation of Executive Order GA-38.  Ex. 14 (Stipulated Facts).

40. E.T. has Down syndrome, asthma, immune deficiency, hypertension, attention deficit hyperactivity disorder, underlying reactive airway disease, mood disorder, and obstructive sleep apnea.  Ex., 14 (Stipulated Facts).

41. E.T. is currently attending in-person instruction but, if the district rescinds its mask mandate, E.T.'s parents will withdraw her from school, causing E.T. to forgo significant educational and social opportunities, as well as occupational and speech therapy.  Ex., 14 (Stipulated Facts).

42. While attending virtual instruction last school year, E.T. regressed in multiple areas including math skills and the ability to independently use the bathroom, and also began to self-harm.  Ex., 14 (Stipulated Facts).

43. Plaintiff S.P. is a student in Richardson ISD, which currently has a mask mandate but has been sued by the Office of the Attorney General for violating GA-38.  Ex., 14 (Stipulated Facts).

44. S.P. has spina bifida, attention deficit hyperactivity disorder, bronchiectasis, Chiari malformation with hydrocephalus, central sleep apnea, chronic respiratory failure, global developmental delay, growth hormone deficiency, seasonal allergies, left vocal cord paralysis, and chronic respiratory failure.  Ex., 14 (Stipulated Facts).

45. S.P.'s treating doctors and specialists have recommended that "he avoid all places that are not following the CDC/universal masking recommendations."  Ex. 14 (Stipulated Facts).

46. S.P. is currently attending in-person and will continue to do so even if Richardson ISD withdraws the mask mandate because the district does not offer a virtual alternative.  Ex., 14 (Stipulated Facts).

47. As a result of attending virtual instruction last year, S.P. suffered academically, and he is currently significantly behind in core grade level skills such as reading and math. recommended that "he avoid all places that are not following the CDC/universal masking recommendations." Ex. 220 ¶ 7 (SP Declaration Regarding SP – August 17).

48. Plaintiff J.R. is a student in San Antonio ISD, which currently has a mask mandate.  Ex. 14 (Stipulated Facts).

49. J.R. has moderate to severe asthma, attention deficit hyperactivity disorder, a growth hormone deficiency, and generalized anxiety disorder.  Ex. 14 (Stipulated Facts).

50. J.R. is attending school in-person but is unable to participate in mask-optional activities such as choir and field trips.  Ex. 14 (Stipulated Facts).

51. Last year, during virtual instruction, J.R.'s anxiety disorder was exacerbated due to the experience of remaining homebound and isolated.  recommended that "he avoid all places that are not following the CDC/universal masking recommendations." Ex. 225 at ¶ 7 (J.L. Declaration Regarding J.R. – September 12).

52. If San Antonio ISD withdrew its mask mandate, J.R.'s parents would withdraw her from school.   recommended that "he avoid all places that are not following the CDC/universal masking recommendations." Ex. 225 at ¶ 7 (J.L. Declaration Regarding J.R. – September 12).

53. Plaintiff H.M. is a student in Leander ISD, which has a mask mandate with a broad opt-out provision.  Ex. 14 (Stipulated Facts).

54. H.M. has Down syndrome, Ventricular septal defect, and bronchomalacia.  Ex. 14 (Stipulated Facts).

55. H.M. started the school year attending classes in-person but, when two students in his class tested positive for COVID-19, H.M.'s parents withdrew him.  Ex. 14 (Stipulated Facts).

56. After three weeks of remaining home, H.M. returned to in-person learning.  recommended that "he avoid all places that are not following the CDC/universal masking recommendations." Ex. 230 at ¶ 10 (R.M. Declaration Regarding H.M. – September 13).

57. If other students test positive or the district withdraws its mask mandate, H.M. will return to at-home learning. Ex. 14 (Stipulated Facts).

58. Last school year, H.M. was not able to successfully attend virtual instruction because, as a child with Down Syndrome, he is a visual learner rather than verbal learner and, unfortunately, visual instruction is near impossible to accommodate in a remote setting.  Ex. 229 at ¶ 7 (R.M. Declaration Regarding H.M. – August 17).

59. Plaintiff A.M. is a student in Edgewood ISD, which has a mask mandate.  Ex. 14 (Stipulated Facts).

60. A.M. has ulcerative colitis (which requires that A.M. receive regular infusions of an immunosuppressant drug), cerebral palsy (and is quadriplegic and spastic), hypotonia, and nonverbal.  Ex. 14 (Stipulated Facts).

61. A.M. is attending in-person classes with success: he is on the cusp of verbalizing words and responds well to socializing with his peers.  Ex. 14 (Stipulated Facts).

62. When A.M. attended school virtually last year, he was unable to access occupational therapy and physical therapy services.  Ex. 14 (Stipulated Facts).

63. If Edgewood ISD no longer mandated masks, A.M. would withdraw from in-person classes and receive homebound instruction, which is limited to four hours of instruction per week and is inadequate to ensure he progresses during a critical developmental period for him. recommended that "he avoid all places that are not following the CDC/universal masking recommendations." Ex. 221 at ¶ 10 (C.M. Declaration Regarding A.M. – August 17).

64. Plaintiff E.S. is a student in Killeen ISD at a non-Fort Hood school, which has a mask policy for its Fort Hood campuses, but not for its non-Fort Hood campuses.  Ex. 14 (Stipulated Facts).

65. E.S. has moderate to severe asthma.  Ex. 14 (Stipulated Facts).

66. E.S. is attending school in-person, although several students and staff have reported positive COVID-19 cases.  Ex. 228 at ¶ 9 (M.M. Declaration Regarding E.S. – August 17, 2021).

67. While attending virtual instruction last year, E.S. struggled with being distant from her peers, had difficulty focusing, and did not have sufficient individualized instruction to make sufficient progress in her classes.  recommended that "he avoid all places that are not following the CDC/universal masking recommendations." Ex. 228 at ¶ 9 (M.M. Declaration Regarding E.S. – August 17, 2021).

68. Since the beginning of September 2021, Defendant Paxton has sued 15 school districts that have instituted mask mandates on the basis that the mandates violate GA-38, including two plaintiff's school districts: Round Rock ISD and Richardson ISD, as well as Spring ISD, Sherman ISD, Galveston ISD, Honey Grove ISD, Paris ISD, Longview ISD, Elgin ISD,

Lufkin ISD, Diboll ISD, Waco ISD, Midway ISD, La Vega ISD, and McGregor ISD. Exs. 29, 33, 88, 92, 107, 111, 112, 115, 118, 120, 125 (Petitions filed against school districts).

69. Defendant Paxton also sued San Antonio ISD over its vaccine mandate on the basis that it likewise violates other provisions of Executive Order GA-38. Ex. 56 (Petition filed against SAISD).

70. On the official website for the Office of the Attorney General of Texas, Defendant Paxton maintains a "List of Government Entities Unlawfully Imposing Mask Mandates" ("List of Noncompliant Entities"). Ex. 12 (AG Paxton's COVID-19 List of Noncompliant Entities as of September 21, 2021).

71. The preface of the List of Noncompliant Entities states that "Attorney General Ken Paxton is committed to protecting the rights and freedoms of all Texans." Ex. 12 (AG Paxton's COVID-19 List of Noncompliant Entities as of September 21, 2021).

72. As of September 22, the List of Noncompliant Entities includes at least 90 school districts "who have been reported as non-compliant with Executive Order GA-38" and indicates which among those entities: (1) have been served with a "lawsuit filed by the Office of the Attorney General . . . to enforce GA-38"; (2) are in "active litigation . . . regarding the enforcement of GA-38"); (3) are not currently in compliance but have been sent a letter by the Texas Attorney General's Office; and (4) "[n]ow in compliance" but "previously not in compliance," which according to the Texas Attorney General's Office is a category that includes school districts that abandoned mask requirements after receiving a letter from the Attorney General's office. Ex. 12 (AG Paxton's COVID-19 List of Noncompliant Entities as of September 21, 2021); Ex. 161 at 29:15-30:10 (Kinghorn Deposition).

73. The letters sent to school districts by the Attorney General's Office accuse the district of recently "enact[ing] a local policy mandating that students and faculty wear face masks at schools in [their] district" and stating that:

> [The Attorney General's] office will pursue further legal action, including any available injunctive relief, costs and attorney's fees, penalties, and sanctions—including contempt of court—available at law against any local jurisdiction and its employees that persist in enforcing local mask mandates in violation of GA-38 and any applicable court order.

> [The Attorney General] request your acknowledgement by 5 p.m. Tuesday, August 17, that in light of the Court's rulings, you will rescind your local policy requiring masks in public schools or, alternatively, not enforce it pending the Supreme Court's disposition of the cases before it involving this issue. Otherwise, you will face legal action taken by my office to enforce the Governor's order and protect the rule of law.

*See, e.g.* Ex. 28 (OAG Letter to Richardson ISD on August 17, 2021); Ex. 32 (OAG Letter to Round Rock ISD on August 17, 2021); Ex. 91 (OAG Letter to Honey Grove ISD on September 3, 2021); Ex. 87 (OAG Letter to Sherman ISD on September 3, 2021).  The letters further request that the school rescind their mask policies or otherwise face potential legal action by the Office.  *Id.*

74. The purpose of these letters is to induce school districts to either rescind their mask policies or not enforce them. Ex. 161 at 38:5-12 (A. Kinghorn Deposition).

75. These form letters have been sent to at least 70 local school districts according to Defendant Paxton's List of Noncompliant Entities. Ex. 12 at 1 (AG Paxton's COVID-19 List of Noncompliant Entities as of September 21, 2021).

76. Attorney General Paxton followed up on his letters' threat to "enforce the Governor's order" and sued Round Rock ISD and Richardson ISD.  Exs. 29, 33 (Petitions against Richardson and Round Rock ISDs).

77. With respect to Round Rock ISD, the Office's efforts have been partially successful. On September 9, 2021, Defendant Paxton sued Round Rock ISD for its August 18 mask mandate applying to students, teachers, staff members, and adult visitors. Ex. 33 at ¶¶ 29-30 (OAG Lawsuit against Round Rock). On September 14, a Williamson County judge granted, *ex parte*, the State of Texas' Motion for Temporary Restraining Order and entered an order prohibiting Round Rock ISD "from enforcing a facemask mandate for as long as GA-38 (or a future executive order containing the same prohibitions) remain in effect." Ex. 34 at 2 (Order Granting State of Texas's Application for a Temporary Restraining Order). However, following a September 17 order from the Third District Court of Appeals staying the temporary restraining order, Round Rock ISD announced that it could "continue with its mask requirement" and planned to hold a Board of Trustees meeting to approve a recommendation to establish a "mask matrix" (which establishes different mask requirements based on various "risk levels"), which was subsequently approved on September 23. Ex. 36 (Order from the Court of Appeals for Stay in Round Rock ISD); Ex. 37 (September 17 Round Rock ISD Announcement); Ex. 38 (September 23 Round Rock ISD Announcement).

78. Defendant Paxton likewise sued Richardson ISD for violating Executive Order GA-38 on September 13, 2021. Ex. 29 (Richardson ISD Petition). In anticipation of starting the school year, Richardson ISD Superintendent Jeannie Stone announced on August 9 that the district reluctantly would not implement a mask mandate in compliance with GA-38. ¶ 10. However, on August 16, the day before in-person instruction began, Superintendent Stone advised the Richardson ISD community that a mask mandate would be implemented because GA-38's enforceability had been challenged in court. Ex. 27 at ¶¶ 12-13 (Declaration of Dr. Jeannie Stone). The school's decision to mandate masks was made based on Richardson ISD's review

of the public health data in its community, including data about the increasing spread of the Delta variant among children and the absence of available pediatric ICU beds in the community at that time. *Id*. at ¶ 14. On September 10, Superintendent Stone learned that the Attorney General announced on his Twitter that he would be suing Richardson ISD, which he did on September 13. *Id*. at ¶ 20. Richardson ISD still has a mask mandate in place but will ultimately comply with any applicable court orders enforcing GA-38 regarding the use of masks in schools. *Id*. at 23. If the Attorney General were to stop enforcing GA-38 or should there be an order barring its enforcement, the district will implement mask requirements so long as student needs, local data on COVID-19 risk levels, and expert guidance shows that they are necessary. *Id*.

79. Due to GA-38, Fort Bend ISD did not implement a mask mandate for the first day of school on August 11, 2021. Ex. 22 at ¶ 11 (Declaration of Denetta Williams, Member of Board of Trustees at Fort Bend ISD).  Between August 7 and 17, 548 students reported positive COVID-19 cases. *Id*. at ¶ 13. On August 23, Fort Bend ISD temporarily closed Pecan Grove Elementary due to a COVID-19 outbreak. *Id*. at 14. On that same day, Fort Bend ISD held a board meeting focused on reviewing the toll of the pandemic on its community, during which it listened to statements from doctors about the impact of the Delta variant, and from parents worried about their children's health and safety. *Id*. at ¶ 16. At the conclusion of the meeting, Fort Bend ISD's Board of Trustees passed a mask mandate that took effect on August 26, 2021. *Id*. at ¶ 17. On August 28, 2021, however, Fort Bend ISD decided to stop enforcing its mask policy due to its perception that the Office of the Attorney General was successful in its enforcement of Executive Order GA-38 through litigation. *Id*. at ¶¶ 19-20.

80. Leander ISD is identified on Defendant Paxton's list as having been "previously not in compliance" with Executive Order GA-38, but are "[n]ow in compliance." Ex. 12 (Defendant Paxton's List of Noncompliant Entities).

81. Killeen ISD is identified on Defendant Paxton's list as having been "previously not in compliance" with Executive Order GA-38, but are "[n]ow in compliance." Ex. 12 (Defendant Paxton's List of Noncompliant Entities).

82. Edgewood ISD is identified on Defendant Paxton's list as presently noncompliant and as having received letters from the Attorney General's Office. Ex. 12 (Defendant Paxton's List of Noncompliant Entities).

83. San Antonio ISD is identified on Defendant Paxton's list as presently noncompliant and as having received letters from the Attorney General's Office. Ex. 12 (Defendant Paxton's List of Noncompliant Entities).

84. Defendant Paxton's enforcement efforts have been successful with respect to other school districts aside from those in which Plaintiffs are enrolled.  For example, as of August 23, 2021, Calvert ISD required that all students and staff wear masks in their buildings as a public health and safety measure. See Ex. 102 (Calvert ISD Public Records). On September 3, 2021, Austin Kinghorn, as General Counsel for the Office of the Attorney General, submitted the Office's form letter to Calvert ISD Superintendent Thyrun Hurst threatening legal action and requesting that the school rescind its mask policy. *Id*. at 2, 4-5. On September 7, 2021, Calvert ISD informed its faculty that it could no longer mandate masks and, on that same day, Superintendent Hurst emailed a response to Mr. Kinghorn stating that [t]he district has taken the proper steps to rescind the mandate."  Id. at 2, 8. In response, Mr. Kinghorn advised Superintendent Hurst that Calvert ISD was "moved" to the Office's

"compliant list on [its] public-facing website" and requested that Calvert ISD "please forward any announcements" to both students and staff. Id. at 3.

85. The Office of Attorney General's threat of legal action prompted West Orange-Covid ISD to change its mask policy from mandatory to optional. As of August 23, 2021, West Orange Cove ISD required that: "all students 2-12 grade and all staff will be required to wear a mask/face covering that completely covers the mouth and nose while on campuses and buses as a part of our dress code until further notice." Ex. 103 at 7 (West Cove ISD PIR Response). On September 7, Mr. Kinghorn issued a letter to Superintendent Rickie Harris requesting that the school rescind its policy, or otherwise face potential legal action brought by the Office of the Attorney General. *Id*. at 3-4. On September 20, West Orange Cove ISD issued revised guidance stating that: "Based on recent possible legal actions from the Office of [t]he Attorney General, effective Monday, September 20, 2021, masks will be highly recommended for students and staff of Orange-Cove ISD." *Id*. at 8.

86. Mr. Kinghorn also issued a form letter to Ferris ISD on September 3. Ex. 85 (Ferris ISD Letter). On September 21, in an email response, Superintendent James Hartman advised Mr. Kinghorn that the Ferris ISD Board of Trustees had removed the district's temporary mask mandate. Ex. 86 (Ferris ISD Correspondence).

87. A similar interaction took place between Mr. Kinghorn and Aransas Pass ISD Superintendent Cara Cooke, who advised Mr. Kinghorn that the Board of Trustees had rescinded its mask mandate resolution following receipt of the Office's letter and requesting that the district be removed from the List of Noncompliant Entities. Ex. 84 (Aransas Pass ISD Correspondence).

88. Plano ISD rescinded its mask requirement after receiving one of the Office of the Attorney General's form letters and a series of communications between the district's attorney, Ms. Mari

McGowan, and the Office of the Attorney General, including a handful of phone calls with Mr. Kinghorn during which Ms. McGowan asked questions about what policies would constitute compliance or noncompliance from the Office's perspective. Ex. 161 at 61:2-66:21 (A. Kinghorn Deposition); Ex. 94 (Plano ISD Correspondence).

89. Salado ISD, Trenton ISD, and San Diego ISD likewise rescinded their mask policies after receiving the Office's letters or after being publicly listed on the List of Noncompliant Entities. Ex. 96 (Salado ISD Correspondence); Ex. 100 (Trenton ISD Correspondence); Ex. 98 (San Diego ISD Correspondence).

90. On Twitter, the Office of the Attorney General and Defendant Paxton have repeatedly publicized their threats of potential legal action against school districts, their multiple lawsuits against school districts in their effort to enforce GA-38, and their victories in compelling school districts to rescind their mask requirements. Ex. 143 (Paxton Tweet). One such tweet by Defendant Paxton on September 7, 2021 embedded a copy of a newsletter that Trenton ISD issued to families in its community explaining that the district "received a letter from the Texas Attorney General's office regarding compliance with Governor Abbott's Executive Order GA-38" that "threatened litigation against the District" and "in an abundance of caution" the district would rescind its 10-day mask requirement." *Id*.

91. Defendant Texas Education Agency assists the Office of the Attorney General in its enforcement efforts. The TEA receives complaints from third parties (including parents, general members of the public, school officials, and external agencies) identifying school districts that are not in compliance with GA-38's prohibition on mask mandates, and then reports those schools—in a list submitted twice weekly—to the Office of the Attorney General. Ex. 160 at 18:15:19:23; 21:12-17 (A. Jernigan Deposition).

92. Since Executive Order GA-38 was issued, TEA has updated its Public Health Guidance four times: on August 5, August 19, September 2, and, most recently, September 17. Ex. 4 (August 5, 2021 TEA Public Health Guidance); Ex. 5 (August 19, 2021 TEA Public Health Guidance); Ex. 3 (September 2, 2021 TEA Public Health Guidance); Ex. 2 (September 17, 2021 TEA Public Health Guidance).

93. TEA's August 5, 2021 Public Health Guidance stated: "Per GA-38, school systems cannot require students or staff to wear a mask. GA-38 addresses government-mandated face coverings in response to the COVID-19 pandemic." Ex. 4 (August 5, 2021 TEA Public Health Guidance).

94. On August 19, 2021 and then again on September 2, TEA stated: "Please note, mask provisions of GA-38 are not being enforced as the result of ongoing litigation." Ex. 5 (August 19 Public Health Guidance); Ex. 3 (September 2, 2021 Public Health Guidance).

95. On September 17, 2021 the Public Health Guidance reverted back to the August 5 guidance stating that "[p]er GA-38, school systems cannot require students or staff to wear a mask." Ex. 2 (September 17 Public Health Guidance).

96. TEA's purpose in issuing the August 5, 2021 and September 17, 2021 guidance documents was to dissuade school districts from requiring masks. Ex. 160 at 39:16-44:17 (A. Jernigan Deposition).

97. Defendants have each received federal funding. Exs. 162, 339, 340, 342.

**Proposed Conclusions of Law**

I.     **Subject Matter Jurisdiction**

   a.        **Sovereign Immunity**

1.   Defendants have waived their sovereign immunity with respect to Plaintiffs' claims under
     Section 504 of the Rehabilitation Act by receiving federal financial assistance.  *See* 42
     U.S.C. § 2000d-7(a) ("A State shall not be immune under the Eleventh Amendment …
     from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973
     … or the provisions of any other Federal statute prohibiting discrimination by recipients of
     Federal financial assistance."); *Danny R. v. Spring Branch ISD & Tex. Educ. Agency*, 124
     Fed. Appx. 289, 289–90 (5th Cir. 2005) (TEA is not immune to suit under Section 504)
     (citing *Pace*, 403 F.3d at 272); *Miller v. Tex. Tech Univ. Health Sci. Ctr.*, 421 F.3d 342,
     350 (5th Cir. 2005) (same for Louisiana DOE).

2.   Congress abrogated Defendants' sovereign immunity with respect to claims pertaining to
     public schools under the Americans with Disabilities Act.  *See Bowers v. Nat'l Collegiate
     Athletic Ass'n*, 475 F.3d 524, 555 (3d Cir. 2007) ("As applied to education, Title II is a
     congruent and proportional means of preventing and remedying the unconstitutional
     discrimination that Congress found to exist both in education and in other areas of
     governmental services, many of which implicate fundamental rights."); *Toledo v. Sanchez*,
     454 F.3d 24, 40 (1st Cir. 2006) ("We are similarly persuaded that Title II's prophylactic
     measures are justified by the persistent pattern of exclusion and irrational treatment of
     disabled students in public education, coupled with the gravity of the harm worked by such
     discrimination."); *Ass'n for Disabled Americans, Inc. v. Fla. Int'l Univ.*, 405 F.3d 954, 959
     (11th Cir. 2005) (concluding that Title II is a "congruent and proportional" response to the

"long history of state discrimination against students with disabilities," which limits their "future ability to exercise and participate in the most basic rights and responsibilities of citizenship"); *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 490 (4th Cir. 2005) (concluding that "Title II of the ADA is valid § 5 legislation, at least as it applies to public higher education," because "it is more likely that disability discrimination … public education programs will be unconstitutional than discrimination in … public employment," and because Title II's "remedial measures … are likely less burdensome to the States than those employed in Title I").

3. The *Ex parte Young* doctrine allows federal courts to enjoin state officials from enforcing state law that violates federal law if the federal officials are sufficiently connected to the enforcement of the challenged state law.  *See Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011) ("[W]hen a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes."); *Ex parte Young*, 209 U.S. 123, 157 (1907) ("In making an officer of the State a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional it is plain that such officer must have some connection with the enforcement of the act.").

4. *Ex parte Young* forecloses the argument that a claimant must show that the defendant whose conduct she seeks to enjoin is specifically authorized to enforce the law the claimant is challenging.  *Id.* at 157 ("It has not, however, been held that it was necessary that such duty should be declared in the same act which is to be enforced. In some cases, it is true, the duty of enforcement has been so imposed (154 U.S. 362, 366, § 19 of the act), but that may possibly make the duty more clear; if it otherwise exist it is equally efficacious. The fact that the state officer by virtue of his office has some connection with the enforcement

of the act is the important and material fact, and whether it arises out of the general law, or is specially created by the act itself, is not material so long as it exists.")

5. Attorney General Paxton is sufficiently connected to the enforcement of Executive Order GA-38's mask provisions against school districts for Plaintiffs to seek prospective relief against him under *Ex parte Young* because he is actively enforcing GA-38 against school districts.  COLs 3–4; FOFs 69–75, 77–82, 84–90.

6. Commissioner Morath is sufficiently connected to the enforcement of Executive Order GA-38's mask provisions against school districts for Plaintiffs to seek prospective relief against him under *Ex parte Young* because he is actively enforcing GA-38 against school districts.  COLs 3–4; FOFs 91–96.

7. Sovereign immunity does not bar Plaintiffs' claims against Attorney General Paxton. *Supra* COLs 1–5.

8. Sovereign immunity does not bar Plaintiffs' claims against Commissioner Morath.  *Supra* COLs 1–4, 6.

9. Sovereign immunity does not bar Plaintiffs' claims against the Texas Education Agency. *Supra* COLs 1–4, 6.

**b.    Standing**

10. Article III of the United States Constitution requires Plaintiffs to demonstrate that they have standing.  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338, (2016).

11. To demonstrate standing a plaintiff "must not only establish (1) an injury in fact (2) that is fairly traceable to the challenged conduct, but he must also seek (3) a remedy that is likely to redress that injury."  *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 797 (2021).

12. Standing's injury requirement "helps to ensure that the plaintiff has a 'personal stake in the outcome of the controversy.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).

13. "An injury must be 'concrete, particularized, and actual or imminent'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)).

14. An "invasion of a legally protected interest" is sufficient to confer standing. *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018).

15. An injury is sufficiently imminent to confer standing if there is a "'substantial risk' that the harm will occur." *Driehaus*, 573 U.S. at 158 (quoting *Clapper*, 368 U.S. at 414 n. 5).

16. The actual or imminent loss of opportunity to attend public school in person is an invasion of a legally protected interest that is an injury sufficient to confer standing. Tex. Const. art VII, § 1 ("A general diffusion of knowledge being essential to the preservation of the liberties and rights of the people, it shall be the duty of the Legislature of the State to establish and make suitable provision for the support and maintenance of an efficient system of public free schools."); *Goss v. Lopez*, 419 U.S. 565, 574 (1975) ("[S]tudent's legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause."); *ARC of Iowa v. Reynolds*, 2021 WL 4166728, at *1 (S.D. Iowa Sept. 13, 2021) (recognizing that "denying school-aged children a free public education violates the U.S. Constitution) (citing *Plyler v. Doe*, 457 U.S. 202, 230–31, (1982)); *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 291 (5th Cir. 2005) ("Title II of the ADA, which applies to public entities including public schools, provides that 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be

denied the benefits of the services, programs or activities of a public entity or be subjected

to discrimination by any such entity.'") (quoting 42 U.S.C. § 12132 and noting that Section

504 of the Rehab Act, 29 U.S.C. § 784(a), "contains virtually identical language" to Section

12132))

17. Each Plaintiff has suffered a concrete, particularized injury sufficient to confer standing or
will suffer concrete, particularized injury sufficient to confer standing imminently because
they have been or will imminently be deprived of the opportunity to attend public school
in person.  COLs 12–16; FOFs 13–16, 23–69.

18. As to standing's traceability requirements "In cases where the choice of a third party is
essential to a plaintiff's standing, the plaintiff must introduce facts showing that the third
party's choices 'have been or will be made in such manner as to produce causation and
permit redressability of injury.'"  *Three Expo Events, L.L.C. v. City of Dallas, Texas*, 907
F.3d 333, 341 (5th Cir. 2018) (quoting *Lujan*, 504 U.S. at 562).

19. M.P. has suffered an injury sufficient to confer standing fairly traceable to Attorney
General Paxton because Attorney General Paxton's enforcement of GA-38 has caused
M.P.'s school district to forego mask requirements it would have implemented absent
Attorney General Paxton's enforcement of GA-38, which in turn has deprived M.P. of the
opportunity to attend public school in person.  COL 18; FOFs 32, 35, 75.

20. E.S. and S.P. have suffered an injury sufficient to confer standing fairly traceable to
Attorney General Paxton because Attorney General Paxton's enforcement of GA-38 has
caused E.S. and S.P. to suffer a higher risk of contracting COVID than they would have
faced absent Attorney General Paxton's enforcement of GA-38.  COL 18; FOFs 43, 46,
66, 78, 80.

21. E.T., J.R., H.M., and A.M. face an imminent injury sufficient to confer standing fairly traceable to Attorney General Paxton because Attorney General Paxton's enforcement of GA-38 will imminently cause E.T., J.R., H.M., and A.M.s' school districts to forego mask requirements they would continue to implement absent Attorney General Paxton's enforcement of GA-38, which in turn will deprive E.T., J.R., H.M., and A.M. of the opportunity to attend public school in person.  COLs 18, 15; FOFs 39, 41, 48, 50, 52, 53, 55, 56–57, 59, 63, 70, 77, 79, 81, 82.

22. M.P. has suffered an injury sufficient to confer standing fairly traceable to Commissioner Morath because Commissioner Morath's enforcement of GA-38 has caused M.P.'s school districts to forego mask requirements they would have implemented absent Commissioner Morath's enforcement of GA-38, which in turn has deprived M.P. of the opportunity to attend public school in person.  COL 18; FOFs 32, 35, 75, 91–96.

23. E.S. and S.P. have suffered an injury sufficient to confer standing fairly traceable to Commissioner Morath because Commissioner Morath's enforcement of GA-38 has caused E.S. and S.P. to suffer a higher risk of contracting COVID than they would have faced absent Commissioner Morath's enforcement of GA-38.  COL 18; FOFs 43, 46, 66, 78, 80, 91–96.

24. E.T., J.R., H.M., and A.M. face an imminent injury sufficient to confer standing fairly traceable to the Commissioner Morath because the Commissioner Morath's enforcement of GA-38 will imminently cause E.T., J.R., H.M., and A.M.s' school districts to forego mask requirements they would continue to implement absent the Commissioner Morath's enforcement of GA-38, which in turn will deprive E.T., J.R., H.M., and A.M. of the

opportunity to attend public school in person.  COLs 18, 15; FOFs 39, 41, 48, 50, 52, 53, 55, 56–57, 59, 63, 70, 77, 79, 81, 82, 91–96.

25. M.P. has suffered an injury sufficient to confer standing fairly traceable to the Texas Education Agency because the Texas Education Agency's enforcement of GA-38 has caused M.P.'s school districts to forego mask requirements they would have implemented absent the Texas Education Agency's enforcement of GA-38, which in turn has deprived M.P. of the opportunity to attend public school in person.  COL 18; FOFs 32, 35, 75, 91–96.

26. E.S. and S.P. have suffered an injury sufficient to confer standing fairly traceable to the Texas Education Agency because the Texas Education Agency's enforcement of GA-38 has caused E.S. and S.P. to suffer a higher risk of contracting COVID than they would have faced absent the Texas Education Agency's enforcement of GA-38.  COL 18; FOFs 43, 46, 66, 78, 80, 91–96.

27. E.T., J.R., H.M., and A.M. face an imminent injury sufficient to confer standing fairly traceable to the Texas Education Agency because the Texas Education Agency's enforcement of GA-38 will imminently cause E.T., J.R., H.M., and A.M.s' school districts to forego mask requirements they would continue to implement absent the Texas Education Agency's enforcement of GA-38, which in turn will deprive E.T., J.R., H.M., and A.M. of the opportunity to attend public school in person.  COLs 18, 15; FOFs 39, 41, 48, 50, 52, 53, 55, 56–57, 59, 63, 70, 77, 79, 81, 82, 91–96.

28.  Under standing's redressability requirement, "the standard is not whether the proposed remedy is an absolute solution, but rather, whether it will 'be likely, as opposed to merely

speculative,' to redress plaintiff's injury." *ARC of Iowa*, 2021 WL 4166728, at *7 (quoting *Lujan*, 504 U.S. at 561).

29. In *Uzuegbunam v. Preczewski*, Supreme Court has confirmed that a remedy need not be capable of completely redressing a plaintiff's injury for the plaintiffs to meet the redressability requirement.  141 S. Ct. 792, 797 (2021).

30. An order enjoining Attorney General Paxton from enforcing GA-38 against Plaintiffs' school districts would likely redress Plaintiffs' injuries because Plaintiffs' school districts will require masks if the Court enjoins Attorney General Paxton from enforcing GA-38. COL 29; FOFs 35, 39, 43, 48, 59, 64, 76–82.

31. Each Plaintiff has standing to sue each Defendant.  COLs 10–30.

32. The Court has subject matter jurisdiction over Plaintiffs' claims.  COLs 1–31.

## II.    Merits

### a.    Statutory Claims

33. Numerous legal authorities establish a citizen's interest in receiving a public education. Tex. Const. art VII, § 1 ("A general diffusion of knowledge being essential to the preservation of the liberties and rights of the people, it shall be the duty of the Legislature of the State to establish and make suitable provision for the support and maintenance of an efficient system of public free schools."); *Goss v. Lopez*, 419 U.S. 565, 574 (1975) (recognizing a "student's legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause."); *see also ARC of Iowa v. Reynolds*, 2021 WL 4166728, at *1 (S.D. Iowa Sept. 13, 2021) (recognizing that "denying school-aged children a free public education violates the U.S. Constitution) (citing *Plyler v. Doe*, 457 U.S. 202, 230–31, (1982)).

34. Plaintiffs have a legally protected interest in having access to public education on par with non-disabled children's access. *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 291 (5th Cir. 2005) (quoting 42 U.S.C. § 12132 (of the ADA) and noting that Section 504 of the Rehab Act, 29 U.S.C. § 784(a), "contains virtually identical language" to Section 12132).

35. Plaintiffs have established a violation of the ADA and Section 504 because (1) they are qualified individuals with disabilities under these statutes, (2) they are being excluded from participation in, or being denied the benefits of, their public education; and (3) the discrimination is due to disability. *See Wilson v. City of Southlake,* 936 F. 3d 326, 330 (5th Cir. 2019) ("To establish a prima facie case of discrimination under the ADA, a plaintiff must demonstrate: (1) that he is a qualified individual within the meaning of the ADA; (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability.").

36. A disability under the ADA and Section 504 is defined as "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. §§ 12102(1)(A).

37. Plaintiffs are persons with disabilities as defined under Section 504 and the ADA. *Id.* FOFs 23-25, 30, 40, 44, 49, 54, 60, 65.

38. Each plaintiff is eligible to enroll and attend their local public school in Texas. Tex. Educ. Code § 25.001(b). FOFs 23, 32, 39, 43, 48, 53, 59, 64.

39. The focus of both the ADA and Section 504 is prohibiting discrimination for those with disabilities. 29 U.S.C. § 701(a)(3)(F) (Rehabilitation Act) (Congress found that individuals with disabilities should "enjoy full inclusion and integration in the economic,

political, social, cultural, and educational mainstream of American Society."); 42 U.S.C. § 12101 (ADA) (Congress found that individuals with disabilities should be assured "equality of opportunity, full participation, independent living, and economic self-sufficiency.").

40. Both the ADA and Section 504 prohibit exclusion from participation, denial of benefits, or other kinds of discrimination. 42 U.S.C. § 12132; *Wilson,* 936 F. 3d at 330.

41. Unlawful discrimination includes (1) denying the opportunity to participate in or benefit from educational services, (2) affording an unequal opportunity to participate or benefit from services, or (3) limiting a person in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others. 28 C.F.R. § 35.130(b)(1)(i)-(ii), (vii). It also includes failure to make reasonable modifications in policies, practices, or procedures when such are necessary to avoid discrimination. 28 C.F.R. § 35.130(b)(7)(i); *Cadena v. El Paso Cty*., 946 F.3d 717, 723–24 (5th Cir. 2020). In addition, "[a] public entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150.

42. Unlawful discrimination occurs both when there are barriers to access, and when there is a failure to provide reasonable modifications needed for meaningful access. *Argenyi v. Creighton Univ.*, 703 F.3d 441, 449 (6th Cir. 2013) (discussing § 504 and ADA Title III).

43. Defendants' actions amount to a denial of educational access to Plaintiffs M.P., H.M., E.T., J.R., and A.M. As a direct result of Defendants' discriminatory actions relating to the enforcement of GA-38 and TEA's Public Health Guidance, M.P has been excluded from the school classroom and forced to miss substantial in-person instruction this school year.

FOFs 32, 35, 75, 91–96. In addition, If Defendants' enforcement of GA-38 and TEA's Public Health Guidance is successful against their districts, E.T., J.R., H.M., and A.M. will be excluded from the school classroom, resulting in the loss of substantial in-person instruction this school year. ET JR AH AM: FOFs 39, 41, 48, 50, 52, 53, 55, 56–57, 59, 63, 70, 77, 79, 81, 82, 91–96. For each of these Plaintiffs, given their high risk for severe COVID-19, the ban on mask requirements has created or will create an absolute barrier to the school building and to in-person learning, which is discrimination prohibited by the ADA and Section 504. 42 U.S.C. § 12132; *Wilson,* 936 F. 3d at 330.

44. For Plaintiffs E.S. and S.P., the ban on mask policies and Defendants' concomitant enforcement activities is denying them meaningful access to their school buildings and in-person education, *i.e.*, an "equal opportunity to … gain the same benefit." *Argenyi*, 703 F.3d at 44. Requiring Plaintiffs to attend school despite their significant risk of severe illness is not the same opportunity that is being provided to other children. FOFs 43, 46, 66, 78, 80, 91–96.

45. As found by the court in *Arc of Iowa*, "Plaintiffs have demonstrated that school programs, services, and activities are not 'readily accessible' to the disabled minor children involved here because these children cannot attend in-person learning at their schools without the very real threat to their lives because of their medical vulnerabilities." *Arc of Iowa*, at *37.

46. Given Courts have repeatedly authorized accommodations to address a risk of injury or health consequence under Title I of the ADA similar to the instant case, Plaintiffs are entitled to a reasonable modification that masks be required on their campuses contingent on local conditions and individual needs. *See Burnett v. Ocean Properties, Ltd.*, 987 F.3d 57, 68–69 (1st Cir. 2021) (finding plaintiff needed an accommodation because although he

was able to physically perform his job, he did so at risk of injury); *Gleed v. AT & T Mobility Services, LLC*, 613 F. App'x 535, 539 (6th Cir. 2015) (reasonable accommodation needed to work "without great pain and a heightened risk of infection"); *Kleyman v. SUNY Downstate Med. Ctr.*, No. 18CV3137PKCST, 2020 WL 5645218, at *10 (E.D.N.Y. Sept. 21, 2020) (finding there was dispute whether plaintiff could perform her job without accommodation only by "seriously endangering her health"); *U.S. E.E.O.C. v. AutoZone, Inc.*, 822 F. Supp. 2d 824, 830 (C.D. Ill. 2011), *aff'd in relevant part sub nom. E.E.O.C. v. AutoZone, Inc.*, 707 F.3d 824 (7th Cir. 2013) (reasonable accommodation of avoiding task causing injury); *Sturz v. Wisconsin Dept. of Corrections*, 642 F. Supp. 2d 881, 888 (W.D. Wis. 2009) ("[D]efendant's argument suggests a disturbing standard for determining whether an accommodation is reasonable. It may be that plaintiff could open the front door with great difficulty or make her way through the parking lot without falling each time, but should she have to?"); *Nawrot v. CPC Int'l*, 259 F. Supp. 2d 716, 726 (N.D. Ill. 2003) ("To hold that a person with potentially life threatening diabetes is not entitled to accommodations . . . would force diabetics like Nawrot to choose between working while risking physical harm and death, or unemployment. The ADA was created to prohibit placing disabled persons in this position."); *see also S.B. by & through M.B. v. Lee*, No. 321CV00317JRGDCP, ___ F. Supp. 3d ___, 2021 WL 4346232 (E.D. Tenn. Sept. 24, 2021) (noting that the Supreme Court's cases finding that prison officials cannot ignore conditions of confinement that are likely to cause serious illness in the future apply with equal force when evaluating the harm to the children with disabilities); *R.K. v. Lee*, No. 3:21-cv-725, ___ F. Supp. 3d ___, 2021 WL 4391640 (M.D. Tenn. Sept. 24, 2021).

47. Both the ADA and Section 504 require covered entities to provide reasonable accommodations or modifications to individuals with disabilities. Under Section 504, a reasonable accommodation may be required to ensure meaningful access to a benefit. *Alexander v. Choate*, 469 U.S. 287, 301 (1985). Under the ADA, reasonable modifications are required when necessary to avoid discrimination on the basis of a disability. 28 C.F.R. § 35.130(b)(7). In addition, broad policies impacting others may be required as part of a reasonable accommodation for particular individuals such as Plaintiffs. *See, e.g., Staron v. McDonald's Corp*., 51 F.3d 353, 357 (2d Cir. 1995) ("We see no reason why, under the appropriate circumstances, a ban on smoking could not be a reasonable modification."); *Simmons v. Monroe Cty., Mississippi*, 415 F. Supp. 3d 723, 730 (N.D. Miss. 2019) ("With respect to the issue of reasonable accommodation, this court regards plaintiff's evidence that the Monroe County jail had a no-smoking policy as being an indication that, in allegedly asking defendant to simply enforce a pre-existing policy, he was seeking a very 'reasonable' accommodation indeed."); *Thursby v. City of Scranton*, No. 3:CV-02-2355, 2006 WL 1455736, at *6 (M.D. Pa. May 25, 2006) ("Ms. Thursby has presented sufficient evidence for a jury to find that the City failed to reasonably accommodate her disability … [through] implementation of a non-smoking policy …."); *Bond v. Sheahan*, 152 F. Supp. 2d 1055, 1062–63, 1071–75 (N.D. Ill. 2001) (denying summary judgment on issue of whether defendant reasonably accommodated plaintiff's asthma by failing to transfer her and by failing to enforce a non-smoking policy). *See also Muller v. Costello*, No. 94-CV-842 (FJS), 1996 WL 191977, at *5 n.14 (N.D.N.Y. Apr. 16, 1996) ("Although *Staron* involved the public accommodation provisions of the ADA, the Second Circuit's reasoning

is instructive. The [*Staron*] court stated that '[i]t is plain to us that Congress did not intend to isolate the effects of smoking from the protections of the ADA.'") (citations omitted).

48. Under both statutes, the determination is a fact-specific inquiry requiring individualized consideration, but the Defendants are attempting to prevent compliance with the law.  FOFs 69–75, 77–82, 84–90, 91–96.  *Staron v. McDonald's Corp.*, 51 F.3d 353, 356 (2nd Cir. 1995) ("[T]he determination of whether a particular modification is 'reasonable' involves a fact-specific, case-by-case inquiry that considers, among other factors, the effectiveness of the modification in light of the nature of the disability in question and the cost to the organization that would implement it."); *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 688 (2001) (ADA Title III) ("To comply with this command, an individualized inquiry must be made to determine whether a specific modification for a particular person's disability would be reasonable under the circumstances as well as necessary for that person, and yet at the same time not work a fundamental alteration.").  For children under the age of 12, the best accommodation to protect those who are at risk of significant illness from COVID-19 is the use of masks, and the ability to require masks is necessary for the protection of children like the plaintiffs.  Defendants have thwarted the ability of school districts to adopt this effective and simple accommodation, preventing school districts from meeting their obligations under federal law.  S.B., 2021 WL 4346232 at *15 (noting that mask-wearing is "*the* most important of the CDC's guidelines") (emphasis in original).  FOFs 69–75, 77–82, 84–90, 91–96.

49. Defendants' discriminatory actions are tied directly to the Plaintiffs' disabilities, given that the CDC, treating doctors, and expert testimony establishes that each of these plaintiffs is at higher risk of injury; the threat to Plaintiffs is significant and it is greater than to the

general public or general student population because of their conditions and because of GA-38's preclusive effect on school districts' ability to implement recommended prevention strategies to address the heightened risk the Plaintiffs' disabilities create. *See generally Arc of Iowa*, at *10–12.  FOFs 13–16, 23–69.

### b.     Preemption Claims

#### i.     ADA and Rehabilitation Act

50. Under the Supremacy Clause, U.S. Const. art. VI, cl. 2, the laws of the United States "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  State law must give way to the extent it "conflicts with federal law."  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 378 (2000).

51. Defendants are duty bound to not enforce GA-38 because in so doing they cause and perpetuate unlawful discrimination under federal law.  *See Astralis Condo. Ass'n v. Sec'y, U.S. Dep't of Hous. & Urb. Dev.*, 620 F.3d 62, 67-70 (1st Cir. 2010).

52. The ban on universal masking conflicts with the ADA and Section 504 because it excludes children with disabilities and denies them of the benefits to which they are entitled.  *Arc of Iowa* at *10–12.  COLs 33–49.

53. The ban stands as an obstacle to the "accomplishment and execution of the full purposes and objectives of Congress" and therefore, Defendants cannot enforce it. *Arc of Iowa* at *12.  COLs 33–49.

54. GA-38's mask provision and Defendants' concomitant enforcement activities relating to GA-38 have "suppressed" the school districts of Plaintiffs and prevented those districts "from giving Plaintiffs the effective accommodation of a temporary universal mask

mandate for all students and teachers." *R.K.* 2021 WL 4391640 at *6. Therefore, the executive order "appears to violate federal law and must yield." *Id.* COLs 33–49.

### ii.    ARPA

55. As discussed above, the Supremacy Clause of the United States Constitution renders federal law the "supreme Law of the Land." U.S. CONST. art. VI, cl. 2. The doctrine of federal preemption that arises out of the Supremacy Clause requires that "any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." *Felder v. Casey*, 487 U.S. 131, 138 (1988) (quoting *Free v. Bland*, 369 U.S. 663, 666 (1962)). State law is preempted when, among other things, it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Pac. Gas & Elec. Co. v. State Energy Res. Conserv. & Dev. Comm'n*, 461 U.S. 190, 204 (1983). Defendants' prohibition on school district mask requirements is in irreconcilable conflict with Congress' choice under the American Rescue Plan Act of 2021 ("ARPA") to give local school districts discretion to decide for themselves whether and to what extent to adopt policies, such as universal masking, in order to best ensure a safe return to in-person instruction. *Id.*

56. With regard to education, the ARPA has provided nearly $121 billion in Elementary and Secondary School Emergency Relief (ESSER) funding in order to help school districts, including Plaintiffs' schools, "return safely to in-person instruction, maximize in-person instructional time, sustain the safe operation of schools, and address the academic, social, emotional, and mental health impacts of the COVID-19 pandemic on the Nation's students." *Id.*; American Rescue Plan Act Elementary and Secondary School Emergency Relief Fund, 86 Fed. Reg. 21195, 21196 (Apr. 22, 2021).

57. A key purpose of the ARPA's ESSER funding is to assist schools in achieving a "safe return to in-person instruction."  Pub. L. No. 117-2, § 2001(i).  To that end, the ARPA requires local school districts receiving ESSER funding to develop and make publicly available a "plan for the safe return to in-person instruction and continuity of services." *Id.* § 2001(i)(1).  The express intent of the ARPA is not only that children should return to in-person schooling, but that they must do so safely.  *Id.*  Local school districts are authorized to use ESSER funds for "developing strategies and implementing public health protocols ***including, to the greatest extent practicable, policies in line with guidance from the Centers for Disease Control and Prevention*** [which currently recommends universal masking in schools] for the reopening and operation of school facilities to effectively maintain the health and safety of students, educators, and other staff." *Id*. § 2001(e)(2)(Q) (emphasis added).

58. Consistent with ARPA, the U.S. Department of Education has issued interim final requirements stating that school districts must address whether they have required CDC safety recommendations such as universal masking as well as ensure the interventions it implements will respond to the needs of all students, "and particularly those students disproportionately impacted by the COVID-19 pandemic, ***including … children with disabilities***." 86 Fed. Reg. 21195, 21200 (emphasis added).

59. It is well settled that when a federal funding statute expressly gives local authorities discretion over how to spend federal money such as in the instant matter, a state law that purports to restrict that discretion is preempted.  *See Lawrence County v. Lead-Deadwood School Dist.*, 469 U.S. 256, 260–61 (1984) (holding that a state law restricting how counties could use federal "payment in lieu of taxes" money for federal properties located within

counties' borders was preempted, where federal statute and implementing regulation expressly gave discretion to counties).  The same rule applies here, given the clear intention of Congress and the Department of Education that local school districts receiving ESSER funding have the discretion to decide for themselves which policies, including mask requirements, would best serve the ARPA's overriding goal of achieving a safe return to in-person instruction.  Congress' choice to vest that discretion with local school districts rather than state governments is a valid exercise of Congress' power under the Spending Clause to impose conditions on the receipt of federal funds, and thus does not raise federalism concerns.  *Lawrence County*, 469 U.S. at 269–70.

60. GA-38 has the legal effect of depriving school districts of the discretion to require masking Congress intended school districts to have when Congress passed the ARPA.  COLs 65–58; FOFs 2–3; Executive Order GA-38.

61. Because GA-38 and TEA's Public Health Guidance expressly prohibit local schools from implementing any mask requirements, including relating to children with disabilities, they are in direct conflict with the ARPA and preempted as contrary to federal law because they "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *See Felder*, 487 U.S. at 138; *Pac. Gas & Elec. Co.*, 461 U.S. at 204; COL 60.

62. Plaintiffs' claim for preemption under the ARP Act is properly before this Court not because of any private right of action under that statute, but instead based on the well-established and longstanding equitable power of the Court to enjoin unlawful actions by state officials.  *See Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327 (2015) ("[W]e have long held that federal courts may in some circumstances grant injunctive relief

against state officers who are violating, or planning to violate, federal law."); *Ex parte Young*, 209 U.S. 123, 150–51 (1908).

63. Unless the federal statute expressly or impliedly precludes such jurisdiction (which the ARP Act does not, for the reasons discussed below), a claim that a state law is preempted by a federal statute gives rise to federal-question jurisdiction in this Court. *Cf. Armstrong*, 575 U.S. at 327 ("The power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations."); *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96, n. 14 (1983) ("A plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U. S. C. § 1331 to resolve*.")*.

64. Plaintiffs' ARPA preemption claim falls within this Court's jurisdiction under § 1331, and nothing in the language of the ARP Act purports to remove that jurisdiction. *See Verizon Md., Inc. v. Public Serv. Comm'n of Md.,* 535 U.S. 635, 643 (2002) (holding that telecommunications carrier could assert preemption claim under court's equitable power, where nothing in federal Telecommunications Act purported to bar or restrict such claims). Plaintiffs can invoke the Court's equitable jurisdiction because neither the ARPA nor the Department of Education's interim final requirement expressly or impliedly indicate that Congress intended to ***preclude*** enforcement by such means. *See Armstrong*, 575 U.S. at 327–28.

65. Because Plaintiffs in this case are seeking only equitable relief and not damages, Plaintiffs can assert their preemption claim under the Court's equitable power and do ***not*** need to show that the ARP Act itself gives rise to a legal private right of action. COLs 62–64.

**III.    Plaintiffs are Prevailing Parties**

66. Plaintiffs are prevailing parties and, under 42 U.S.C. § 1988, 42 U.S.C. § 12205, and 29

U.S.C. § 794a, are entitled to recover their reasonable attorneys' fees, costs, and litigation

expenses.

67. An evidentiary hearing will be set in the future to determine the amount of such recovery.

Dated: September 29, 2021                    Respectfully submitted,

_____
Thomas M. Melsheimer
Texas Bar No. 13922550
tmelsheimer@winston.com
Scott C. Thomas
Texas Bar No. 24046964
scthomas@winston.com
Alex Wolens
Texas Bar No. 24110546
John Michael Gaddis (*pro hac vice*)
Texas Bar No. 24069747
William G. Fox, Jr. (*application pending*)
Texas Bar No. 24101766
**WINSTON & STRAWN LLP**
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

Brandon W. Duke (*pro hac vice*)
Texas Bar No. 240994476
bduke@winston.com
**WINSTON & STRAWN LLP**
800 Capitol St., Suite 2400
Houston, TX 77002
(713) 651-2600
(713) 651-2700 (fax)

Dustin Rynders (*pro hac vice*)
Texas Bar No. 24048005
drynders@drtx.org
**DISABILITY RIGHTS TEXAS**
1500 McGowen, Suite 100
Houston, TX 77004
(713) 974-7691
(713) 974-7695 (fax)

L. Kym Davis Rogers
Texas Bar No. 00796442
krogers@drtx.org
**DISABILITY RIGHTS TEXAS**
1420 W. Mockingbird Lane, Suite 450
Dallas, TX 75247
(214) 845-4045
(214) 630-3472 (fax)

Robert Winterode (*pro hac vice*)
Texas Bar No. 24085664
rwinterode@drtx.org
**DISABILITY RIGHTS TEXAS**
2211 E. Missouri, Suite 243
El Paso, TX 79903
(210) 424-9652
(915) 542-2676 (fax)

Peter Hofer
Texas Bar No. 09777275
phofer@drtx.org
Brian East
Texas Bar No. 06360800
beast@disabilityrightstx.org
**DISABILITY RIGHTS TEXAS**
2222 West Braker Lane
Austin, TX 78758
(512) 407-2745
(512) 454-3999 (fax)

**ATTORNEYS FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system on September 29, 2021.

*/s/Thomas Melsheimer*
Thomas Melsheimer
