# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| E.T., by and through her parents and next friends; J.R., by and through her parents and next friends; H.M., by and through her parents and next friends; E.S., by and through her parents and next friends; M.P., by and through her parents and next friends; S.P., by and through her parents and next friends; and A.M., by and through her parents and next friends. | ) ) ) ) ) ) ) ) | Civil Action No. 1:21-CV-00717-LY |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| MIKE MORATH, in his official capacity as the COMMISSIONER of the TEXAS EDUCATION AGENCY; the TEXAS EDUCATION AGENCY; and ATTORNEY GENERAL KENNETH PAXTON, in his official capacity as ATTORNEY GENERAL OF TEXAS, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFFS' TRIAL BRIEF**

# TABLE OF CONTENTS

PLAINTIFFS' TRIAL BRIEF ........................................................................................... 1

I. ........INTRODUCTION ................................................................................................ 1

II. .......FACTUAL BACKGROUND .................................................................................. 4

    A.    The Governor issues Executive Order GA-38 on July 29, 2021, prohibiting public schools from implementing mask requirements for the 2021-2022 school year. ... 4

    B.    Plaintiffs are students with medical disabilities that place them at higher risk for contracting COVID-19 and/or experiencing severe illness due to the virus. ......... 7

    C.    Defendants' Enforcement of Executive Order GA-38 has deprived Plaintiffs of meaningful access to their public schools. .............................................................. 8

    D.    Defendants are engaged in extensive and active enforcement of GA-38, including litigation, despite claims they are not authorized to enforce it. ........................... 13

III. ......ARGUMENT & AUTHORITIES ................................................................... 22

    A.    The Court has subject matter jurisdiction. .......................................................... 22

        1.    For Plaintiffs' two statutory claims—Section 504 and the ADA—sovereign immunity is not available as a defense. ................................. 23

        2.    *Ex parte Young* overcomes any sovereign immunity defense in this case because Defendants are actively enforcing GA-38. ................................. 25

            a.    On its face, *Ex parte Young* deprives a state official of sovereign immunity when he is enforcing a law that violates federal law. ... 25

            b.    Fifth Circuit cases do not and cannot require a different result. ... 30

        3.    Plaintiffs have standing because Defendants' unlawful conduct has deprived Plaintiffs of meaningful access to in-person public education. . 33

            a.    Plaintiffs have suffered an injury because they have been deprived of meaningful access to in-person public education. .................... 33

                 i.    Plaintiffs' actual or imminent loss of opportunity to attend and have meaningful access to in-person public school is an injury sufficient to confer standing. ................................................................. 34

                 ii.    Plaintiffs have been deprived of the opportunity to attend and have meaningful access to in-person public school. ...................................................... 37

            b.    Plaintiffs' injury is fairly traceable to Defendants' actual and threatened enforcement of GA-38 against school districts. .......... 40

            c.    An injunction enjoining Defendants from enforcing GA-38 against school districts would likely redress Plaintiffs' injury. ............... 43

    B.    Defendants have violated the ADA and Rehabilitation Act. ............................... 44

        1.    Plaintiffs are qualified individuals with disabilities. ................................. 46

      2.     G.A. 38 discriminates against Plaintiffs. ................................................... 46

           a.     Exclusion from in-person learning.................................................. 47

           b.     Unequal access to in-person learning ............................................ 49

           c.     Failure to Provide Reasonable Modification ................................ 52

      3.     The discrimination is by reason of the Plaintiffs' disability. .................... 54

C.     GA 38 is preempted by the ADA and Section 504. ............................................. 55

D.     GA-38 and the TEA's Public Health Guidance are preempted by the American Rescue Plan Act. ................................................................................................. 56

      1.     The Rescue Act expressly gives local school districts discretion to adopt policies, including universal masking, to achieve a safe return to in-person instruction. ............................................................................................. 57

      2.     By barring local school districts from adopting mask requirements, GA-38 and TEA's Guidance are in direct conflict with the Act............................ 59

      3.     The Rescue Act preemption claim arises under the Court's well-established equitable power to enjoin unlawful actions by state officials. 60

E.     An injunction is necessary to protect Plaintiffs from further harm and is in the public interest. ................................................................................................... 63

IV........CONCLUSION............................................................................................................. 64

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Abbott*,
956 F.3d 696 (5th Cir. 2020), *cert. granted, judgment vacated sub nom.*
*Planned Parenthood Ctr. for Choice v. Abbott*, 141 S. Ct. 1261, 209 L. Ed. 2d
5 (2021)................................................................................................................31

*Agey v. Am. Liberty Pipe Line Co.*,
172 S.W.2d 972 (Tex. 1943)................................................................................29

*Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*,
851 F.3d 507 (5th Cir. 2017) ...............................................................................30

*Alexander v. Choate*,
469 U.S. 287 (1985)..............................................................................................51

*Alexander v. Sandoval*,
532 U.S. 275 (2001)........................................................................................60, 61

*Arc of Iowa*, No. 4:21-cv-00264-RP-SBJ, PACER Doc. 17 (S.D. Iowa Sept. 9,
2021) ....................................................................................................................45

*ARC of Iowa v. Reynolds*,
2021 WL 4166728 (S.D. Iowa Sept. 13, 2021) ........................................... *passim*

*Argenyi v. Creighton Univ.*,
703 F.3d 441 (6th Cir. 2013) .........................................................................46, 49

*Armstrong v. Exceptional Child Center, Inc.*,
575 U.S. 320 (2015)...........................................................................59, 60, 61, 62

*Ass'n for Disabled Americans, Inc. v. Fla. Int'l Univ.*,
405 F.3d 954 (11th Cir. 2005) .............................................................................24

*Astralis Condo. Ass'n v. Sec'y, U.S. Dep't of Hous. & Urb. Dev.*,
620 F.3d 62 (1st Cir. 2010)..................................................................................54

*Bond v. Sheahan*,
152 F. Supp. 2d 1055 (N.D. Ill. 2001) .................................................................53

*Bowers v. Nat'l Collegiate Athletic Ass'n*,
475 F.3d 524 (3d Cir. 2007).................................................................................24

*Burnett v. Ocean Properties, Ltd.*,
987 F.3d 57 (1st Cir. 2021)..................................................................................50

*Cadena v. El Paso Cty.*,
   946 F.3d 717 (5th Cir. 2020) ...................................................................46

*City of Austin v. Paxton*,
   943 F.3d 993 (5th Cir. 2019) ...............................................................30, 31

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) .........................................................................33, 38, 39

*Coastal Habitat Alliance v. Patterson*,
   601 F. Supp. 2d 868 (W.D. Tex. 2008) .....................................................60

*Constantine v. Rectors & Visitors of George Mason Univ.*,
   411 F.3d 474 (4th Cir. 2005) ....................................................................24

*Crosby v. Nat'l Foreign Trade Council*,
   530 U.S. 363 (2000) ..................................................................................54

*Danny R. v. Spring Branch ISD & Tex. Educ. Agency*,
   124 Fed. Appx. 289 (5th Cir. 2005) ..........................................................23

*Disability Rights South Carolina v. McMaster*,
    No. 3:21-02728-MGL, 2021 WL 4444841, *11 (D.S.C. Sept. 28, 2021) ...........................46

*Felder v. Casey*,
   487 U.S. 131 (1988) .............................................................................55, 59

*Free v. Bland*,
   369 U.S. 663 (1962) ..................................................................................55

*G.S. by & through Schwaigert v. Lee*,
   No. 21-CV-025520SHL-ATC, 2021 WL 4057812 (W.D. Tenn. Sept. 3, 2021) .........44, 45, 54

*Gill v. Whitford*,
   138 S.Ct. 1916 (2018) ...............................................................................34

*Glass v. Paxton*,
   900 F.3d 233 (5th Cir. 2018) ....................................................................39

*Gleed v. AT & T Mobility Services, LLC*,
   613 F. App'x 535 (6th Cir. 2015) .............................................................50

*Goss v. Lopez*,
   419 U.S. 565 (1975) ..................................................................................34

*Gresham v. Windrush Partners, Ltd.*,
   730 F.2d 1417 (11th Cir. 1984) ................................................................62

*Guttman v. Khalsa,*
  669 F.3d 1101 (10th Cir. 2012) ..................................................................24

*Hayes v. Desantis,*
  No. 1:21-cv-22863, ___ F. Supp. 3d ___, 2021 WL 4236698 (S.D. Fla. Sept.
  15, 2021) ......................................................................................................45

*Helling v. McKinney,*
  509 U.S. 25 (1993)..................................................................................49, 50

*K.P. v. LeBlanc,*
  627 F.3d 115 (5th Cir. 2010) ......................................................................30

*Kleyman v. SUNY Downstate Med. Ctr.,*
  No. 18CV3137PKCST, 2020 WL 5645218 (E.D.N.Y. Sept. 21, 2020)................50

*Lawrence County v. Lead-Deadwood School Dist.,*
  469 U.S. 256 (1984)..................................................................................58, 59

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992)..................................................................................39, 42

*Mi Familia Vota v. Abbott,*
  977 F.3d 461 (5th Cir. 2020) ......................................................................31

*Miller v. Tex. Tech Univ. Health Sci. Ctr.,*
  421 F.3d 342 (5th Cir. 2005) ......................................................................23

*Mitchell v. Pidcock,*
  299 F.2d 281 (5th Cir. 1962) ......................................................................63

*Monsanto Co. v. Geertson Seed Farms,*
  561 U.S. 139 (2010)....................................................................................33

*Morris v. Livingston,*
  739 F.3d 740 (5th Cir. 2014) ......................................................................31

*Muller v. Costello,*
  No. 94-CV-842 (FJS), 1996 WL 191977 (N.D.N.Y. Apr. 16, 1996) ......................53

*Nawrot v. CPC Int'l,*
  259 F. Supp. 2d 716 (N.D. Ill. 2003) ..........................................................51

*NiGen Biotech, L.L.C. v. Paxton,*
  804 F.3d 389 (5th Cir. 2015) ................................................................30, 31

*Okpalobi v. Foster,*
  244 F.3d 405 (5th Cir. 2001) ......................................................................31

*Pac. Gas & Elec. Co. v. State Energy Res. Conserv. & Dev. Comm'n,*
    461 U.S. 190 (1983)....................................................................................55, 58, 59

*Pace v. Bogalusa City Sch. Bd.,*
    403 F.3d 272 (5th Cir. 2005) (en banc) ............................................................23, 35

*PGA Tour, Inc. v. Martin,*
    532 U.S. 661 (2001)....................................................................................................51

*Plyler v. Doe,*
    457 U.S. 202 (1982)....................................................................................................34

*Progreso Indep. Sch. Dist. v. Morath,*
    No. 18-0455, 2019 WL 1048819 (Tex. Feb. 27, 2019) ........................................22

*R.K. v. Lee,*
    No. 3:21-cv-725, 2021 WL 4391640 (M.D. Tenn. Sept. 24, 2021) ..........................45, 50, 55

*S.B. by & through M.B. v. Lee,*
    No. 321CV00317JRGDCP, ___ F. Supp. 3d ___, 2021 WL 4346232 (E.D.
    Tenn. Sept. 24, 2021) ........................................................................................ *passim*

*Shaw v. Delta Air Lines, Inc.,*
    463 U.S. 85 (1983)......................................................................................................60

*Silver Sage Partners, Ltd. v. City of Desert Hot Springs,*
    251 F.3d 814 (9th Cir. 2001) ....................................................................................62

*Simmons v. Monroe Cty., Mississippi,*
    415 F. Supp. 3d 723 (N.D. Miss. 2019)....................................................................52

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016)....................................................................................................33

*Staron v. McDonald's Corp.,*
    51 F.3d 353 (2nd Cir. 1995)........................................................................51, 52, 53

*Sturz v. Wisconsin Dept. of Corrections,*
    642 F. Supp. 2d 881 (W.D. Wis. 2009) ....................................................................50

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014)..........................................................................................33, 38, 39

*Tennessee v. Lane,*
    541 U.S. 509 (2004)....................................................................................................24

*Tex. Democratic Party v. Abbott,*
    978 F.3d 168 (5th Cir. 2020) ....................................................................................31

*Tex. Democratic Party v. Hughes*,
  2021 WL 2310010 (5th Cir. June 4, 2021) ...................................................31

*Three Expo Events, L.L.C. v. City of Dallas, Texas*,
  907 F.3d 333 (5th Cir. 2018) ......................................................................39

*Thursby v. City of Scranton*,
  No. 3:CV-02-2355, 2006 WL 1455736 (M.D. Pa. May 25, 2006).................52

*Toledo v. Sanchez*,
  454 F.3d 24 (1st Cir. 2006).........................................................................24

*U.S. E.E.O.C. v. AutoZone, Inc.*,
  822 F. Supp. 2d 824 (C.D. Ill. 2011), *aff'd in relevant part sub nom. E.E.O.C.
  v. AutoZone, Inc.*, 707 F.3d 824 (7th Cir. 2013) ......................................50

*Uzuegbunam v. Preczewski*,
  141 S. Ct. 792 (2021)..............................................................33, 42, 43

*Va. Office for Prot. & Advocacy v. Stewart*,
  563 U.S. 247 (2011)................................................................25, 29, 33

*Verizon Md., Inc. v. Public Serv. Comm'n of Md.*,
  535 U.S. 635 (2002)......................................................................................60

*Warth v. Seldin*,
  422 U.S. 490 (1975)...............................................................................33, 39

*Whole Woman's Health v. Jackson*,
  2021 WL 4128951 (5th Cir. Sept. 10, 2021) ...........................................32

*Wilson v. City of Southlake*,
  936 F. 3d 326 (5th Cir. 2019) ............................................................44, 46, 48

*Ex parte Young*,
  209 U.S. 123 (1907).................................................................. *passim*

## Statutes & Regulations

U.S. Const., amend. XIV ...............................................................................24

U.S. Const., art. I, sec. 8, cl. 1........................................................................59

U.S. Const., art. III...................................................................................33, 44

U.S. Const., art. VI, cl. 2............................................................................54, 56

28 U.S.C. § 1331 ...........................................................................................60

29 U.S.C. § 701 *et seq.* ................................................................ *passim*

29 U.S.C. § 784(a) ......................................................................... *passim*

42 U.S.C. § 1983 ...................................................................................49

42 U.S.C. § 2000d-7(a) .........................................................................23

42 U.S.C. § 12101 *et seq.* ............................................................. *passim*

Pub. L. No. 117-2 .......................................................................... *passim*

28 C.F.R. § 35.130(b)(1)(i)-(ii), (vii) ...................................................46

28 C.F.R. § 35.130(b)(7) .......................................................................51

28 C.F.R. § 35.130(b)(7)(i) ...................................................................46

28 C.F.R. § 35.150 ................................................................................46

86 Fed. Reg. 21195, 21196 (Apr. 22, 2021) .........................................56

86 Fed. Reg. 21195, 21200 ...................................................................57

Tex. Const., art VII, § 1 ........................................................................34

Tex. Educ. Code § 7.021 .......................................................................22

Tex. Educ. Code § 7.055 .......................................................................22

Tex. Educ. Code § 7.055(b) ..................................................................29

## Other Authorities

Executive Order GA-38 .................................................................. *passim*

Allyson Waller, et al., *At least 45 districts shut down in-person classes due to COVID-19 cases, affecting more than 40,000 students*, THE TEXAS TRIBUNE, September 3, 2021, *available at* https://www.texastribune.org/2021/09/03/texas-covid-school-districts-shut-down/ (last accessed on September 25, 2021) ...........................................6

U.S. Dep't of Education, American Rescue Plan Elementary and Secondary School Emergency Relief Fund – Methodology for Calculating Allocations (Revised June 25, 2021) at 3, *available at* https://oese.ed.gov/files/2021/06/Revised-ARP-ESSER-Methodology-and-Allocation-Table_6.25.21_FINAL.pdf ...............................................56

## I.   INTRODUCTION

The Governor's Executive Order GA-38 is having a profound impact on students with disabilities, who are at greater risk than their classmates of serious illness or death from COVID-19.   GA-38 deprives local school officials of the discretion to require masking when, in their judgment, requiring masking is necessary to protect the health of the students in their care.   This restriction has become more and more alarming as the school year has proceeded, as more Texas public school students have tested positive for COVID-19 during the first seven weeks of the current school year than all of last year.   What should have been a public health issue has become a political football.   In the face of this political debate, students with disabilities face an impossible choice:  either attend school in person and face a potentially life-threatening health risk, or protect their health and be deprived of the essential benefits of a public school education.

Plaintiffs are among those students, and they bring this suit to enjoin Defendants' enforcement of GA-38 as inconsistent with federal law.   They assert claims under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.   They also assert that GA-38 is preempted under the Supremacy Clause of the U.S. Constitution, because it conflicts with the Americans with Disabilities Act, the Rehabilitation Act, and the American Rescue Plan Act of 2021, which imposes certain conditions on the state's receipt of COVID-related funding.   For all these reasons, GA-38 is unlawful and void, and this Court should enjoin its enforcement.   It will not be alone in doing so:  five other district courts have already enjoined similar orders.

Defendants cannot avoid this suit by claiming sovereign immunity.   With respect to Plaintiffs' statutory claims, either the State has waived any sovereign immunity or Congress has abrogated it.   And in any event, when a state official is enforcing a requirement that violates federal law, he is not acting as an arm of the state and cannot claim sovereign immunity.   The *Ex parte Young* doctrine allows plaintiffs to seek a federal injunction against state officials to

prevent them from enforcing state requirements that violate federal law. That is exactly what Defendants are doing today. Attorney General Paxton is actively enforcing GA-38 against school districts across the state that have required masking—including by suing fifteen of them and sending letters to nearly a hundred, threatening litigation. Indeed, the Attorney General has promised to sue every school district that fails to comply with GA-38. And Commissioner Morath of the Texas Education Authority ("TEA") is enforcing GA-38 against school districts by publishing "public health guidance" that informs school districts of their obligations under GA-38 and by providing the Attorney General with the information he needs for his statewide enforcement campaign. Defendants insist that this Court should close its eyes to these activities, arguing that GA-38 does not specifically charge them with enforcement. But there is no dispute that they have enforcement power—and are actively exercising it today. The Supreme Court's decision in *Ex parte Young* is clear, and the Fifth Circuit's cases do not require a contrary result.

Plaintiffs also have standing. Because of their disabilities, Plaintiffs face a greater risk than the general population of contracting COVID-19 and suffering life-threatening complications and death. GA-38 deprives them of the opportunity to attend in person or have meaningful access to public school by stripping school districts of the discretion to require masks, even in the face of high community spread. Plaintiffs' injury is fairly traceable to Defendants' action because the enforcement of GA-38 has caused or will likely imminently cause Plaintiffs' school districts to abandon mask requirements they would otherwise impose. And the evidence shows that an order from this Court enjoining Defendants from enforcing GA-38 will redress Plaintiffs' injuries because, in that event, their school districts will implement mask requirements.

On the merits of their claims, the evidence shows overwhelmingly that Plaintiffs have been deprived of their rights under the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act.  It is undisputed that Plaintiffs are children who are qualified individuals with disabilities under these Acts.  It is also undisputed that (1) Plaintiffs suffer a heightened risk of severe complications if infected with COVID-19, (2) the Delta variant is more contagious and harmful to pediatric patients than prior variants, and (3) the number of COVID-19 positive cases in Texas public schools (after just one-and-a-half months) is exponentially higher than last year, when local school officials were allowed to require masks.  The record in this case establishes that GA-38 discriminates against Plaintiffs by reason of their disabilities because it results in their exclusion or unequal access to in-person, public school education.  Further, GA-38 prevents Texas schools, including Plaintiffs' own schools, from considering or providing masking requirements as a reasonable modification to avoid this discrimination.

GA-38 and the TEA's Public Health Guidance are also preempted by the ADA and Rehabilitation Act, as well as the American Rescue Plan of 2021.  GA-38's categorical prohibition on mask requirements is in irreconcilable conflict with Congress's choice to give local school districts discretion to decide for themselves whether and to what extent to adopt policies, such as universal masking, that will best ensure a safe return to in-person instruction.  Plaintiffs' preemption claims are properly before this Court because they are grounded in the Court's well-established and longstanding equitable power to enjoin unlawful actions by state officials.  This Court should grant the injunction.

## II.    FACTUAL BACKGROUND

### A.    The Governor issues Executive Order GA-38 on July 29, 2021, prohibiting public schools from implementing mask requirements for the 2021-2022 school year.

On July 29, 2021, Texas Governor Greg Abbott issued Executive Order GA-38, which prohibits governmental entities, including public school districts, from imposing mask requirements.  Ex. 1, ¶ 4(a).  Within days, the Texas Education Agency ("TEA")—the state agency that oversees primary and secondary public education in the State of Texas—issued its updated "Public Health Guidance," which establishes requirements for school systems during the pandemic, to reflect that "[p]er GA-38, school systems cannot require students or staff to wear a mask."  Ex. 4 (August 5, 2021 TEA Public Health Guidance).  It has updated that guidance three times since then—most recently on September 17. Ex. 2 (September 17, 2021 TEA Public Health Guidance).  That updated guidance continues to reiterate GA-38's mandate that public schools are not permitted to require students, staff, or visitors to wear masks in their facilities.

Most Texas public schools began in-person classes between August 9 and 23.  Since the beginning of the school year (about 6-7 weeks ago), 154,444 students have tested positive for COVID-19.  Ex. 7 (Texas Health and Human Services, Texas Public Schools COVID-19 Data as of September 19, 2021).  By comparison, only 148,197 students tested positive for COVID-19 during the entire 2020-21 school year.  Ex. 10 (Texas Health and Human Services, Historical Data for the 2020-2021 School Year).  In other words, there have been more positive student cases in the first seven weeks of school than there were during the entire 2020-2021 school year.

Why the drastic change?  During last school year, school districts had the discretion to choose whether to implement mask mandates for in-person instruction.  In general, TEA's March 25, 2021 Public Health Planning Guidance recommended that "[e]very student, teacher, or staff member shall wear a mask over the nose and mouth when inside a school building, school

facility, facility used for school activities, or when in an outdoor space on school property . . . wherever it is not feasible to maintain six feet of social distancing."  Ex. 164 (March 25, 2021 TEA Public Health Planning Guidance).

Unfortunately, what began as a public health measure has escalated into a political debate about the boundaries of individual freedom and liberty.  *See* Ex. 138 (Defendant Paxton's Tweet on August 20, 2021 at 4:56 PM) ("Recent SCOTX decision is NOT a mask-mandate loss.  Not a loss for freedom-loving Texans or the Rule of Law."); Ex. 142 (Defendant Paxton's Tweet on August 26, 2021 at 12:38 PM) ("BIG WIN FOR LAW & LIBERTY! @GregAbbott_TX's ban on mask mandates is clear.  Dem local govts didn't care.  So I sued them.  Dem judges sided with local D friends.  SCOTX just ruled:  The Gov's exec order stands.  ALL public entities must comply—or be sued and lose over and over again.").

Another difference between the current and prior school year is that last year, school districts offered virtual instruction for various periods, which was effective in reducing overall transmission rates.  But after the conclusion of the 2020-2021 school year, TEA announced that spring 2021 State of Texas Assessments of Academic Readiness (STAAR) results had significantly decreased because of virtual instruction.  Ex. 163 (TEA Releases Spring 2021 STAAR Grades).  As a result, the State has prioritized offering in-person instruction this year— though without masks.  *See* Ex. 159, Megan Aghazadian Depo. at 11:21-12:12.

A third difference is the Delta variant.  Ex. 18, ¶¶ 24-29 (Dr. Ben Greenberg Expert Report).  The Delta variant infects children at a higher rate than previous variants and has caused higher infection rates among students than the Alpha variant did during the previous school year. Ex. 17, ¶ 21 (Dr. Edward Septimus Expert Report).  There is also growing evidence that the Delta variant causes more serious illness and increased fatality rates.  *Id*., ¶¶ 22-23.  Although

vaccines offer significant protection against the Delta variant, children under 12 still cannot be vaccinated.  Ex. 17, ¶ 18 (Dr. Edward Septimus Affidavit).

Yet despite the evidence of rising pediatric cases and the omnipotence of the Delta variant, school districts are prohibited from even *considering* masking requirements as a basic mitigation strategy in preventing COVID-19 outbreaks on their campuses that could invariably cause them to temporarily shut down.  Indeed, since the start of the school year last month, at least 45 districts in Texas have temporarily shut down due to COVID-19 outbreaks among students and staff.[1]

The State's position on masking requirements during the 2021-2022 school year runs contrary to the Centers for Disease Control and Prevention's ("CDC") Guidance for COVID-19 Prevention in K-12 Schools, updated on August 5, 2021, which "recommends universal indoor masking for all teachers, staff, students, and visitors to K-12 schools, regardless of vaccination status."  *See* Ex. 13 at 1.  According to the CDC, masking requirements are integral to promoting a safe return to in-person learning this school year, especially due to "the circulating and highly contagious Delta variant."  *Id.*  In explaining its reason for issuing its updated recommendation, the CDC stated that:

> [W]ith COVID-19 cases increasing nationally since mid-June 2021, driven by the B.1.617.2 (Delta) variant of SARS-CoV-2, protection against exposure remains essential in school settings.  Because of the highly transmissible nature of this variant, along with the extent of missing of vaccinated and unvaccinated people in schools, the fact that children <12 years of age are not currently eligible for vaccination, and low levels of vaccination among youth ages 12-17, CDC recommends universal indoor masking for all students (age 2 years and older), teachers, staff, and visitors to K-12 schools regardless of vaccination status.

---

[1] Allyson Waller, et al., *At least 45 districts shut down in-person classes due to COVID-19 cases*, THE TEXAS TRIBUNE, September 3, 2021, *available at* https://www.texastribune.org/2021/09/03/texas-covid-school-districts-shut-down/ (last accessed on September 25, 2021).

*Id.*  In addition to masking requirements, the CDC recommends that schools work with local public health officials to determine additional prevention strategies "by monitoring levels of community transmission (i.e. low, moderate, substantial, or high) and local vaccine coverage, and use of screening testing to detect cases in K-12 schools."  *Id.*  The CDC's guidance "is based on current scientific evidence and lessons learned from schools implementing COVID-19 prevention strategies."  Yet because of Executive Order GA-38, schools in Texas are not permitted to adopt the CDC's science-based recommendations and are discouraged from taking into account local factors in crafting their COVID-19 mitigation policies thanks to a state-wide, politically driven blanket approach.  *Id.*

**B.     Plaintiffs are students with medical disabilities that place them at higher risk for contracting COVID-19 and/or experiencing severe illness due to the virus.**

Plaintiffs are seven students enrolled in the Texas public school system who have disabilities as defined under the ADA and Section 504.  *See* Exs. 220, 221, 222, 223, 224, 225, 226, 227, 228, 229, 230 (Declarations of Plaintiffs' respective parents).  Plaintiffs' disabilities include Down syndrome, a heart defect, asthma, immune deficiency, underlying reactive airway disease, spina bifida, chronic respiratory failure, and cerebral palsy.  Plaintiffs' medical conditions place them at increased risk of either contracting COVID-19 and/or experiencing severe symptoms from the virus.  Ex. 15 at Section III (Expert Report of Dr. Alexander Yudovich); Ex. 16 at Section III (Amendment to Report of Dr. Alexander Yudovich); Ex. 18 at Section II (Expert Report of Dr. Benjamin Greenberg).  In addition, six of the seven Plaintiffs are under the age of 12 and thus not eligible to receive any of the currently authorized COVID-19 vaccines.[2]

---

[2] Plaintiff E.T. recently turned 12 years old and has an immune deficiency among other disabilities. Ex. 15, ¶ 9 (Dr. Alexander Yudovich Report); Ex. 14 (Plaintiffs' Proposed Stipulated

For Plaintiffs to attend school safely in the current health climate, their school districts must be able to consider universal masking requirements when community spread is high.  *See* Ex. 17, ¶ 18.  (Dr. Edward Septimus Affidavit).  Universal masking has been shown to be an effective tool in reducing the spread of COVID-19 and reducing the severity of symptoms a person may experience should they contract the virus.  Ex. 18, ¶¶ 19-20 (Dr. Ben Greenberg Affidavit); Ex. 17, ¶¶ 15, 18-20 (Dr. Edward Septimus Affidavit).  Requiring masing is therefore an effective means of reducing the risk that Plaintiffs will contract COVID and suffer severe complications or death from COVID.  *See generally* Ex. 17 (Dr. Edward Septimus Affidavit).  Inconsistent and voluntary use of masks in schools has been shown to be ineffective and to contribute to school-based outbreaks.  Ex. 17, ¶ 20 (Dr. Edward Septimus Affidavit).  This is a matter of public health, not politics.  Mask-wearing requires communal participation to be effective—no different than banning smoking in restaurants to prevent secondhand smoke, prohibiting drunk driving to prevent traffic accidents, and mandating an exclusion of peanut-based snacks or foods in schools to protect students with peanut allergies.  Ex. 18, ¶ 16 (Dr. Ben Greenberg Affidavit).

### C.      Defendants' Enforcement of Executive Order GA-38 has deprived Plaintiffs of meaningful access to their public schools.

Plaintiffs have been put in the impossible position of choosing between attending school in person and risking their health, or staying home and missing the educational, extracurricular, and social benefits of attending school.

---

Client Facts Chart). Despite the fact E.T. is recently eligible for the vaccine, the vaccine alone may not provide sufficient protection against COVID-19, as children over 12 who experience immunosuppression are less likely to respond to the vaccine and remain at risk for infection similar to an unvaccinated child. Ex. 18, ¶ 15 (Dr. Ben Greenberg Affidavit).

Plaintiff M.P. is a student in Fort Bend ISD, which currently has no mask mandate because of Defendants' enforcement actions.[3] M.P. has Down syndrome, hypotonia, mixed receptive-expressive language disorder, and developmental delay.[4]  M.P. attended in-person instruction this school year for the first two weeks (in August) because Fort Bend ISD offered no alternative remote instruction.[5]  Due to rising COVID-19 positive cases and the lack of a mask mandate, M.P. stayed home in early September and attended virtual instruction, which is now available in the district but only for a limited number of M.P.'s classes.[6]  M.P. attended school virtually last school year and experienced significant regression in a number of areas, including social skills, ability to focus, and reading fluency.[7]  Because M.P. is no longer attending classes in person, she is unable to participate in elective classes such as choir and taekwondo, which are her favorite school activities.[8]  Additionally, because she is receiving only limited virtual instruction, she has received no speech services or reading support from the district this school year.[9]

Plaintiff E.T. is a student in Round Rock ISD, which currently has a mask mandate despite Executive Order GA-38.[10]  E.T. has Down syndrome, asthma, immune deficiency, hypertension, attention deficit hyperactivity disorder, underlying reactive airway disease, mood disorder, and obstructive sleep apnea.[11]  E.T. is currently attending in-person instruction but, if the district rescinds its mask mandate, E.T.'s parents will be forced to withdraw her from school,

---

[3] Ex. 14 (Stipulated Facts).
[4] *Id.*
[5] Ex. 226, ¶¶ 12-13 (Declaration of K.P. Regarding Student M.P. – September 12).
[6] *Id.*, ¶¶ 7-9.
[7] *Id.*
[8] Ex. 227, ¶¶ 2-3 (Declaration of K.P. Regarding Student M.P. – September 28).
[9] *Id.*
[10] Ex. 14 (Stipulated Facts).
[11] *Id.*

causing E.T. to forgo significant educational and social opportunities, as well as occupational and speech therapy.[12]  While attending virtual instruction last school year, E.T. regressed in multiple areas including math skills and the ability to independently use the bathroom, and also began to self-harm.[13]

Plaintiff S.P. is a student in Richardson ISD, which currently has a mask mandate but has been sued by the Office of the Attorney General for violating GA-38.[14]  S.P. has spina bifida, attention deficit hyperactivity disorder, bronchiectasis, Chiari malformation with hydrocephalus, central sleep apnea, chronic respiratory failure, global developmental delay, growth hormone deficiency, seasonal allergies, left vocal cord paralysis, and chronic respiratory failure.[15]  S.P.'s treating doctors and specialists have informed his mother that it is dangerous for him to attend in-person schooling without certain CDC-approved precautions.[16]  He is currently attending school in person and will have no choice but to do so, at risk to his health, even if Richardson ISD withdraws the mask mandate because the district does not offer a virtual alternative.[17]  As a result of attending virtual instruction last year, S.P. suffered academically, and he is currently significantly behind in core grade level skills such as reading and math.[18]

Plaintiff J.R. is a student in San Antonio ISD, which currently has a mask mandate.[19] J.R. has moderate to severe asthma, attention deficit hyperactivity disorder, a growth hormone deficiency, and generalized anxiety disorder.[20]  J.R. is attending school in person but is unable to

---

[12] *Id*.
[13] *Id*.
[14] Ex. 14 (Stipulated Facts).
[15] *Id*.
[16] Ex. 220, ¶ 5 (SP Declaration Regarding SP – August 17).
[17] Ex. 14 (Stipulated Facts).
[18] Ex. 220, ¶ 7 (SP Declaration Regarding SP – August 17).
[19] Ex. 14 (Stipulated Facts).
[20] *Id*.

participate in mask-optional activities such as choir and field trips.[21]  Last year, during virtual

instruction, J.R.'s anxiety disorder was exacerbated due to the experience of remaining

homebound and isolated.[22]  If San Antonio ISD withdrew its mask mandate, J.R.'s parents would

have no choice but to withdraw her from school.[23]

Plaintiff H.M. is a student in Leander ISD, which has a mask mandate with a broad opt-

out provision.[24]  H.M. has Down syndrome, ventricular septal defect, and bronchomalacia. H.M.

started the school year attending classes in person but, when two students in his class tested

positive for COVID-19, H.M.'s parents withdrew him.[25]  After three weeks of remaining home,

H.M. returned to in-person learning.[26]  If other students test positive or the district withdraws its

mask mandate, H.M. will return to at-home learning.[27]  Last school year, H.M. was not able to

successfully attend virtual instruction because, as a child with Down syndrome, he is a visual

learner rather than verbal learner and, unfortunately, visual instruction is near impossible to

accommodate in a remote setting.[28]

Plaintiff A.M. is a student in Edgewood ISD, which has a mask mandate.[29]  A.M. has

ulcerative colitis (which requires that A.M. receive regular infusions of an immunosuppressant

drug), cerebral palsy (and is quadriplegic and spastic), and hypotonia and is nonverbal.[30]  A.M. is

attending in-person classes with success: he is on the cusp of verbalizing words and responds

---

[21] *Id.*
[22] Ex. 225, ¶ 7 (J.L. Declaration Regarding J.R. – September 12).,
[23] *Id.*
[24] Ex. 14 (Stipulated Facts).
[25] *Id.*
[26] Ex. 230, ¶ 10 (R.M. Declaration Regarding H.M. – September 13).
[27] Ex. 14 (Stipulated Facts).
[28] Ex. 229, ¶ 7 (R.M. Declaration Regarding H.M. – August 17).
[29] Ex. 14 (Stipulated Facts).
[30] *Id.*

well to socializing with his peers.[31]  When A.M. attended school virtually last year, he was

unable to access occupational therapy and physical therapy services.[32]  If Edgewood ISD no

longer mandated masks, A.M. would have to withdraw from in-person classes and receive

homebound instruction, which is limited to four hours of instruction per week and is inadequate

to ensure he progresses during a critical developmental period for him.[33]

       Plaintiff E.S. is a student in Killeen ISD, which has a mask policy only for its Fort Hood

campuses where she is not enrolled.[34]  E.S. has moderate to severe asthma.[35]  E.S. is attending

school in person, although several students and staff have reported positive COVID-19 cases.[36]

While attending virtual instruction last year, E.S. struggled with being distant from her peers, had

difficulty focusing, and did not have sufficient instruction to make sufficient progress in her

classes.

       On August 17, 2021, Plaintiffs filed the Original Complaint alleging that Executive Order

GA-38 violates the ADA and Section 504 because it denies them equal access to in-person

school and prohibits schools from considering mask mandates as a reasonable accommodation

for students with disabilities who are at greater risk of contracting COVID-19 or suffering severe

illness as a result of the virus, and, further, that Executive Order GA-38 is preempted by the

American Rescue Plan Act of 2021, a federal law that allocated over $11 billion dollars in

funding to Texas public schools to implement safety protocol in an effort to promote in-person

instruction for the 2021-2022 school year.  Dkt. 7 (Plaintiffs' Original Complaint).  On

---

[31] *Id.*
[32] *Id.*
[33] *Id.*; Ex. 221, ¶ 10 (C.M. Declaration Regarding A.M. – August 17).
[34] Ex. 14 (Stipulated Facts).
[35] *Id.*
[36] Ex. 228, ¶ 9 (M.M. Declaration Regarding E.S. – September 14).

September 1, Plaintiffs filed the Amended Complaint, which added Defendant Attorney General

Paxton as a defendant. Dkt. 21 (Plaintiffs' First Amended Complaint).  And on September 29,

2021, Plaintiffs filed the instant Second Amended Complaint, adding a fourth cause of action

alleging that Executive Order GA-38 is preempted by the ADA and Section 504.  Dkt. 45

(Plaintiffs' Second Amended Complaint).  Plaintiffs seek to enjoin Defendants from enforcing

Executive Order GA-38 insofar as it prohibits Plaintiffs' school districts from considering

whether to implement mask requirements as part of their COVID-19 mitigation strategies.

### D. Defendants are engaged in extensive and active enforcement of GA-38, including litigation, despite claims they are not authorized to enforce it.

Since appearing in this matter, Defendants have taken the position that they are not

proper parties to sue because they do not enforce GA-38 and are not identified in the Executive

Order as being charged with enforcement.  Dkt. 24 (Defendants' Brief Addressing Propriety of

Current Parties) ("Governor Abbott does not enforce GA-38 and therefore the injury is not fairly

traceable to him, nor can it be redressed against him.") ("The Attorney General does not enforce

GA-38 and therefore the injury is not fairly traceable to him, nor can be it be redressed again him

[sic].") ("Commissioner Morath does not 'enforce' the Public Health Guidance and has made no

effort to do so[.]") ("The Public Health Guidance is not mandatory, and the TEA has not sought

to enforce it.").  Yet, outside this courtroom, Defendant Paxton has launched a high-profile,

litigious campaign to enforce Executive Order GA-38 against a number of school districts across

the State of Texas that have chosen to institute mask mandates this school year, including school

districts in which Plaintiffs are enrolled.  Regardless of what the Executive Order says, then,

Defendant Paxton obviously sees himself as charged with its enforcement.

Since the beginning of September, Defendant Paxton has sued 15 school districts that

have instituted mask mandates on the basis that the mandates violate GA-38, including two of

Plaintiffs's school districts: Round Rock ISD and Richardson ISD, as well as Spring ISD, Sherman ISD, Galveston ISD, Honey Grove ISD, Paris ISD, Longview ISD, Elgin ISD, Lufkin ISD, Diboll ISD, Waco ISD, Midway ISD, La Vega ISD, and McGregor ISD.  Exs. 29, 33, 88, 92, 107, 111, 112, 115, 118, 120, 125 (Petitions filed against school districts).  Defendant Paxton also sued San Antonio ISD, in which J.R. attends school, over its vaccine mandate on the basis that it likewise violates other provisions of Executive Order GA-38.  Ex. 56 (Petition filed against SAISD).

On the official website for the Office of the Attorney General of Texas, Defendant Paxton maintains a "List of Government Entities Unlawfully Imposing Mask Mandates" ("List of Noncompliant Entities").  Ex. 12 (AG Paxton's COVID-19 List of Noncompliant Entities as of September 22, 2021).  In the preface for the list, it states that "Attorney General Ken Paxton is committed to protecting the rights and freedoms of all Texans."  The list identifies all governmental entities "who have been reported as non-compliant with Executive Order GA-38" and indicates which among those entities: (1) have been served with a "lawsuit filed by the Office of the Attorney General . . . to enforce GA-38"; (2) are in "active litigation . . . regarding the enforcement of GA-38"); or (3) are not currently in compliance but have been sent a letter by the Texas Attorney General's Office, which according to the Texas Attorney General's Office is a category that includes school districts that abandoned mask requirements after receiving a letter from the Attorney General's office. Ex. 12 (AG Paxton's COVID-19 List of Noncompliant Entities as of September 21, 2021); Ex. 161 at 29:15-30:10 (A. Kinghorn Deposition). As of September 22, at least 90 school districts are named in the list.  The website also identifies a list of school districts and other government entities that are "[n]ow in compliance" but "previously not in compliance."

-14-

The letters sent to school districts by the Attorney General's Office accuse them of "enact[ing] a local policy mandating that students and faculty wear face masks at schools in [their] district," and they state that:

> [The Attorney General's Office] will pursue further legal action, including any available injunctive relief, costs and attorney's fees, penalties, and sanctions—including contempt of court—available at law against any local jurisdiction and its employees that persist in enforcing local mask mandates in violation of GA-38 and any applicable court order.

> [The Attorney General] request your acknowledgement by 5 p.m. Tuesday, August 17, that in light of the Court's rulings, you will rescind your local policy requiring masks in public schools or, alternatively, not enforce it pending the Supreme Court's disposition of the cases before it involving this issue. Otherwise, you will face ***legal action taken by my office to enforce the Governor's order*** and protect the rule of law. [37]

And indeed, the very purpose of these letters is to induce school districts to either rescind their mask policies or not enforce them.  Ex. 161 at 38:5-12 (A. Kinghorn Depo).  These form letters have been sent to at least 70 local school districts according to Defendant Paxton's List of Noncompliant Entities.  Ex. 12 at 1 (AG Paxton's COVID-19 List of Noncompliant Entities as of September 22, 2021).  In addition, as discussed below, Defendant Paxton followed up on his letters' threat "to enforce the Governor's order" and sued school districts, including Round Rock ISD and Richardson ISD.

The letters, the List of Noncompliant Entities, and the litany of lawsuits have achieved their desired effect in many cases, including with respect to the school districts in which Plaintiffs are enrolled: Fort Bend ISD and Killeen ISD.

---

[37] See, *e.g.*, Ex. 32 (OAG Letter to Round Rock ISD on August 17, 2021); Ex. 28 (OAG Letter to Richardson ISD on August 17, 2021); Ex. 91 (OAG Letter to Honey Grove ISD on September 3, 2021); Ex. 87 (OAG Letter to Sherman ISD on September 3, 2021) (emphasis added).

With respect to Fort Bend ISD, the Office's enforcement efforts have been successful. Due to GA-38, Fort Bend ISD did not implement a mask mandate for the first day of school on August 11, 2021. Ex. 22, ¶ 11 (Declaration of Denetta Williams, Member of Board of Trustees at Fort Bend ISD). Between August 7 and 17, 548 students reported positive COVID-19 cases. *Id*., ¶ 13. On August 23, Fort Bend ISD temporarily closed Pecan Grove Elementary due to a COVID-19 outbreak. *Id*., ¶ 14. On that same day, Fort Bend ISD held a board meeting focused on reviewing the toll of the pandemic on its community, during which it listened to statements from doctors about the impact of the Delta variant, and from parents worried about their children's health and safety. *Id*., ¶ 16. At the conclusion of the meeting, Fort Bend ISD's Board of Trustees passed a mask mandate that took effect on August 26, 2021. *Id*., ¶ 17. On August 28, 2021, however, Fort Bend ISD decided to stop enforcing its mask policy because the Office of the Attorney General was successful in its enforcement of Executive Order GA-38 through litigation. *Id*., ¶¶ 19-20.

With respect to Round Rock ISD, the Office's efforts have been partially successful. On September 9, 2021, Defendant Paxton sued Round Rock ISD for its August 18 mask mandate applying to students, teachers, staff members, and adult visitors. Ex. 33, ¶¶ 29-30 (OAG Lawsuit against Round Rock). On September 14, a Williamson County judge granted, *ex parte*, the State of Texas' Motion for Temporary Restraining Order and entered an order prohibiting Round Rock ISD "from enforcing a facemask mandate for as long as GA-38 (or a future executive order containing the same prohibitions) remain in effect." Ex. 34 at 2 (Order Granting State of Texas's Application for a Temporary Restraining Order). However, following a September 17 order from the Third District Court of Appeals staying the temporary restraining order, Round Rock ISD announced that it could "continue with its mask requirement" and planned to hold a Board

of Trustees meeting to approve a recommendation to establish a "mask matrix" (which establishes different mask requirements based on various "risk levels"), which was subsequently approved on September 23.  Ex. 36 (Order from the Court of Appeals for Stay in Round Rock ISD); Ex. 37 (September 17 Round Rock ISD Announcement); Ex. 38 (September 23 Round Rock ISD Announcement).

Defendant Paxton likewise sued Richardson ISD for violating Executive Order GA-38 on September 13, 2021.  Ex. 29 (Richardson ISD Petition).  In anticipation of starting the school year, Richardson ISD Superintendent Jeannie Stone announced on August 9 that the district reluctantly would not implement a mask mandate in compliance with GA-38. Ex. 27, ¶ 10 (Declaration of Dr. Jeannie Stone).  But on August 16, the day before in-person instruction began, Superintendent Stone advised the Richardson ISD community that a mask mandate would be implemented because GA-38's enforceability had been challenged in court.  *Id*., ¶¶ 12-13 (Declaration of Dr. Jeannie Stone).  The school's decision to mandate masks was made based on Richardson ISD's review of the public health data in its community, including data about the increasing spread of the Delta variant among children and the absence of available pediatric ICU beds in the community at that time.  *Id*., ¶ 14.  On September 10, Superintendent Stone learned that the Attorney General announced on Twitter that he would be suing Richardson ISD, which he did on September 13.  *Id*., ¶ 20.  Richardson ISD still has a mask mandate in place but will ultimately comply with any applicable court orders enforcing GA-38 regarding the use of masks in schools.  *Id*. at 23.  If the Attorney General were to stop enforcing GA-38 or should there be an order barring its enforcement, the district will implement mask requirements so long as student needs, local data on COVID-19 risk levels, and expert guidance shows that they are necessary.  *Id*.

With respect to Leander ISD and Killeen ISD, both school districts are identified on Defendant Paxton's list as having been "previously not in compliance" with Executive Order GA-38, but are "[n]ow in compliance." Ex. 12 (Defendant Paxton's List of Noncompliant Entities). Edgewood ISD and San Antonio are listed as presently noncompliant and as having received letters from the Attorney General's Office. *Id*.

Defendant Paxton's enforcement efforts have also been successful with respect to other school districts aside from those in which Plaintiffs are enrolled. For example, as of August 23, 2021, Calvert ISD required that all students and staff wear masks in their buildings as a public health and safety measure. See Ex. 102 (Calvert ISD Public Records). On September 3, 2021, Austin Kinghorn, as General Counsel for the Office of the Attorney General, submitted the Office's form letter to Calvert ISD Superintendent Thyrun Hurst threatening legal action and requesting that the school rescind its mask policy. *Id*. at 2, 4-5. On September 7, 2021, Calvert ISD informed its faculty that it could no longer mandate masks and, on that same day, Superintendent Hurst emailed a response to Mr. Kinghorn stating that:

> The district has taken the proper steps to rescind the mandate. The Calvert ISD website has been changed, announcements are being made and the teacher staff has been informed that we can no longer mandate masks but certainly has the rights to encourage the students to wear masks for the safety of themselves and others. Please let me know if other steps are necessary in order to rescind the mandate.

*Id*. at 2, 8. In response, Mr. Kinghorn advised Superintendent Hurst that Calvert ISD was "moved" to the Office's "compliant list on [its] public-facing website" and requested that Calvert ISD "please forward any announcements" that were given to both students and staff. *Id*. at 3.

The threat of legal action prompted West Orange Cove ISD to change its mask policy from mandatory to optional. As of August 23, 2021, West Orange Cove ISD required that: "all students 2-12 grade and all staff will be required to wear a mask/face covering that completely

covers the mouth and nose while on campuses and buses as a part of our dress code until further notice." Ex. 103 at 7 (West Orange Cove ISD PIR Response). On September 7, Mr. Kinghorn issued a letter to Superintendent Rickie Harris requesting that the school rescind its policy, or otherwise face potential legal action brought by the Office of the Attorney General. *Id*. at 3-4. On September 20, West Orange Cove ISD issued revised guidance: "Based on recent possible legal actions from the Office of [t]he Attorney General, effective Monday, September 20, 2021, masks will be highly recommended for students and staff of Orange-Cove ISD." *Id*. at 8.

Mr. Kinghorn also issued a form letter to Ferris ISD on September 3. Ex. 86 (Ferris ISD Email Correspondence). On September 21, in an email response, Superintendent James Hartman advised Mr. Kinghorn that:

> Tonight the Ferris Board of Trustees removed the Temporary Mask Mandate effective tomorrow, September 22. Face coverings are now optional but highly encouraged for staff and students. This update has been distributed to all FISD parents.

*Id*.

A similar interaction took place between Mr. Kinghorn and Aransas Pass ISD Superintendent Cara Cooke, who advised Mr. Kinghorn that the Board of Trustees had rescinded its mask mandate resolution following receipt of the Office's letter and requesting that the district be removed from the List of Noncompliant Entities. Ex. 84 (Aransas Pass ISD Correspondence). Salado ISD, Trenton ISD, Plano ISD, and San Diego ISD likewise rescinded their mask policies after receiving the Office's letters or after being publicly listed on the List of Noncompliant Entities. Ex. 96 (Salado ISD Correspondence); Ex. 100 (Trenton ISD Correspondence); Ex. 94 (Plano ISD Correspondence); Ex. 98 (San Diego ISD Correspondence); Ex. 101 (Matthias ISD Correspondence with OAG). Plano ISD's decision to withdraw its mask requirement came after a series of communications between the district's attorney, Ms. Mari

-19-

McGowan, and the Office of the Attorney General, including a handful of phone calls with Mr.

Kinghorn during which Ms. McGowan asked questions about what policies would constitute

compliance or noncompliance from the Office's perspective.  Ex. 161 at 50:9-53:6 (A. Kinghorn

Depo).

Defendant Paxton has further used his Twitter account to flaunt these enforcement efforts

and threaten legal action against any other school districts that implement a mask mandate.  For

example, on September 7, he tweeted: "3 districts rescinded mask-mandates: Trenton, Calvert, &

Los Fresnos ISDs.  In doing so, they'll save taxpayer $$ in futile litigation & comply with TX

law.  More ISDs are still breaking the law.  Lawsuits are coming against them THIS WEEK.

Rescind now or see you in court!"  Ex. 143 (Defendant Paxton Tweet on September 7, 2021 at

3:40pm).  This September 7 tweet embedded a copy of a newsletter that Trenton ISD issued to

families in its community explaining that the district "received a letter from the Texas Attorney

General's office regarding compliance with Governor Abbott's Executive Order GA-38" that

"threatened litigation against the District" and "in an abundance of caution" the district would

rescind its 10-day mask requirement."  *Id*.

And on September 14, Defendant Paxton tweeted: "I have filed 9 more lawsuits against

the following ISDs for defying Exec. Order 38: La Vega, McGregor, Midway, Waco, Diboll,

Lufkin, Longview, Paris and Honey Grove.  There will be more to come as lawlessness

continues across the state."  Ex. 147 (Defendant Paxton Tweet on September 14, 2021 at

11:48am).  Then, later that day, he tweeted: "A WIN: Paris ISD has been ordered to follow the

law.  No mask mandate allowed as it clearly defies Exec Order 38."  Ex. 145 (Defendant Paxton

Tweet on September 14 at 4:15pm).

Defendant Texas Education Agency assists the Office of the Attorney General in its enforcement efforts.  The TEA receives complaints from third parties (including parents, general members of the public, school officials, and external agencies) identifying school districts that are not in compliance with GA-38's prohibition on mask mandates, and then reports those schools—in a list submitted twice weekly—to the Office of the Attorney General.  Ex. 160 at 18:15-19:23; 21:12-17 (A. Jernigan Depo); Exs. 343, 344, 345, 346, 347, 348, 349, 350, 351, 352 (Emails from TEA to Attorney General's Office reporting noncompliant school districts).

The TEA further participates in enforcing GA-38 by issuing Public Health Guidance that reiterates the prohibition on mask requirements.  Since Executive Order GA-38 was issued, TEA has updated its Public Health Guidance four times: on August 5, August 19, September 2, and, most recently, September 17.  Ex. 4 (August 5, 2021 TEA Public Health Guidance); Ex. 5 (August 19, 2021 TEA Public Health Guidance); Ex. 3 (September 2, 2021 TEA Public Health Guidance); Ex. 2 (September 17, 2021 TEA Public Health Guidance).  The August 5 Public Health Guidance stated: "Per GA-38, school systems cannot require students or staff to wear a mask.  GA-38 addresses government-mandated face coverings in response to the COVID-19 pandemic."  Ex. 4 (August 5, 2021 TEA Public Health Guidance). On August 19, and then again on September 2, it stated: "Please note, mask provisions of GA-38 are not being enforced as the result of ongoing litigation."  Ex. 5 (August 19 Public Health Guidance); Ex. 3 (September 2 Public Health Guidance).  Even though at this time the TEA publicly told school districts in the state that GA-38's mask provisions were not being forced, privately they were continuing to send lists of districts that had mask requirements to the Attorney General's office. Exs. 344, 345, 346, 348, 350, 351, 352.  On September 17, without explanation, the Public Health Guidance reverted back to the August 5 guidance stating that "[p]er GA-38, school systems cannot require students

or staff to wear a mask." Ex. 2 (September 17 Public Health Guidance). TEA's purpose in

issuing the August 5/September 17 guidance was to dissuade school districts from requiring

masks. Ex. 160 at 39:16-44:17 (A. Jernigan Depo) ("Q. (By Mr. Fox): By including this mask

section, which says schools [*sic*] systems cannot require students or staff to wear a mask, did the

Texas Education Agency intend to dissuade school districts from requiring masks? A. Yes."). In

addition, TEA and TEA Commissioner Morath's powers with respect to Texas school districts

are manifold, and both the Agency and Morath are at liberty to pursue a number of corrective

actions against districts for any reason whatsoever, including, for example, noncompliance with

its public health guidance and GA-38.[38]

Defendants have received federal funding. Exs. 162, 339, 340, 342.

## III.   ARGUMENT & AUTHORITIES

### A.   The Court has subject matter jurisdiction.

This Court has subject matter jurisdiction over the claims in this case, and neither of

Defendants' arguments—sovereign immunity and lack of standing—has any merit. *First*,

Defendants cannot claim sovereign immunity with respect to the Rehabilitation Act or the ADA

at all, as the State of Texas and its agencies have waived sovereign immunity as to the

---

[38] *Progreso Indep. Sch. Dist. v. Morath*, No. 18-0455, 2019 WL 1048819 (Tex. Feb. 27, 2019)
(Respondents' Brief on the Merits) (noting the expansive powers vested by statute to Morath and
the Commissioner's "broad power" to impose sanctions, initiate a special accreditation
investigation for any reason, and lower a district's "accreditation status without any statutory
textual limitation on that power"); *see also* Tex. Educ. Code § 7.021 (enumerating TEA's powers
and duties with respect to school districts); Tex. Educ. Code § 7.055 (enumerating Morath's
nearly 40 powers and duties with respect to school districts); Ex. 160 at 28:12-16 (A. Jernigan
Depo) (noting that with respect to Morath's powers as TEA commission, "there are a lot of
them"); *id.* at 30:16-33:21 (stating that TEA and Morath can take varied and sundry corrective
actions with respect to school districts, including withholding funding, conducting a special
accreditation investigation, lowering the accountability rating of a district, lowering the
accreditation status of a district, placing a monitor, conservator, or board of managers to oversee
a district, and requiring a district to attend a hearing with the Commissioner and/or the general
public and/or engage in a third-party audit of issues of noncompliance).

Rehabilitation Act claims by accepting federal funds, and Congress has validly abrogated state

sovereign immunity to ADA claims in the educational context.  *Second*, and in any event,

Plaintiffs can rely on *Ex parte Young* to defeat Defendants' sovereign immunity defense because

Defendants are actively enforcing GA-38's mask provisions against school districts and have the

authority to do so.  And finally, Plaintiffs have standing because Defendants' actions are

depriving them of meaningful access to an in-person public education.

      1.      **For Plaintiffs' two statutory claims—Section 504 and the ADA— sovereign immunity is not available as a defense.**

For purposes of the claim under Section 504 of the Rehabilitation Act, sovereign

immunity is not a defense, because the State of Texas and its agencies (including Defendants)

have waived sovereign immunity by accepting federal funding.[39]  *See* 42 U.S.C. § 2000d-7(a)

("A State shall not be immune under the Eleventh Amendment . . . from suit in Federal court for

a violation of section 504 of the Rehabilitation Act of 1973 . . . or the provisions of any other

Federal statute prohibiting discrimination by recipients of Federal financial assistance."); *Pace v.

Bogalusa City Sch. Bd*., 403 F.3d 272, 287 (5th Cir. 2005) (en banc) (state agencies waive immunity

from Section 504 claims by accepting federal funding); *Danny R. v. Spring Branch ISD & Tex.

Educ. Agency*, 124 Fed. Appx. 289, 289–90 (5th Cir. 2005) (TEA is not immune to suit under

---

[39] Defendant TEA receives federal funding from several sources, including ESSER funding under the ARP Act.  Ex. 6, Letter from Suzanne B. Goldberg, Acting Asst. Sec. for Civil Rights, U.S. Dep't of Ed. to Defendant Morath (Sept. 21, 2021); Ex. 339, USASpending.gov, Education Agency, Texas, https://www.usaspending.gov/recipient/eb6f10a7-ba74-da8e-bdac-d13de8455e69-C/latest.  Defendant Paxton's office also receives funding for various law enforcement programs.  Ex. 162, USASpending.gov, Attorney General, Texas, https://www.usaspending.gov/recipient/4a2062fe-3ef6-bcc3-49de-6a17aff8ba31-C/latest; Ex. 342, Office of the Attorney General, Title IV-D and Child Support in Texas, https://www.texasattorneygeneral.gov/child-support/who-we-are/title-iv-d-and-child-support-texas.

Section 504) (citing *Pace*, 403 F.3d at 272); *Miller v. Tex. Tech Univ. Health Sci. Ctr.*, 421 F.3d 342, 350 (5th Cir. 2005) (same for Louisiana DOE).

As for Plaintiffs' claims under the ADA, courts have consistently held that Congress validly abrogated any sovereign immunity defense with respect to claims pertaining to public schools. *Ass'n for Disabled Americans, Inc. v. Fla. Int'l Univ.*, 405 F.3d 954, 958–59 (11th Cir. 2005) (concluding that "Title II of the ADA, as applied to access to public education, constitutes a valid exercise of Congress's enforcement power under Section 5 of the Fourteenth Amendment"); *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 490 (4th Cir. 2005) (concluding that "Title II of the ADA is valid § 5 legislation, at least as it applies to public higher education"); *Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 555 (3d Cir. 2007) ("[W]e join several sister circuits in holding that Congress acted within its Constitutional authority in abrogating sovereign immunity under Title II of the ADA."); *Toledo v. Sanchez*, 454 F.3d 24, 40 (1st Cir. 2006) ("We are similarly persuaded that Title II's prophylactic measures are justified by the persistent pattern of exclusion and irrational treatment of disabled students in public education, coupled with the gravity of the harm worked by such discrimination."); *see also Guttman v. Khalsa*, 669 F.3d 1101, 1123 (10th Cir. 2012) (noting with approval the holdings in *Toledo*, *Constantine*, and *Assoc. for Disabled Ams., Inc.* and recognizing that "the exceptionally well-documented history of irrational discrimination in schools is sufficient to compensate for the right's limited value in the constitutional scheme"); *cf. Tennessee v. Lane*, 541 U.S. 509, 533–34 (2004) (similarly holding that Title II of the ADA validity abrogates sovereign immunity in cases implicating the right of access to the courts).

For these statutory claims, then, this Court need not address the application of *Ex parte Young*; sovereign immunity is not available as a defense.

     2.     *Ex parte Young* **overcomes any sovereign immunity defense in this
case because Defendants are actively enforcing GA-38.**

The *Ex parte Young* doctrine is an exception to state sovereign immunity that allows
federal courts to enjoin state officials from enforcing state law if the officials are sufficiently
connected to the law's enforcement. *Ex parte Young*, 209 U.S. 123, 157 (1907) ("In making an
officer of the State a party defendant in a suit to enjoin the enforcement of an act alleged to be
unconstitutional it is plain that such officer must have some connection with the enforcement of
the act."); *see also Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011)
("[W]hen a federal court commands a state official to do nothing more than refrain from
violating federal law, he is not the State for sovereign-immunity purposes."). Defendants have
argued that this doctrine is unavailable in this case because the challenged law does not expressly
charge Defendants with its enforcement. This reads the doctrine far too narrowly. Defendants
cannot deny that they have a sufficient connection to the enforcement of GA-38 ***when they are
actively enforcing it.*** This Court need go no farther than *Ex parte Young* itself to reach this
conclusion. The Fifth Circuit's cases are not—and cannot be—to the contrary.

     a.     **On its face, *Ex parte Young* deprives a state official of sovereign
immunity when he is enforcing a law that violates federal law.**

*Ex parte Young* allows a plaintiff to seek a federal court injunction against a state court
official—notwithstanding the State's sovereign immunity—when the official is enforcing a state
law that is contrary to federal law or the U.S. Constitution. *Young*, 209 U.S. at 155–56. In *Ex
parte Young*, the plaintiffs argued that railroad rates set by the Minnesota legislature were
unconstitutional and sought to enjoin Minnesota's attorney general from enforcing them. *Id.* at
127–29. The trial court granted a preliminary injunction against the attorney general that
precluded him from enforcing the rates. *Id.* at 132. The attorney general proceeded to violate
the injunction by attempting to enforce the rates in state-court actions, and the trial court held

-25-

him in contempt.  *Id.* at 133–34.  The case reached the Supreme Court by way of the attorney

general's habeas corpus petition.  *Id.* at 126.  He argued that the trial court lacked jurisdiction

because the plaintiff's original suit and injunction were barred by sovereign immunity.  *Id.* at

141.

The Supreme Court disagreed, rejecting the sovereign immunity defense on the ground

that sovereign immunity is not available to a state official taking action that violates federal law.

The connection between the official and the challenged state law was essential to the Supreme

Court's ruling.  According to the Court, its prior authorities supported the conclusion that

> individuals, who, as officers of the State, are clothed with some duty in regard to
> the enforcement of the laws of the State, and who threaten and are about to
> commence proceedings, either of a civil or criminal nature, to enforce against
> parties affected an unconstitutional act, violating the Federal Constitution, may be
> enjoined by a Federal court of equity from such action.

*Id.* at 155–56.  For purposes of injunctive relief, the Court held that the state officer "must have

*some connection* with the enforcement of the act."  *Id.* at 157 (emphasis added).  In Attorney

General Young's case, the Court found it sufficient that he had general enforcement authority

under Minnesota law and was actively engaged in enforcing the challenged law.  As the Court

explained:

> By his official conduct it seems that he regarded it as a duty connected with his
> office to compel the company to obey the commodity act, for he commenced
> proceedings to enforce such obedience immediately after the injunction issued, at
> the risk of being found guilty of contempt by so doing.

*Id*. at 160.   The attorney general invoked this authority under Minnesota caselaw and statutes,

which provided that the "Attorney General might institute, conduct and maintain all suits and

proceedings he might deem necessary for the enforcement of the laws of the State, the

preservation of order and the protection of public rights, and that there were no statutory

restrictions in that State limiting the duties of the Attorney General in such case."  *Id.* at 160–

161.  The Court concluded that the attorney general's common-law and general statutory duties "by virtue of his office sufficiently connected him with the duty of enforcement to make him a proper party to a suit of the nature of the one now before the United States Circuit Court." *Id.*

In reaching this conclusion, the Court did ***not*** find it "necessary that such duty should be declared in the same act which is to be enforced." *Id*. at 157.  Although such an explicit delegation of authority "may possibly make the duty more clear," a duty that derives from a different source would be "equally efficacious." *Id*.  The Court continued:

> The fact that the state officer by virtue of his office has some connection with the enforcement of the act is the important and material fact, and whether it arises out of the general law, or is specially created by the act itself, is not material so long as it exists.

*Id.*  Thus, the only enforcement duty *Ex parte Young* requires is *some* duty under state law to enforce the challenged case law—not a specific duty arising from the challenged law itself.

The claims here easily meet that test.  Both Attorney General Paxton and Commissioner Morath have ***some*** authority to enforce GA-38's mask provisions, and they are threatening to enforce and actually enforcing GA-38's mask provisions against school districts.  As set forth above, the record contains ample evidence of their enforcement and threatened enforcement.

As for Attorney General Paxton, he has filed lawsuits against at least fifteen school districts—including districts that some Plaintiffs attend—alleging that they have violated GA-38 by requiring masking and asking for injunctive relief compelling the school districts to discontinue their mask mandates.  Exs. 29, 33, 88, 92, 107, 111, 112, 115, 118, 120, 125 (Petitions filed against school districts).   His office has also sent letters to at least 98 school districts—including districts that some Plaintiffs attend—accusing them of violating GA-38 by requiring masking, demanding that the school districts discontinue their mask mandates, and threatening them with litigation.  Ex. 12 (AG Paxton's COVID-19 List of Noncompliant Entities

as of September 22, 2021); *see, e.g.*, Ex. 32 (OAG Letter to Round Rock ISD on August 17, 2021); Ex. 28 (OAG Letter to Richardson ISD on August 17, 2021); Ex. 91 (OAG Letter to Honey Grove ISD on September 3, 2021); Ex. 87 (OAG Letter to Sherman ISD on September 3, 2021) (emphasis added).  For example, the Attorney General's letter to Round Rock Independent School District says,

> You recently enacted a local policy mandating that students and faculty wear face masks at schools in your district. Your actions exceeded your authority as restricted by Governor Abbott's Executive Order GA-38, which states that "[n]o governmental entity, including a county, city, school district, and public health authority, and no governmental official may require any person to wear a face covering or to mandate that another person wear a face covering[.] . . . you will rescind your local policy requiring masks in public schools or, alternatively, not enforce it pending the Supreme Court's disposition of the cases before it involving this issue. Otherwise, you will face legal action taken by my office to ***enforce*** the Governor's order and protect the rule of law.

Ex. 32 at 1–2 (emphasis added).  And finally, he has made public threats that he will sue other school districts to enforce GA-38's mask mandates, has tweeted about his litigation campaign against school districts who want to require masking, and has posted on his Office's official website a list of school districts—including all school districts Plaintiffs attend—that he claims are violating GA-38.  *See supra* at Section II.C.

Commissioner Morath of the Texas Education Agency ("TEA") is playing a key role in the Attorney General's enforcement campaign in at least two ways.  First, the TEA's representatives testified at deposition that it receives complaints about school districts that are requiring masking and has been sending the names of those school districts to the Attorney General's office twice a week.  Ex. 160 at 18:15-19:23; 21:12-17 (A. Jernigan Depo); see also Exs. 343, 344, 345, 346, 347, 348, 349, 350, 351, 352 (Emails from TEA to Attorney General's Office reporting noncompliant school districts).  The TEA is therefore serving as Attorney General Paxton's detective—providing him with the names of school districts to target for

litigation.  Second, the TEA has incorporated GA-38's prohibition on mask mandates into its own official guidance for schools.  Exs. 4, 2 ("Per GA-38, school systems cannot require students or staff to wear a mask.").  The TEA intends this guidance to dissuade school districts from requiring masking.  Ex. 160 at 39:13-44:17 (A. Jernigan Depo).  Thus, in addition to providing the Attorney General with information about school districts for his litigation campaign, Commissioner Morath and his agency are taking their own actions to "dissuade" schools from violating GA-38.

These active enforcement efforts are more than sufficient to bring Defendants within *Ex parte Young*.  As the Court has explained, the *Ex parte Young* doctrine recognizes that a state official enforcing an unconstitutional law "'comes into conflict with the superior authority of [the] Constitution,' and therefore is 'stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct. The State has no power to impart to him any immunity from responsibility to the supreme authority of the United States.'" *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 254–55 (2011) (quoting *Young*, 209 U.S. at 159–60).  By definition, this principle turns on the ***possibility*** and ***fact*** of the official's enforcement powers, not on any technical question about the powers' source.

This is not to say there is never a reason to ask whether a state official has enforcement power over a challenged law.   In this case, however, Defendants themselves have answered that question.  Defendants' ongoing, active enforcement of GA-38's mask provisions against school districts is a sufficient connection to the enforcement of GA-38 to defeat any claim of sovereign immunity in this case.

In any event, Attorney General Paxton and Commissioner Morath ***do*** have authority under Texas law to enforce GA-38.  Like the attorney general in *Ex parte Young* itself (209 U.S.

at 160), "[t]he Attorney General [of Texas] is the chief law officer of the State, and it is incumbent upon him to institute in the proper courts proceedings to enforce or protect any right of the public that is violated."  *Agey v. Am. Liberty Pipe Line Co.*, 172 S.W.2d 972, 974 (Tex. 1943).  Enforcing rights of the public is exactly what the Attorney General purports to be doing in his lawsuits against school districts.  And by statute, Commissioner Morath "serve[s] as the educational leader of the state" and "as executive officer of the [TEA] and as executive secretary of the [Texas Board of Education]."  Tex. Edu. Code § 7.055(b).  His published guidance intended to "dissuade" school districts from masking purports to have been "authorized by Executive Order GA-38, which has the effect of state law."  *See* Ex. 160 at 39:16-44:17 (A. Jernigan Depo); Ex. 2 (TEA Public Health Guidance - September 17)*.*  According to the TEA itself, then, it has authority to issue guidance under GA-38.

In short, *Ex parte Young* provides the Court with all the authority it needs to reject Defendants' sovereign immunity defense.  Defendants' active enforcement of GA-38's mask provisions against school districts is enough on its own to show that Defendants are sufficiently connected to the enforcement of GA-38 to bring them within *Ex parte Young*.  And their official roles under Texas law and statutes underscore that connection.  On this issue, the Court need look no further than *Ex parte Young* itself.

> **b.**     **Fifth Circuit cases do not and cannot require a different result.**

Contrary to Defendants' contention, the Fifth Circuit's cases do not require a different result.  Defendants have not cited a single case in which the Fifth Circuit has declined to apply *Ex parte Young* to a state official who is actively engaged in enforcing the challenged law.  To the extent certain Fifth Circuit panels have suggested a requirement that the challenged law specifically charge the official with enforcement, they have done so only where the official was

-30-

*not* actively engaged in enforcement.  Those decisions do not and could not undermine the explicit holding of *Ex parte Young* itself.

Where a state official is actively engaged in enforcement activity, the Fifth Circuit has consistently applied *Ex parte Young*.  *See City of Austin v. Paxton*, 943 F.3d 993, 1000–01 (5th Cir. 2019) (discussing actual enforcement that incurred in three prior panel opinions that allowed application of *Ex parte Young*:  *K.P. v. LeBlanc*, 627 F.3d 115 (5th Cir. 2010); *Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507 (5th Cir. 2017); and *NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389 (5th Cir. 2015)).  In each of these cases, the court's analysis focused on the "active" role the defendant was taking in enforcing the statute.  *See K.P.*, 627 F.3d at 125; *Air Evac EMS, Inc.*, 851 F.3d at 519 ("[b]etween their rate-setting authority and role in arbitrating fee disputes through the administrative process, state defendants effectively ensure the maximum-reimbursement scheme is enforced," and their enforcement activities were "pervasive"); *NiGen Biotech*, 804 F.3d at 392–93 ("the fact that Paxton sent letters threatening enforcement of the [challenged Act] makes it clear that he had not only the authority to enforce the [Act], but was also constraining the [plaintiff's] activities, in that it faced possible prosecution if it continued to make and distribute its products").

Defendants have not cited a single Fifth Circuit case that denied the application of *Ex parte Young* based on an alleged lack of "connection" to the challenged law when—as here—the defendants were actively engaged in enforcing it.   Many of these cases that Defendants cite did not involve active enforcement of the challenged law at all.  ECF No. 24, 34 (citing, *e.g.*, *City of Austin*, 943 F.3d 993; *Mi Familia Vota v. Abbott*, 977 F.3d 461, 467–69 (5th Cir. 2020); *Morris v. Livingston*, 739 F.3d 740, 745–46 (5th Cir. 2014); *Okpalobi v. Foster*, 244 F.3d 405, 414–16 (5th Cir. 2001)).  In others, the Fifth Circuit declined to apply *Ex parte Young* only after

concluding that alleged enforcement activities were not actually enforcement.  *See*, *e.g.*, *Tex. Democratic Party v. Hughes*, 2021 WL 2310010, at *3 (5th Cir. June 4, 2021) (press release announcing a requirement contained no specific threat of enforcement); *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 180 (5th Cir. 2020) (Governor's suspension of primary election and extension of early voting period were not sufficient connection to enforcement of challenged election code provision regarding mail-in voting, and Attorney General Paxton's statements that distributing mail-in ballots was illegal were not specific threats of enforcement); *In re Abbott*, 956 F.3d 696, 709 (5th Cir. 2020) (Attorney General's press release stating that challenged law would be enforced did not contain specific threats of enforcement), *cert. granted, judgment vacated sub nom. Planned Parenthood Ctr. for Choice v. Abbott*, 141 S. Ct. 1261, 209 L. Ed. 2d 5 (2021).  And in *Whole Woman's Health v. Jackson*, of course, there could have been no active enforcement because the challenged statute specifically **precludes** state enforcement.  *See* 2021 WL 4128951, at *4 (5th Cir. Sept. 10, 2021).  None of these cases enable a state official to avoid *Ex parte Young* simply because his active enforcement efforts are grounded in a broader authority.

To the extent the language of these cases suggests a need to find the enforcement authority in the text of the challenged law itself, applying that language in a case like this one—involving active enforcement—would conflict with *Ex parte Young* itself.  Again, the Supreme Court held that whether the enforcement power "arises out of the general law, or is specially created by the act itself, is not material so long as it exists."  209 U.S. at 157.  The attorney general in *Ex parte Young* was actively engaged in enforcing the challenged law, and the Court specifically held that his "power by virtue of his office sufficiently connected him with the duty of enforcement to make him a proper party."  *Id*. at 161.  As discussed above, Attorney General

Paxton undeniably has authority to enforce Texas law—and Commissioner Morath has statutory authority with respect to public schools.  And just as important, they both apparently ***believe*** they have such authority, ***because they are both actively engaged in GA-38's enforcement***.  Fifth Circuit cases do not require this Court to blind itself to that reality.

Reaching any other result in this case would defeat the purpose of *Ex parte Young*.  As the Supreme Court explained, "the use of the name of the state to enforce an unconstitutional act . . . is a proceeding without the authority of, and one which does not affect, the state in its sovereign or governmental capacity."  *Ex parte Young*, 209 U.S. at 159.  As a result, the *Young* doctrine is an "important limit on the sovereign-immunity principle"—a legal "fiction" necessary to "permit the federal courts to vindicate federal rights."  *Stewart*, 563 U.S. at 254–55 (citations omitted).  A requirement that the challenged law specifically authorize the defendant to enforce it—when the defendant ***is already engaged in*** that enforcement—would conflict with *Ex parte Young* and preclude the vindication of federal rights.  The Fifth Circuit's cases do not—and could not—impose such a requirement.

> **3.      Plaintiffs have standing because Defendants' unlawful conduct has deprived Plaintiffs of meaningful access to in-person public education.**

Article III of the United States Constitution requires Plaintiffs to demonstrate that they have standing.  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338, (2016).  To demonstrate standing a plaintiff "must not only establish (1) an injury in fact (2) that is fairly traceable to the challenged conduct, but he must also seek (3) a remedy that is likely to redress that injury."  *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 797 (2021).

> **a.      Plaintiffs have suffered an injury because they have been deprived of meaningful access to in-person public education.**

Standing's injury requirement "helps to ensure that the plaintiff has a 'personal stake in the outcome of the controversy.'"  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)

(quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).  In addition to existing injuries, "imminent"

injuries meet the injury requirement.  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)

(stating that "an injury must be 'concrete, particularized, and actual or imminent'") (quoting

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)).  An injury is sufficiently

imminent to confer standing if there is a "'substantial risk' that the harm will occur." *Driehaus*,

573 U.S. at 158 (quoting *Clapper*, 368 U.S. at 414 n. 5).

Here, some Plaintiffs have suffered an actual injury, and other Plaintiffs face a substantial

risk of imminent injury if Defendants are permitted to continue enforcing GA-38.  The injury is

the loss of the opportunity to attend and have meaningful access to public school in person.

Some of Plaintiffs' parents have kept them home.  Ex. 14.  Plaintiffs M.P. and H.M. have been

previously excluded from in-person education this year; M.P. is still not attending in person.

Other Plaintiffs, E.T., J.R., and A.M., are attending school because their schools currently

require masks, but will be forced to stay home if masks are not required; H.M. will also be

forced home again.  Ex. 14.  Two of Plaintiffs face a substantial risk of injury because Attorney

General Paxton has sued their school districts. Exs. 14, 29 (Richardson ISD Petition), 33 (Round

Rock ISD Petition).  Other Plaintiffs are attending school in districts without masks; these

students have been denied equal access to in-person learning because attending school at

significant risk of injury is not the same opportunity provided to other children who do not have

disabilities.  Ex. 14.

> i.    **Plaintiffs' actual or imminent loss of opportunity to attend and have meaningful access to in-person public school is an injury sufficient to confer standing.**

An "invasion of a legally protected interest" is sufficient to confer standing.  *Gill v.

Whitford*, 138 S.Ct. 1916, 1929 (2018).  The loss of opportunity to attend and have meaningful

access to in-person public school is a legally protected interest.

To begin with, numerous authorities recognize citizens' interest in receiving a public education.  According to the Texas Constitution, "A general diffusion of knowledge being essential to the preservation of the liberties and rights of the people, it shall be the duty of the Legislature of the State to establish and make suitable provision for the support and maintenance of an efficient system of public free schools."  Tex. Const. art VII, § 1.  And the Supreme Court has recognized a "student's legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause."  *Goss v. Lopez*, 419 U.S. 565, 574 (1975); *see also ARC of Iowa v. Reynolds*, 2021 WL 4166728, at *1 (S.D. Iowa Sept. 13, 2021) (recognizing that denying school-aged children a free public education violates the U.S. Constitution) (citing *Plyler v. Doe*, 457 U.S. 202, 230–31 (1982)).

Moreover, in passing the Americans with Disabilities Act and the Rehabilitation Act, Congress has recognized that disabled children have an interest in having access to public school on par with non-disabled children's access.  According to the Fifth Circuit,

> Title II of the ADA, which applies to public entities including public schools, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity or be subjected to discrimination by any such entity."

*Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 291 (5th Cir. 2005) (quoting 42 U.S.C. § 12132 (of the ADA) and noting that Section 504 of the Rehabilitation Act, 29 U.S.C. § 784(a), "contains virtually identical language" to Section 12132).  Plaintiffs have a legally protected interest, therefore, in access to public education on par with non-disabled children.

Here, the actions of Defendants have deprived Plaintiffs of the opportunity to attend public school in person and are invading Plaintiffs' legally protected interest in access to public school on par with non-disabled children.  Both M.P. and H.M. have missed in-person school

this year due to the enforcement of GA-38; the injury is imminent for E.T., J.R., and A.M. who will be pulled from in-person school if the Defendants are permitted to continue the enforcement actions. Ex. 14. Defendant TEA has acknowledged that students, including students with disabilities, suffer when they lose in-person instruction, which is confirmed by Plaintiffs' Experts. Ex. 159 at 17:14-18:9 (M. Aghazadian Depo); Ex. 163 (TEA Releases Spring 2021 STAAR Grades); Ex. 20, ¶¶ 13-18 (Sherwood Expert Report); Ex. 21, ¶¶ 14-17 (Sandbank Expert Report). For E.S. and S.P., the actions of Defendants have denied them equal access to in-person learning. E.S. attends in-person school in a district that came into compliance with GA-38 by dropping its mask mandate; S.P. will be forced to attend in-person school in a district without masks if the Defendants' enforcement lawsuit against his district is successful. Ex. 14. They are attending at significant risk to their health, which is not the same opportunity provided to students without disabilities.[40]

TEA has noted that students who learn virtually "didn't learn as much, in short, by a pretty significant amount in both math and reading across all grade levels." Ex. 159 at 17:24-18:2 (M. Aghazadian Depo). Plaintiffs' Experts concur with Defendant TEA about the harms of virtual learning and highlight the unique harms Plaintiffs as students with disabilities suffer when they lose in-person instruction. Margaret Sherwood has explained "[w]hy Students with Disabilities Need Access to In-Person Instruction," Ex. 20 at page 2, in her report, explaining: "In-person instruction for students with disabilities has been widely researched, and service providers are trained in how to provide this instruction in a face-to-face instructional environment. Similar guidance and research does not yet exist for providing virtual instruction to

---

[40] As discussed *infra* at Section III.B, Plaintiffs' injuries are also recognized under the ADA and Section 504. *See Arc of Iowa*, 2021 WL 4166728, at *37.

students with significant academic, developmental, social, and behavioral needs," *id.*, ¶ 14. She went on to explain particular short comings of virtual instruction for students with behavioral needs, social skills deficits, and developmental needs. *Id.*, ¶ 15-16.  She concluded saying, "It is my opinion based on experience and observations that virtual instruction has a similar regressive impact on students with disabilities that we see when students are not attending school in person, such as summer break or disability-related absences." *Id.*, ¶ 18.

Professor Micheal Sandbank, an expert on the importance of in-person schooling unique to disabled children, supported Ms. Sherwood's conclusions, pointing to research finding that remote instruction was not meeting the needs of students with disabilities, that attendance was lower for students with disabilities in virtual instruction than for those attending in-person, and that vast majority of evidence-baseed strategies for teaching students with disabilities have only been evidence based in in-person formats. Ex. 21, ¶¶ 14–17.

Overall, Ms. Sherwood's and Professor Sandbank's opinions further show that, given Plaintiffs' disabilities, depriving Plaintiffs of the opportunity to attend school in person invades Plaintiffs' legally protected interest in access to public education on par with non-disabled children.  Depriving Plaintiffs of the opportunity to attend and have meaningful access to in-person public school is an injury sufficient to confer standing on Plaintiffs.

### ii.    Plaintiffs have been deprived of the opportunity to attend and have meaningful access to in-person public school.

Circumstances in which Plaintiffs' schools cannot require anyone to wear a mask deprive Plaintiffs of the opportunity to attend and have meaningful access to school in person.  Dr. Edward Septimus has submitted an expert report on behalf of Plaintiffs in this case that explains why masks are an effective means of reducing COVID-19 transmission.  *See generally* Ex. 17. Moreover, Dr. Benjamin Greenberg has submitted an expert report that explains why disabled

children like the Plaintiffs, given Plaintiffs' medical conditions, face a higher risk of contracting

COVID-19 and a higher risk of facing severe or fatal symptoms from COVID-19 than non-

disabled children.  Ex. 18, ¶¶ 13–15.  Dr. Greenberg has also explained why requiring masks in

school is necessary to protect children with disabilities like Plaintiffs.  *Id.*, ¶¶ 16–23.  Overall,

Dr. Greenberg concluded,

> Thus, the scientific evidence overwhelmingly supports the conclusion that masks
> are an effective means of protecting people from the spread of the virus and from
> severe symptoms caused by the virus. As such, I believe that mask requirements
> in schools are necessary to protect children like the Plaintiffs from the virus. A
> child, at least like those among the Plaintiffs, would be safer from the virus
> staying at home than going to a school with a mask-optional policy.

*Id.*, ¶ 23.  Thus, because (1) Plaintiffs face a heightened risk of contracting and suffering severe

and fatal symptoms from COVID-19 because of their medical conditions, (2) "mask

requirements in schools are necessary to protect children like the Plaintiffs from the virus," and

(3) "[a] child, at least like those among the Plaintiffs, would be safer from the virus staying at

home than going to a school with a mask-optional policy," prohibiting Plaintiffs' schools from

requiring masks denies Plaintiffs the opportunity to attend and have meaningful access to in-

person schooling.  Plaintiffs are either unable to attend, and are thus excluded from in-person

school, or they must attend at great risk of illness, which is unequal access.

For the same reasons, Plaintiffs whose school districts require masks and that the

Attorney General has sued or threatened to sue face a substantial risk that their school districts

will stop requiring masks.  If the Attorney General's lawsuits succeed, school districts requiring

masks will no longer be able to do so because the Attorney General has asked for orders

enjoining sued school districts from requiring masks.  Exs. 29, 33, 88, 92, 107, 111, 112, 115,

118, 120, 125 (Petitions filed against school districts).  And students who attend school districts

the Attorney General has not sued face a substantial risk that their school districts will stop

requiring masks because the Attorney General has indicated his intent to sue such school

districts, including by sending letters to such school districts explicitly threatening litigation if

they do not abandon their mask requirements. *See e.g.* Ex. 65 (OAG Letter to Edgewood ISD).

The Plaintiffs that are currently attending in-person school because their school districts still

require masks who will be forced to stay home without masks face a substantial risk that their

schools will stop requiring masks, which will deprive such students of the opportunity to attend

school in person, and that substantial risk is sufficient to confer standing. *Driehaus*, 573 U.S. at

158 (stating that "[a]n injury is sufficiently imminent to confer standing if there is a "'substantial

risk' that the harm will occur") (quoting *Clapper*, 368 U.S. at 414 n. 5). And the risk of unequal

access is similarly imminent for any Plaintiff who will be forced to attend in-person school at

great risk to his or her health.[41]

*          *          *

Plaintiffs have clearly demonstrated that they have a real stake in the outcome of this

case. *Driehaus*, 573 U.S. at 158 (stating that "[s]tanding's injury requirement "helps to ensure

that the plaintiff has a 'personal stake in the outcome of the controversy'") (quoting *Warth v.

Seldin*, 422 U.S. 490, 498 (1975)). Plaintiffs have demonstrated that, rather than merely

complaining about a government policy they dislike, they are complaining about a real injury:

the lack of an opportunity to attend or have meaningful access to school that has already

---

[41] Defendants' prior reliance on *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013) and
*Glass v. Paxton*, 900 F.3d 233 (5th Cir. 2018) is misplaced. The plaintiffs in those cases alleged
that their free speech had been chilled due to fears of hypothetical future harm. Here, Plaintiffs
who are currently staying home, or will stay home if districts are unable to require masking as an
accommodation, are doing so because of the very real and significant risk that COVID-19
presents for them due to their disabilities, as shown by the uncontroverted testimony of Drs.
Yudovich, Greenberg, and Septimus.

occurred for multiple Plaintiffs given their medical conditions; and the substantial risk of such

harm for others due to the actions of the Defendants.

> **b.** **Plaintiffs' injury is fairly traceable to Defendants' actual and threatened enforcement of GA-38 against school districts.**

"In cases where the choice of a third party is essential to a plaintiff's standing, the

plaintiff must introduce facts showing that the third party's choices 'have been or will be made in

such manner as to produce causation and permit redressability of injury.'" *Three Expo Events,*

*L.L.C. v. City of Dallas, Texas*, 907 F.3d 333, 341 (5th Cir. 2018) (quoting *Lujan*, 504 U.S. at

562.  The district court in S.B. found that the injuries incurred by students with disabilities was

traceable to the Tennessee governor's executive order banning mandatory mask usage.  *S.B. by*

*& through M.B. v. Lee*, __ F. Supp. 3d __, 2021 WL 4346232 *8-9 (E.D. Tenn. Sept. 24, 2021).

The court noted that the governor's argument to the contrary was an attempt to stop any legal

challenge or court review of his order.  *Id*. at * 9 ("Because his executive order forestalls

Plaintiffs from pursuing an alleged reasonable accommodation under the ADA, the Court clearly

has license to enjoin his executive order and is likely to do so.").

Here, Plaintiffs have ample evidence that the school districts they attend have or likely

will abandon mask requirements because of Defendants' enforcement of GA-38's mask

provisions against them.  That evidence includes:

- On August 28, 2021, Fort Bend ISD decided to stop enforcing its mask policy due to

  its perception that the Office of the Attorney General was successful in its

  enforcement of Executive Order GA-38 through litigation.  Ex. 22, ¶¶ 19–20.  In turn,

  M.P. who attends a Fort Bend School, has been staying home because of the risk of

  COVID arising from the Attorney General's causing Fort Bend to stop requiring

  masks.  Ex. 226, ¶¶ 7–9.

- On September 9, 2021, Defendant Paxton sued Round Rock ISD for its August 18 mask mandate applying to students, teachers, staff members, and adult visitors. Ex. 33, ¶¶ 29–30.  Although the trial court granted a TRO enjoining Round Rock ISD from enforcing its mask requirement, a Texas court of appeals stayed the trial court's order, and Round Rock is continuing to require masks.  Exs. 36, 37, 38.  Plaintiff E.T., who attends a Round Rock school and is currently going in person because of Round Rock's mask requirement, still faces a substantial risk of deprivation of her opportunity to attend school in person because Attorney General Paxton could prevail in his lawsuit against Round Rock ISD.  Indeed, E.T.'s parents will withdraw her from school if Round Rock ISD stops requiring masks.  Ex. 223.  The Attorney General's lawsuit against Round Rock ISD is clearly the cause of that substantial risk.

- Although Richardson ISD is currently requiring masks, Ex. 27, the Attorney General has sued Richardson ISD to enjoin Richardson ISD from requiring masks, Ex. 29. Richardson ISD will comply with any court order enjoining it from requiring masks. Ex. 27.  The Attorney General's lawsuit has therefore caused a substantial risk that S.P., who attends a Richardson school, will be deprived of meaningful access to in-person school.

- Attorney General Paxton's non-compliant-entity webpage lists Killeen ISD as "Now in Compliance (previously not in compliance)" with GA-38.  Ex. 12.  This shows that Attorney General Paxton's enforcement efforts have caused Killeen ISD to stop requiring masks, which has deprived Plaintiff E.S. of meaningful access to in-person schooling.

- Although the TEA never published public health guidance prohibiting masks before the Governor promulgated GA-38, the TEA has now published guidance that states, "Per GA-38, school systems cannot require students or staff to wear a mask." Ex. 2. The TEA testified in its deposition that it intends this guidance to dissuade schools from requiring masking, Ex. 160 at 39:16-44:17 (A. Jernigan Depo), which means the TEA's guidance is likely to cause some school districts not to require masks that would otherwise do so.

- Defendant Paxton has sued 15 school districts that have instituted mask mandates on the basis that the mandates violate GA-38, including Round Rock ISD, Spring ISD, Richardson ISD, Sherman ISD, Galveston ISD, Honey Grove ISD, Paris ISD, Longview ISD, Elgin ISD, Lufkin ISD, Diboll ISD, Waco ISD, Midway ISD, La Vega ISD, and McGregor ISD. Exs. 29, 33, 88, 92, 107, 111, 112, 115, 118, 120, 125 (Petitions filed against school districts). And the Attorney General has promised in tweets as recently as September 14, 2021 to file more lawsuits. Ex. 147.

Ultimately, the evidence above shows that Defendants' enforcement of GA-38 has caused school districts to stop requiring masks so as to deprive Plaintiffs of the opportunity to attend school in person, and Defendants conduct is creating a substantial risk that other school districts will do the same:

- The Office of the Attorney General is aware that the letters it has sent to noncompliant school districts have successfully influenced several of them to withdraw their mask policies. Ex. 161 at 49:10-13 (A. Kinghorn Depo).

- TEA, in issuing Public Health Guidance reiterating the force and effect of Executive Order GA-38 on school districts' masking policies, intended to dissuade school

districts from implementing mask mandates. Ex. 160 at 39:13-44:17 (A. Jernigan Depo).

> c.     An injunction enjoining Defendants from enforcing GA-38
>        against school districts would likely redress Plaintiffs' injury.

Under the redressability requirement, "the standard is not whether the proposed remedy is an absolute solution, but rather, whether it will 'be likely, as opposed to merely speculative,' to redress plaintiff's injury." *ARC of Iowa*, 2021 WL 4166728, at *7 (quoting *Lujan*, 504 U.S. at 561). In *Uzuegbunam v. Preczewski*, Supreme Court recently confirmed that a remedy need not be capable of completely redressing a plaintiff's injury for the plaintiffs to meet the redressability requirement. 141 S. Ct. 792, 797 (2021). The Supreme Court held in *Uzuegbunam* that a plaintiff seeking only nominal damages could satisfy the redressability and reasoned that "[a] single dollar often will not provide full redress, but the partial remedy satisfies the redressability requirement." *Id.* at 801–02.

Here, enjoining Defendants from enforcing GA-38 against school districts would redress Plaintiffs' actual and imminent injuries. According to a member of the Fort Bend ISD Board of Trustees, "[i]f the AG stopped enforcing GA-38, or there is an order barring enforcement of GA-38, the FBISD mask requirement would immediately go back into effect." Ex. 22, ¶ 22. Other school districts, such as Killeen ISD that have stopped requiring masks likely because of Defendants' enforcement of GA-38 would likely also require masks again if the Court orders Defendants to stop enforcing GA-38. Indeed, the Attorney General's enforcement was the only reason Trenton ISD stopped requiring masks. Ex. 100. Moreover, ordering the Attorney General to stop enforcing GA-38 would end the Attorney General's lawsuits that have created a substantial risk that S.P. and E.T., will be denied meaningful access and lose the opportunity to attend school in person. Such an order would also end the Attorney General's letter writing

campaign that likely caused Trenton ISD and Killeen ISD to stop requiring masks and stop the

TEA's guidance that is intended to dissuade schools from requiring masks.  Thus, an order

enjoining Defendants from enforcing GA-38 would likely redress Plaintiffs' actual and imminent

injuries because such an order would pave the way for school districts to require masks that

would require masks but for Defendants' conduct.  *See, e.g.*, *ARC of Iowa*, 2021 WL 4166728, at

*7 (finding the plaintiffs have standing to challenge the state ban on masks because without

enforcement of the law, districts who had previously enforced mask mandates would have

discretion to do again).

Defendants cannot contend that Plaintiffs fail to meet the redressability requirement

because Plaintiffs' sought relief would leave local district attorneys free to enforce GA-38.

Aside from the fact that Defendants' argument depends on the premise that local authorities will

enforce an executive order a federal court has declared unconstitutional, *Uzuegbunam* makes

clear that a partial remedy can satisfy the redressability requirement.  141 S. Ct. at 801–02.

Article III simply does not require Plaintiffs to sue every defendant that could possibly

enforce GA-38 against them.  The ones actually enforcing it are enough.  Plaintiffs have

standing.

### B.    Defendants have violated the ADA and Rehabilitation Act.

The evaluation of a claim of disability discrimination under the ADA and Section 504 is

substantially the same.[42]  To establish a violation, Plaintiffs must demonstrate that (1) they are

---

[42] *See Wilson v. City of Southlake,* 936 F. 3d 326, 330 (5th Cir. 2019) ("To establish a prima
facie case of discrimination under the ADA, a plaintiff must demonstrate: (1) that he is a
qualified individual within the meaning of the ADA; (2) that he is being excluded from
participation in, or being denied benefits of, services, programs, or activities for which the public
entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that
such exclusion, denial of benefits, or discrimination is by reason of his disability.").

qualified individuals with disabilities under the ADA and Section 504, (2) they are being excluded from participation in, or being denied the benefits of their public education; and (3) the discrimination is due to disability.  Here, the ban on mask requirements is forcing the plaintiffs to choose between staying at home to protect their health and safety, and thus forgoing the benefits of in-person education, or exposing themselves to serious risk of illness or death by appearing for in-person classes in the absence of the most important and effective COVID-19 prevention strategy.  As discussed below, students in both categories have been denied meaningful access to their public schools and are suffering disability discrimination.

All the federal courts to have addressed similar ADA/Rehabilitation Act claims challenging state-wide limitations on the use of masks have found that the plaintiff students are likely to succeed on the merits of their ADA and Section 504 claims.  In the first case heard, *G.S.*, the court granted a TRO in favor of the plaintiffs,[43] followed by a preliminary injunction.[44] In the next two cases to be heard, the courts have granted plaintiffs' requests for TROs.[45]  In the fourth case, the court denied the plaintiff's original request for a TRO in favor of an evidentiary hearing,[46] and then entered a preliminary injunction in the plaintiff's favor.[47] The plaintiffs in each of these cases are students with disabilities who have medical conditions that place them at higher risk of severe illness or death if they contract COVID-19; some of the plaintiffs have been staying at home due to the respective state bans on masking policies, but a majority have been

---

[43] *G.S.*, 2021 WL 4057812.
[44] *G.S.*, 2021 WL 4268285.
[45] *Arc of Iowa*, 2021 WL 4166728; *R.K. v. Lee*, No. 3:21-cv-725, 2021 WL 4391640 (M.D. Tenn. Sept. 24, 2021).
[46] *S.B. by & through M.B. v. Lee*, No. 321CV00317JRGDCP, PACER Doc. 6 (E.D. Tenn. Sept. 7, 2021).
[47] *S.B. by & through M.B. v. Lee*, No. 321CV00317JRGDCP, ___ F. Supp. 3d ___, 2021 WL 4346232 (E.D. Tenn. Sept. 24, 2021).

attending in-person school at significant risk to their health.[48]  The Tennessee court in *G.S.* concluded the plaintiffs, all three of whom are attending school in person, "have established that their exclusion is due to the threat Plaintiffs face from COVID-19 exposure because of their extreme medical vulnerabilities—in other words, due to their disabilities."[49]  In a fifth case, *Disability Rights South Carolina*, the court issued a preliminary injunction in favor of plaintiffs, finding, "This was not a close call.  The General Assembly's COVID measures disallowing school districts from mandating masks . . . discriminates against children with disabilities.  Thus, with this Order, the Court will enjoin its enforcement."[50]

### 1.      Plaintiffs are qualified individuals with disabilities.

A disability under the ADA and Section 504 is defined as "a physical or mental impairment that substantially limits one or more major life activities."[51]  As stipulated to by the parties, each plaintiff has a disability as defined under Section 504 and the ADA.[52]  Additionally, each plaintiff is eligible to enroll and attend the local public school.[53]

### 2.      G.A. 38 discriminates against Plaintiffs.

The focus of both the ADA and Section 504 is prohibiting discrimination for those with

---

[48] *G.S.*, 2021 WL 4268285 at \*4; *Arc of Iowa*, No. 4:21-cv-00264-RP-SBJ, PACER Doc. 17, at 20 (S.D. Iowa Sept. 9, 2021) (Brief in Support of Motion for Temporary Restraining Order and Preliminary Injunction); *S.B,* 2021 WL 4346232 at \*24 ; *R.K.* 2021 WL 4391640 at \*24.

[49] *G.S.*, 2021 WL 4268285 at \*4; *see also Arc of Iowa*, 2021 WL 415572 at \*10–12.  One federal court, without addressing the merits of the ADA and Section 504 claims, denied a motion for a preliminary injunction in a similar case brought in Florida, finding that that the plaintiffs had failed to exhaust administrative remedies under the IDEA because the allegations and relief requested in the complaint, unlike in the instant case, were focused on the failure of the defendants to provide a free appropriate education as opposed to access to education.  *Hayes v. Desantis*, No. 1:21-cv-22863, ___ F. Supp. 3d ___, 2021 WL 4236698, at 7 (S.D. Fla. Sept. 15, 2021).

[50] *Disability Rights South Carolina v. McMaster*, No. 3:21-02728-MGL, 2021 WL 4444841, \*11 (D.S.C. Sept. 28, 2021).

[51] 42 U.S.C. §§ 12102(1)(A).

[52] Ex. 14 (Stipulated Facts).

[53] *Id*.

disabilities.[54] Both statutes prohibit exclusion from participation, denial of benefits, or other kinds of discrimination.[55] Unlawful discrimination includes (1) denying the opportunity to participate in or benefit from educational services, (2) affording an unequal opportunity to participate or benefit from services, or (3) limiting a person in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others.[56]  It also includes failure to make reasonable modifications in policies, practices, or procedures when such are necessary to avoid discrimination.[57] In addition, "[a] public entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities."[58]  Thus, unlawful discrimination occurs both when there are barriers to access, and when there is a failure to provide reasonable modifications needed for meaningful access.[59]  Defendant Paxton's actions here result in the denial of access and benefits, and prevent the provision of reasonable modifications.

### a.      Exclusion from in-person learning

Defendants' actions deny educational access to Plaintiffs, two of whom have missed in-person school because their schools are not requiring masks as a result of GA-38, and three more who will miss in-person school if Defendant Paxton's enforcement is successful.

- M.P. began the school year attending class in person in Fort Bend ISD; the district adopted a mask requirement after local spread of COVID-19 forced several

---

[54] 29 U.S.C. § 701(a)(3)(F) (Rehabilitation Act) (Congress found that individuals with disabilities should "enjoy full inclusion and integration in the economic, political, social, cultural, and educational mainstream of American Society."); 42 U.S.C. § 12101 (ADA) (Congress found that individuals with disabilities should be assured "equality of opportunity, full participation, independent living, and economic self-sufficiency.").
[55] 42 U.S.C. § 12132; *Wilson*, 936 F. 3d at 330.
[56] 28 C.F.R. § 35.130(b)(1)(i)-(ii), (vii).
[57] 28 C.F.R. § 35.130(b)(7)(i); *Cadena v. El Paso Cty.*, 946 F.3d 717, 723–24 (5th Cir. 2020).
[58] 28 C.F.R. § 35.150.
[59] *Argenyi v. Creighton Univ.*, 703 F.3d 441, 449 (6th Cir. 2013) (§ 504 and ADA Title III).

schools to halt in-person learning.  But the district then reversed course when the

state-court injunctions were stayed.[60]  M.P.'s parents had no choice but to pull

M.P. from in-person school given the rising number of cases and Fort Bend ISD's

adherence to GA-38.[61]

- H.M. began the school year attending class in person in Leander ISD; the district
  has a mask mandate that has a broad opt-out provision.[62]  After classmates tested
  positive for COVID-19, H.M.'s parent kept him home for his safety.[63]  After three
  weeks, he returned to the classroom, but his parents will pull him from in-person
  school if the district's mask mandate is removed.[64]

- E.T., J.R., and A.M. are attending in-person school in districts that currently have
  a mask mandate, but each of their districts has either been sued or threatened with
  a lawsuit by Defendant Paxton.[65]  If Defendants' enforcement of GA-38 and
  TEA's Public Health Guidance is successful against these districts, the parents of
  each student will pull them from in-person school.[66]

For each of these, the ban on mask requirements has created or will create an absolute

barrier to the school building and to in-person learning, which is discrimination prohibited by the

ADA and Section 504.[67]  The decision to stay home is not a "revealed preference" or "self-

---

[60] Ex. 195 ("[R]ight now the provisions of Executive Order GA-38 that bar mask mandates are
effective. In light of this legal development, at this time, the District is not requiring the wearing
of masks.").
[61] Ex. 226 ¶ 7-13; Ex. 14.
[62] Ex. 14.
[63] Ex. 14.
[64] *Id*.
[65] *Id*.
[66] Ex. 225, ¶ 12; Ex. 223, ¶ 12; Ex. 230, ¶ 11; Ex. 14.
[67] 42 U.S.C. § 12132; *Wilson,* 936 F. 3d at 330.

inflicted" harm, as suggested by Defendants.  It is the action of parents who have been given no choice but to forfeit the public education to which their child with a disability is entitled, in order to protect that child's health.  For example, M.P., H.M., and E.T., are each individuals with Down syndrome, recognized by the CDC as placing them at increased risk from COVID-19.[68]

Prior to the enactment of Section 504 and the ADA, people with disabilities were often faced with barriers, physical and otherwise, that prevented access to services.  The argument by the Defendants—that a decision not to cross a barrier in order to avoid a serious health risk is a self-inflicted injury—goes against the very purpose of these laws preventing disability discrimination.

As the court in *Disability Rights South Carolina* found, "Years ago, ramps were added to schools to accommodate those with mobility-related disabilities so they could access a free public education.  Today, a mask mandate works as a sort of ramp to allow children with disabilities to access their schools.  Thus, the same legal authority requiring schools to have ramps requires that school districts have the option to compel people to wear masks at school."[69]

### b.    Unequal access to in-person learning

For E.S. and S.P., enforcement of GA-38 has denied or will deny them equal access to their education.

- E.S. attends in-person class in Killeen ISD.[70]  Killeen ISD initially had a mask mandate but is now in compliance with GA-38 according to Defendant Paxton's compliance list.[71]  E.S.'s parents feel they have no option but to send E.S. in

[68] Ex. 15 at Section III, ¶¶ 1, 3, 6; Ex. 16 at Section III, ¶ 3.
[69] 2021 WL 4444841 at *10.
[70] Ex. 14.
[71] Ex. 12.

person—she did not make adequate progress last year when attending virtually.[72]

- S.P. attends in-person class in Richardson ISD.[73]  Richardson ISD has a mask mandate, but has been sued by Defendant Paxton.[74]  S.P.'s parents feel they will have no option but to continue sending S.P. in person even if Richardson ISD is no longer able to require masks—he did not make adequate progress last year attending school virtually.[75]  He is now behind in both math and reading, and has also regressed behaviorally.  He suffers from chronic anxiety about the possibility of contracting COVID-19.[76]

For E.S. and S.P., the ban on mask policies has denied or will deny them meaningful access to their school buildings and in-person education, *i.e.*, an "equal opportunity to … gain the same benefit."[77]  Attending school at significant risk of severe illness is not the same opportunity that is being provided to other children.  As found by the court in *Arc of Iowa*, "Plaintiffs have demonstrated that school programs, services, and activities are not 'readily accessible' to the disabled minor children involved here because these children cannot attend in-person learning at their schools without the very real threat to their lives because of their medical vulnerabilities."[78]  Similarly, the court in *R.K.* found that the plaintiffs "are entitled to the anti-discrimination protections in the ADA and Section 504" because they were forced "to face a prevalent threat of infection every time the access public educational programs and services"

---

[72] Ex. 14.
[73] *Id*.
[74] Ex. 27.
[75] Ex. 14.
[76] *Id*.
[77] *Argenyi*, 703 F.3d at 449.
[78] *Arc of Iowa* at *37.

which meant the programs were not readily accessible to those with disabilities.[79]

The court in *S.B.* reached a similar conclusion, relying on the Supreme Court decision in *Helling v. McKinney*.[80]  In *Helling*, a state inmate sued the prison officials under 42 U.S.C. § 1983 alleging that his constitutional rights had been violated because he has significant health conditions but was placed in a cell with a fellow inmate who smoked five packs of cigarettes a day.[81]  The Supreme Court held that the plaintiff had stated a sufficient claim based on his involuntary exposure to tobacco smoke which posed an unreasonable risk to his health and future health.[82]  The court in *S.B.* acknowledged the differences between *Helling* and the challenges to the state limitations on mask mandates, but found the underlying holding—that prison officials cannot ignore a condition of confinement that is likely to cause serious illness in the future—applies when evaluating the harm to the children with disabilities.[83]  Similarly, courts have recognized that accommodations in other contexts can be required to address a risk of injury or health consequence under Title I of the ADA.  *See Burnett v. Ocean Properties, Ltd.*, 987 F.3d 57, 68–69 (1st Cir. 2021) (finding plaintiff needed an accommodation because although he was able to physically perform his job, he did so at risk of injury); *Gleed v. AT & T Mobility Services, LLC*, 613 F. App'x 535, 539 (6th Cir. 2015) (reasonable accommodation needed to work "without great pain and a heightened risk of infection"); *Kleyman v. SUNY Downstate Med. Ctr.*, No. 18CV3137PKCST, 2020 WL 5645218, at *10 (E.D.N.Y. Sept. 21, 2020) (finding there was dispute whether plaintiff could perform her job without accommodation only by "seriously

---

[79] *R.K.*, 2021 WL 4391640, at *6.
[80] 509 U.S. 25, 333 (1993).
[81] *Id*. at 28.
[82] *Id*. at 32, 35.
[83] *Arc of Iowa*, 2021 WL 4166728; *S.B. by & through M.B. v. Lee*, No. 321CV00317JRGDCP, ___ F. Supp. 3d ___, 2021 WL 4346232 (E.D. Tenn. Sept. 24, 2021); *R.K,* 2021 WL 4391640..

endangering her health"); *U.S. E.E.O.C. v. AutoZone, Inc.*, 822 F. Supp. 2d 824, 830 (C.D. Ill.

2011), *aff'd in relevant part sub nom. E.E.O.C. v. AutoZone, Inc.*, 707 F.3d 824 (7th Cir. 2013)

(reasonable accommodation of avoiding task causing injury); *Sturz v. Wisconsin Dept. of*

*Corrections*, 642 F. Supp. 2d 881, 888 (W.D. Wis. 2009) ("[D]efendant's argument suggests a

disturbing standard for determining whether an accommodation is reasonable. It may be that

plaintiff could open the front door with great difficulty or make her way through the parking lot

without falling each time, but should she have to?"); *Nawrot v. CPC Int'l*, 259 F. Supp. 2d 716,

726 (N.D. Ill. 2003) ("To hold that a person with potentially life threatening diabetes is not

entitled to accommodations . . . would force diabetics like Nawrot to choose between working

while risking physical harm and death, or unemployment. The ADA was created to prohibit

placing disabled persons in this position.").

### c.      Failure to Provide Reasonable Modification

Both the ADA and Section 504 require covered entities to provide reasonable

accommodations or modifications to individuals with disabilities.[84]  Under Section 504, a

reasonable accommodation may be required to ensure meaningful access to a benefit.[85]  Under

the ADA, reasonable modifications are required when necessary to avoid discrimination on the

basis of a disability.[86]  This determination is a fact-specific inquiry requiring individualized

consideration, but the Defendants are attempting to prevent compliance with the law.[87]

---

[84]  Courts often use "accommodation" and "modification" interchangeably in non-employment cases.
[85] *Alexander v. Choate*, 469 U.S. 287, 301 (1985).
[86] 28 C.F.R. § 35.130(b)(7).
[87] *Staron v. McDonald's Corp.*, 51 F.3d 353, 356 (2nd Cir. 1995) ("[T]he determination of whether a particular modification is 'reasonable' involves a fact-specific, case-by-case inquiry that considers, among other factors, the effectiveness of the modification in light of the nature of the disability in question and the cost to the organization that would implement it."). *See also PGA Tour, Inc. v. Martin*, 532 U.S. 661, 688 (2001) (ADA Title III) ("To comply with this command, an individualized inquiry must be made to determine whether a specific modification

As the experts' declarations demonstrate, for children under the age of 12, the best accommodation to protect those who are at risk of significant illness from COVID-19 is the use of masks, and the ability to require masks is necessary for the protection of children like the plaintiffs.

Dr. Greenberg stated, "I believe that mask requirements in schools are necessary to protect children like the Plaintiffs from the virus."[88]  The need for masking has been recognized by national health authorities, including the CDC, as well as by local health authorities and school officials weighing the specific needs of their local communities.  As the court in *S.B.* found, mask-wearing is "*the* most important of the CDC's guidelines …"[89]  Local school districts, which have implemented mask policies since the start of the pandemic, are the proper decision-makers as to what accommodations are needed to address Plaintiffs' individual needs.  For some, this may be targeted use of masking, such as an individual classroom or campus; other districts may need to implement universal masking.  Defendants have thwarted the ability of school districts to adopt this effective and simple accommodation, preventing school districts from meeting their obligations under federal law.

Plaintiffs do not seek an order compelling universal, district-wide masking. Instead, they seek an order that the school districts be allowed to decide the breadth of their own masking policies, based on local conditions and individual needs.  Regardless, many courts have held that broad policies impacting others may be required as a reasonable accommodation for a particular

---

for a particular person's disability would be reasonable under the circumstances as well as necessary for that person, and yet at the same time not work a fundamental alteration.")
[88] Ex. 18, ¶ 22.  *See also* Ex. 17, ¶ 16 ("There is near consensus on the safety and effectiveness of masks for individuals over the age of two").
[89] 2021 WL 4346232 at *15 (emphasis in original).

individual.[90]

### 3.     The discrimination is by reason of the Plaintiffs' disability.

Defendants have attempted to frame the issue as concerns about "COVID-19 generally" and the "threat that we all face from COVID-19."[91]  This ignores the evidence that each of the Plaintiffs has disabilities and medical conditions that qualify each of them as "high risk" for COVID-19 complications such as severe illness, death, or long COVID.[92]

- M.P. has Down syndrome.[93]

- E.T. has Down syndrome, asthma, and an immune deficiency.[94]

- S.P. has spina bifida, epilepsy, and chronic respiratory failure.[95]

- J.R. has moderate to severe asthma.[96]

---

[90] *See, e.g., Staron v. McDonald's Corp.*, 51 F.3d 353, 357 (2d Cir. 1995) ("We see no reason why, under the appropriate circumstances, a ban on smoking could not be a reasonable modification."); *Simmons v. Monroe Cty., Mississippi*, 415 F. Supp. 3d 723, 730 (N.D. Miss. 2019) ("With respect to the issue of reasonable accommodation, this court regards plaintiff's evidence that the Monroe County jail had a no-smoking policy as being an indication that, in allegedly asking defendant to simply enforce a pre-existing policy, he was seeking a very 'reasonable' accommodation indeed."); *Thursby v. City of Scranton*, No. 3:CV-02-2355, 2006 WL 1455736, at *6 (M.D. Pa. May 25, 2006) ("Ms. Thursby has presented sufficient evidence for a jury to find that the City failed to reasonably accommodate her disability … [through] implementation of a non-smoking policy …."); *Bond v. Sheahan*, 152 F. Supp. 2d 1055, 1062–63, 1071–75 (N.D. Ill. 2001) (denying summary judgment on issue of whether defendant reasonably accommodated plaintiff's asthma by failing to transfer her and by failing to enforce a non-smoking policy). *See also Muller v. Costello*, No. 94-CV-842 (FJS), 1996 WL 191977, at *5 n.14 (N.D.N.Y. Apr. 16, 1996) ("Although *Staron* involved the public accommodation provisions of the ADA, the Second Circuit's reasoning is instructive. The [*Staron*] court stated that '[i]t is plain to us that Congress did not intend to isolate the effects of smoking from the protections of the ADA.'") (citations omitted).
[91] Dkt. 35 at 25, 10.
[92] Dkt. 7 at 5; Ex. 18, ¶¶13-15; Ex. 15, Section III, ¶¶ 1-9.
[93] Ex. 14.
[94] *Id.*
[95] Ex. 14.
[96] *Id.*

- H.M. has Down syndrome.[97]

- A.M. has cerebral palsy, and receives infusions which causes him to become immunosuppressed.[98]

- E.S. has moderate to severe asthma.[99]

The CDC, treating doctors, and expert testimony establishes that each of these plaintiffs is at higher risk of injury; the threat to Plaintiffs is significant and it is greater than to the general public because of their conditions and because of GA-38's preclusive effect on school districts' ability to implement recommended prevention strategies to address the heightened risk the Plaintiffs' disabilities create. The court in *G.S.* held that a similar barrier created by the ban on universal masking is tied directly to the students' disabilities.[100]

### C.    GA 38 is preempted by the ADA and Section 504.

As discussed *infra*, under the Supremacy Clause, the laws of the United States "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.  State law must give way to the extent it "conflicts with federal law."  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 378 (2000).  Simply put, a defendant "is duty bound not to enforce a [state] statutory provision if doing so would either cause or perpetuate unlawful discrimination" under federal law.  *Astralis Condo. Ass'n v. Sec'y, U.S. Dep't of Hous. & Urb. Dev.*, 620 F.3d 62, 67-70 (1st Cir. 2010).  As found by the court in *Arc of Iowa*, the ban on universal masking conflicts with the ADA and Section 504 because it excludes children with disabilities and denies

---

[97] *Id*.
[98] *Id*.
[99] *Id*.
[100] *G.S.*, 2021 WL 4268285 at *4.

them of the benefits to which they are entitled.[101]  For this reason, the ban stands as an obstacle

to the "accomplishment and execution of the full purposes and objectives of Congress" and state

officials cannot enforce it.[102]  Similarly, the court in R.K. found that the school districts of

plaintiffs are "being suppressed" by the Tennessee executive order on masks, and thus prevented

"from giving Plaintiffs the effective accommodation of a temporary universal mask mandate for

all students and teachers." [103]  As a result, the executive order "appears to violate federal law and

must yield."[104]

> **D.      GA-38 and the TEA's Public Health Guidance are preempted by the
> American Rescue Plan Act.**

GA-38 and the TEA's Public Health Guidance are also preempted by the American

Rescue Plan of 2021 (the "Rescue Act"), because their categorical prohibition on mask

requirements is in irreconcilable conflict with Congress's choice to give local school districts

discretion to decide for themselves whether and to what extent to adopt policies, such as

universal masking, in order to best ensure a safe return to in-person instruction.  Plaintiffs'

preemption claim is properly before this Court because it is grounded in the Court's well-

established and longstanding equitable power to enjoin unlawful actions by state officials.

Again, the Supremacy Clause of the United States Constitution renders federal law the

"supreme Law of the Land."  U.S. Const. art. VI, cl. 2.  The doctrine of federal preemption that

arises out of the Supremacy Clause requires that "any state law, however clearly within a State's

acknowledged power, which interferes with or is contrary to federal law, must yield." *Felder v.

Casey*, 487 U.S. 131, 138 (1988) (quoting *Free v. Bland*, 369 U.S. 663, 666 (1962)).  State law is

---

[101] *Arc of Iowa* at *10–12.
[102] *Id*. at *12.
[103] *R.K.* ___ WL ___ at *__.
[104] *Id*.

preempted when, among other things, it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Pac. Gas & Elec. Co. v. State Energy Res. Conserv. & Dev. Comm'n*, 461 U.S. 190, 204 (1983).

> **1.    The Rescue Act expressly gives local school districts discretion to adopt policies, including universal masking, to achieve a safe return to in-person instruction.**

Congress enacted the $1.9 trillion Rescue Act to address the impact of the COVID-19 pandemic and facilitate recovery from its health and economic effects.  *See* Pub. L. No.  117-2. With regard to education, the Act provided nearly $121 billion in Elementary and Secondary School Emergency Relief funding in order to "help schools return safely to in-person instruction, maximize in-person instructional time, sustain the safe operation of schools, and address the academic, social, emotional, and mental health impacts of the COVID-19 pandemic on the Nation's students."[105]  Local districts in Texas – including the districts in which Plaintiffs attend school – have been allocated over $11 billion in this funding so that they can address those needs.[106]  A key purpose of the Act's school funding is to assist schools in achieving a "safe return to in-person instruction."  Pub. L. 117-2, § 2001(i).  To that end, the Act requires local school districts receiving funding to develop and make publicly available a "plan for the safe return to in-person instruction and continuity of services."  *Id.* § 2001(i)(1).  Thus, the express intent of the Act is not only that children should return to in-person schooling but that they must do so *safely*.

---

[105] *See* Ex. 167 (American Rescue Plan Act Elementary and Secondary School Emergency Relief Fund, 86 Fed. Reg. 21195, 21196 (Apr. 22, 2021); *see* Pub. L. No. 117-2, § 2001).

[106] *See* Ex. 166 (U.S. Dep't of Education, American Rescue Plan Elementary and Secondary School
Emergency Relief Fund – Methodology for Calculating Allocations (Revised June 25, 2021) at 3, *available at* https://oese.ed.gov/files/2021/06/Revised-ARP-ESSER-Methodology-and-Allocation-Table_6.25.21_FINAL.pdf).

Congress did not dictate a one-size-fits-all approach to achieving this goal.  Instead, the Act explicitly gives local school districts the authority to use their discretion in determining how to allocate up to 80% of the ESSER funding for a variety of pandemic-related purposes.  *See* Pub. L. No.  117-2, § 2001(i)(e)(2) (local educational agencies "shall use the remaining funds for any of the following:…").  Among other purposes, local school districts are authorized to use the Act's funding for "developing strategies and implementing public health protocols ***including, to the greatest extent practicable, policies in line with guidance from the Centers for Disease Control and Prevention*** for the reopening and operation of school facilities to effectively maintain the health and safety of students, educators, and other staff."  *Id*. § 2001(e)(2)(Q) (emphasis added).  As discussed above in Section II.A, the CDC's guidance specifically recommends universal indoor masking in all K-12 schools.[107]

Consistent with the statute's mandate that local school districts develop plans for safe return to in-person instruction, the U.S. Department of Education has issued interim final requirements providing that each school district's safe-return plan must describe "the extent to which it has adopted policies, and a description of any such policies, on each of the following safety recommendations established by the CDC…," specifically including "universal and correct wearing of masks."  86 Fed. Reg. 21195, 21200.  To be clear, the plan requirement "does not mandate that [a local educational agency] adopt the CDC guidance, but only requires that [it] describe in its plan the extent to which it has adopted the key prevention and mitigation strategies identified in the guidance," which include both "[*u]niversal and correct wearing of masks*," and notably "***appropriate accommodations for children with disabilities*** with respect to health and

---

[107] Ex. 13 at 1 (Centers for Disease Control and Prevention's ("CDC") Guidance for COVID-19 Prevention in K-12 Schools.

safety policies," among others.  *Id.* (emphasis added).  The interim requirements further provide

that a local educational agency must ensure the interventions it implements will respond to the

needs of all students, "and particularly those students disproportionately impacted by the

COVID-19 pandemic, ***including ... children with disabilities***."  *Id.* (emphasis added).

In sum, the Act does not require local schools to adopt CDC guidance on universal

masking, but it does require them to explain how and to what extent they are using the Act's

funding to adopt key COVID "prevention and mitigation strategies," both with regard to

universal masking and with regard to the particular health and safety needs of children with

disabilities.  This is consistent with the Act's overall purpose of promoting ***safe*** return to in-

person instruction, while allowing local school districts the discretion to decide for themselves

how that goal can best be achieved given different local circumstances.

## 2. By barring local school districts from adopting mask requirements, GA-38 and TEA's Guidance are in direct conflict with the Act.

As explained above, the Act expressly gives local school districts discretion in

determining how best to use their allocations of funding to achieve the overriding goal of safe

return to in-person instruction, allowing local schools to adopt a variety of COVID mitigation

and prevention strategies that specifically include the option of implementing mask

requirements.  Because GA-38 and TEA's Public Health Guidance expressly prohibit local

schools from implementing any mask requirements, they are in direct conflict with the Act

because they "stand[] as an obstacle to the accomplishment and execution of the full purposes

and objectives of Congress."  *See Pac. Gas & Elec. Co.*, 461 U.S. at 204.

It is well settled that when a federal funding statute expressly gives local authorities

discretion over how to spend federal money, a state law that purports to restrict that discretion is

preempted.  *See Lawrence County v. Lead-Deadwood School Dist.*, 469 U.S. 256, 260–61 (1984)

-59-

(holding that a state law restricting how counties could use federal "payment in lieu of taxes" money for federal properties located within counties' borders was preempted, where federal statute and implementing regulation expressly gave discretion to counties).  The same rule applies here, given the clear intention of Congress and the Department of Education that local school districts receiving the Act's funding have the discretion to decide for themselves which policies, including mask requirements, would best serve the Act's overriding goal of achieving a safe return to in-person instruction.  Congress's choice to vest that discretion with local school districts rather than state governments is a valid exercise of Congress's power under the Spending Clause to impose conditions on the receipt of federal funds, and thus does not raise federalism concerns.  *Lawrence County*, 469 U.S. at 269–70.

Because GA-38 and the TEA Guidance impermissibly interfere with the local discretion expressly allowed by the Act, they are preempted as contrary to federal law and "must yield" under the Supremacy Clause.  *See Felder*, 487 U.S. at 138; *Pac. Gas & Elec. Co.*, 461 U.S. at 204.

### 3.     The Rescue Act preemption claim arises under the Court's well-established equitable power to enjoin unlawful actions by state officials.

Plaintiffs' claim for preemption under the Rescue Act is properly before this Court, not because of any private right of action under that statute, but instead based on the well-established and longstanding equitable power of the Court to enjoin unlawful actions by state officials.  *See Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327 (2015) ("[W]e have long held that federal courts may in some circumstances grant injunctive relief against state officers who are violating, or planning to violate, federal law."); *Ex parte Young*, 209 U.S. 123, 150–51 (1908).

-60-

Unless the federal statute expressly or impliedly precludes such jurisdiction[108] (and the

Rescue Act does not, for the reasons discussed below), a claim that a state law is preempted by a

federal statute gives rise to federal-question jurisdiction in this Court.  "A plaintiff who seeks

injunctive relief from state regulation, on the ground that such regulation is pre-empted by a

federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus

presents a federal question which the federal courts have jurisdiction under 28 U. S. C. § 1331 to

resolve*." Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96, n. 14 (1983).  Plaintiffs' Rescue Act

preemption claim thus falls within this Court's jurisdiction under § 1331, and nothing in the

language of the Act purports to remove that jurisdiction.  *See Verizon Md., Inc. v. Public Serv.*

*Comm'n of Md.,* 535 U.S. 635, 643 (2002) (holding that telecommunications carrier could assert

preemption claim under court's equitable power, where nothing in federal Telecommunications

Act purported to bar or restrict such claims).

As recently explained by the Supreme Court in *Armstrong*, federal courts have the

equitable power to hear and resolve preemption claims asserted by private plaintiffs **unless** the

federal statute at issue shows either expressly or by implication that Congress intended to

preclude such private enforcement actions.  575 U.S. at 327–28.[109]  Unlike the statute at issue in

---

[108] *Cf. Armstrong*, 575 U.S. at 327 ("The power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations.").

[109] Importantly, because Plaintiffs in this case are seeking only equitable relief and not damages, Plaintiffs can assert their preemption claim under the Court's equitable power and do **not** need to show that the Rescue Act itself gives rise to a private right of action.  *See Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) (explaining test for finding a private right of action); *Armstrong*, 575 U.S. at 331–32; *cf. Coastal Habitat Alliance v. Patterson*, 601 F. Supp. 2d 868, 880 (W.D. Tex. 2008) (Yeakel, J.) ("[W]hen a statute does not provide an explicit or clearly articulated right of action in a party, a court may only imply such a right when the statute creates a pervasive legislative scheme governing rights between the plaintiff and defendant classes.").  These are two very different standards.  While Plaintiffs would not be able to assert a private right of action unless the statute expressly or impliedly shows that Congress intended to *create* such a right (*see Sandoval*, 532 U.S. at 286), Plaintiffs can invoke the Court's **equitable** jurisdiction unless the

*Armstrong*, the Rescue Act "does not display any intent to foreclose [such] jurisdiction." *See*

*Verizon Md., Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 647 (2002).  In *Armstrong*, the

Supreme Court cited two reasons for concluding that private plaintiffs could not invoke a federal

court's equitable power to assert their claim that an Idaho Medicaid reimbursement formula was

preempted by the federal Medicaid statute.  Neither of those reasons are applicable to the Rescue

Act.

    First, the Court noted that the Medicaid statute contained express provisions for

administrative enforcement by the Secretary of Health and Human Services.  *Armstrong*, 575

U.S. at 328.  The Court took this express enforcement provision as suggesting Congress intended

to preclude other means of enforcement.  *Id.*; *see Sandoval*, 532 U.S. at 290.  Here, by contrast,

neither the Rescue Act nor the Department of Education's interim final requirements say

anything at all about how the Act's provisions are to be enforced in the event that state officials

impermissibly prevent local school districts from exercising the discretion Congress has given

them to determine the best policies for ensuring a safe return to in-person instruction.  Given the

absence of any statutory indication to the contrary, this Court has the equitable power to enjoin

Defendants' enforcement of GA-38 and the TEA Guidance insofar as they conflict with and

stand as an obstacle to the congressional purpose behind the ARPA.

    The second reason for the *Armstrong* Court's ruling against private enforcement in that

case is also not applicable here.  The *Armstrong* plaintiffs had asked the district court to impose

sweeping affirmative relief by ordering the state to raise its Medicare reimbursement rates

---

statute expressly or impliedly shows that Congress intended to ***preclude*** enforcement by such
means.  *See Armstrong*, 575 U.S. at 327–28.  Thus, when (as here) the statute is silent as to how
or by whom it may be enforced, a claim under the Court's equitable power can proceed.

according to a court-determined formula. 575 U.S. at 323–24. But the Court concluded that because the "sheer complexity" of the rate-setting mandate under the Medicaid statute made it "judicially unadministrable," Congress intended to preclude private enforcement actions in the courts and leave enforcement exclusively to the HHS Secretary. *Id.* at 328–29. Here, by contrast, Plaintiffs are not seeking affirmative relief but instead are merely asking the Court to enjoin Defendants from taking specified enforcement actions against local school districts and school officials who disobey a state regulation that is invalid because it conflicts with federal law. There is nothing complex or judicially unadministrable about this simple and long-established equitable remedy.[110] Thus, the facts and circumstances of this case are distinguishable from *Armstrong* and fully support this Court's exercise of its equitable power to resolve Plaintiffs' Rescue Act preemption claim.

### E.    An injunction is necessary to protect Plaintiffs from further harm and is in the public interest.

As GA-38 violates and is preempted by federal law, the Could should enjoin Defendants and their agents from enforcing or giving any effect to the provisions of GA-38 prohibiting public schools or school district from requiring masks for their students, staff, and others on their campuses.

The balance of the harm, the equities at issue, and the public interest all weigh in favor of an injunction. As detailed above, Plaintiffs' medical conditions place them at increased risk of either contracting COVID-19 and/or experiencing severe symptoms from the virus. As a result, Plaintiffs have lost and will continue to lose the opportunity to attend and have meaningful access to public school in person without an injunction. In addition, courts presume that a

---

[110] *See Armstrong*, 575 U.S. at 327 ("The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England.").

violation of a civil rights statute is an irreparable harm.  *See Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir. 2001) ("[W]here a defendant has violated a civil rights statute, we will presume that the plaintiff has suffered irreparable injury from the fact of the defendant's violation."); *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1423 (11th Cir. 1984) ("[I]rreparable injury may be presumed from the fact of discrimination and violations of fair housing statutes.").

Moreover, an injunction will not cause any harm to Defendants because complying with federal law is "no hardship" and is in the public interest. *Mitchell v. Pidcock*, 299 F.2d 281, 287 (5th Cir. 1962).  It is also in the public's interest to inhibit the spread of COVID-19 and the devastation it is wreaking in Texas, among both school-aged children and their families, particularly for the safety of disabled children.  And it is in the public's best interest for its school districts to have full authority to respond to the needs of its citizenry by considering county-wide infection and hospitalization rates, available resources, vaccination rates, public opinion, and the number of other factors that guide public policy during a pandemic.

Accordingly, an injunction enjoining Defendants and their officers, agents, servants, employees, and attorneys—and others who are in active concert or participation with Defendants—from implementing, giving any effect to, issuing any guidance adopting, imposing any fines, or withholding any funding in connection with, or bringing any legal actions to enforce Paragraphs 3(b), 3(e), 3(g), and 4 of GA-38 as to public schools or school districts is necessary to prevent further harm and is in the public interest.

## IV.     CONCLUSION

For the reasons stated above and based on the evidence and arguments Plaintiffs will provide at trial, Plaintiffs should prevail on each of their claims.

Dated: September 29, 2021

Respectfully submitted,

_____
Thomas M. Melsheimer
Texas Bar No. 13922550
tmelsheimer@winston.com
Scott C. Thomas
Texas Bar No. 24046964
scthomas@winston.com
Alex Wolens
Texas Bar No. 24110546
John Michael Gaddis (*pro hac vice*)
Texas Bar No. 24069747
William G. Fox, Jr.
Texas Bar No. 24101766
**WINSTON & STRAWN LLP**
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

Brandon W. Duke (*pro hac vice*)
Texas Bar No. 240994476
bduke@winston.com
**WINSTON & STRAWN LLP**
800 Capitol St., Suite 2400
Houston, TX 77002
(713) 651-2600
(713) 651-2700 (fax)

Dustin Rynders (*pro hac vice*)
Texas Bar No. 24048005
drynders@drtx.org
**DISABILITY RIGHTS TEXAS**
1500 McGowen, Suite 100
Houston, TX 77004
(713) 974-7691
(713) 974-7695 (fax)

L. Kym Davis Rogers
Texas Bar No. 00796442
krogers@drtx.org
**DISABILITY RIGHTS TEXAS**
1420 W. Mockingbird Lane, Suite 450
Dallas, TX 75247
(214) 845-4045
(214) 630-3472 (fax)

Robert Winterode (*pro hac vice*)
Texas Bar No. 24085664
rwinterode@drtx.org
**DISABILITY RIGHTS TEXAS**
2211 E. Missouri, Suite 243
El Paso, TX 79903
(210) 424-9652
(915) 542-2676 (fax)

Peter Hofer
Texas Bar No. 09777275
phofer@drtx.org
Brian East
Texas Bar No. 06360800
beast@disabilityrightstx.org
**DISABILITY RIGHTS TEXAS**
2222 West Braker Lane
Austin, TX 78758
(512) 407-2745
(512) 454-3999 (fax)

**ATTORNEYS FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system on September 29, 2021.

*/s/Thomas Melsheimer*
Thomas Melsheimer

-66-